*Quinda Beeson v. Safeco Insurance Company of America,*

Case No. 20-CIV-327-SLP,

United States District Court for the

Western District of Oklahoma

Expert Report of Mort G. Welch

November 30, 2021

1

**EXHIBIT 1**

**Q. BEESON_M. WELCH 00001**

## TABLE OF CONTENTS

I.  Education..................................................................................................6

II. Experience And Qualifications...................................................................6

    A.  History of Practice...........................................................................6

    B.  Insurance Practice...........................................................................8

    C.  Published Decisions........................................................................10

    D.  Teaching Experience.......................................................................10

III. Prior Testimony.......................................................................................11

IV. Compensation..........................................................................................12

V. Documents Reviewed...................................................................................12

VI. Exhibits................................................................................................13

VII.   National Standards For Adjustment of Insurance Claims.............................13

    A.  Investigation Standards....................................................................14

    B.  Documentation Standard...................................................................23

    C.  Communication Standard..................................................................25

    D.  Insurer's Knowledge of Applicable Law................................................26

        1.  The Beeson Policy.....................................................................27

Q. BEESON_M. WELCH 00002

2.  Which State's Law Applies To Determine Validity And Construction Of

The Beeson Policy?..................................................................30

3.  The Colorado UM/UIM Statute................................................35

4.  Case Law Does Not Allow Setoffs Or Reductions Of The Amount

Of Recoverable Damages Under UM/UIM Coverage...........................40

5.  Oklahoma Insurance Department Regulation Prohibits Reduction of

UM Recovery Because Of Health Insurance......................................41

6.  Limitations On Subrogation And Reimbursement Against

UM/UIM Recovery..................................................................43

7.  The Collateral Source Rule......................................................48

8.  Elements Of Recoverable Damages............................................53

E.  Evaluation Standard.................................................................56

F.  Negotiation Standard................................................................62

G.  Internal Insurance Company Standards..........................................64

VIII.    Mrs. Beeson's Medical Evaluation And Treatment.......................66

IX.  The Adjustment of Quinda Beeson's UM And Medical Payments Claims...........74

X.  Violation Of Standards...............................................................102

A.  Failure To Consider Choice Of Law Issues.......................................102

3

B. Low Ball Offer..................................................................................104

C. Failure To Evaluate All Elements Of Potentially Recoverable Damages.........108

   1. Improper Application of 12 O.S. § 3009.1 To Reduce The Amount Of

      Mrs. Beeson's Special Damages....................................................108

      a. Failure To Consider Whether The Colorado Collateral Source Rule

         Applied To The Evaluation Of Mrs. Beeson's Special Damages...........109

      b. Section 3009.1 By Its Express Terms Does Not Apply To The Judgment

         Of A UM/UIM Claim................................................................115

      c. Assuming Section 3009.1 Can Be Applied Outside The Trial Of A Civil

         Action, Safeco Did Not Comply With The Requirements To Allow

         Consideration Of The Amounts Paid To Mrs. Beeson's Healthcare

         Providers............................................................................120

      d. The Only Oklahoma Supreme Court Decision To Interpret

         Section 3009.1....................................................................122

   2. Failure To Document Each Element Of General Damages Included In

      The Evaluation........................................................................124

   3. Failure To Include The Cost Of Possible Future Medical Treatment In

      The Evaluation........................................................................125

Q. BEESON_M. WELCH 00004

4.  Failure To Evaluate Future Pain And Suffering As An Element Of

General Damages..............................................................129

5.  Failure To Evaluate Permanence Of And Disability From Injury............132

a.  Failure To Consider That The UM/UIM Coverage Provisions Of The

Beeson Policy Do Not Authorize The Application Of Section 3009.1....133

b.  Failure To Consider Colorado UM/UIM Statute Prohibits Reduction

In Special Damages.......................................................134

c.  Failure To Consider Oklahoma Insurance Department Regulation

Prohibiting Reduction of UM Coverage Because Insured Has

Health Insurance.........................................................135

d.  Failure To Consider Oklahoma And Colorado Case Law

Prohibit Reduction Of The Amount Of Recoverable UM/UIM

Benefits By The Amount Paid By Collateral Sources...............136

D.  Failure To Investigate Whether United Healthcare/OPTUM Had A

Viable Subrogation Or Reimbursement Claim Under Colorado Or

Oklahoma Law.................................................................137

Q. BEESON_M. WELCH 00005

Dear Mr. Rowe:

This report is submitted pursuant to Rule 26(a)(2)(b), Federal Rules of Civil Procedure, in my capacity as an expert witness for your client, the plaintiff Quinda Beeson. I will refer to her as Mrs. Beeson. I will refer to the defendant as Safeco. Unless otherwise indicated all bates stamped documents cited and quoted are designated as Safeco documents.

## I.  Education.

I received a Bachelor of Arts degree with Special Distinction from the University of Oklahoma in 1972 where I was a member of Phi Beta Kappa and a "Big Man On Campus". I received a Juris Doctorate degree from the University of Texas School of Law in 1975 where I received the American Jurisprudence Award for highest grade in two courses.

## II.  Experience And Qualifications.

### A.  History of Practice.

I have been continuously engaged in the practice of law since 1975. I was employed in 1975 and 1976 by a general practice law firm, Johnson and Davis, in Harlingen, Texas. From 1976 to 1978, I was an associate with Cooper, Stewart, Elder and Abowitz, in Oklahoma City, a civil litigation firm which handled many cases on behalf of insurers and their insureds, and to a lesser extent injured persons. In 1978 I was a co-founder of Abowitz and Welch, and was a shareholder in this law firm, later known as Abowitz, Welch and Rhodes, until 1995. In

6

Q. BEESON_M. WELCH 00006

1995, I was a sole practitioner.  In 1996 I formed another law firm, Welch, Jones & Smith, P.C., with current Associate Dean at the Oklahoma City University Law School Laurie W. Jones and Sherry L. Smith.  This firm became Welch and Smith, P.C. in 2000, and continues to this day.

I was a member of the State Bar of Texas from 1975 when first admitted to practice law.  I have been a member of the Oklahoma Bar Association since 1976. I am admitted to practice in the United States District Courts for the Western and Northern Districts, the Tenth Circuit Court of Appeals, and the United States Supreme Court. I have also been admitted to practice *pro hac vice* in several state and federal trial and appellate courts in Arizona, Arkansas, California, Illinois, Iowa, Kansas, Missouri, New Jersey, New Mexico, Ohio, Pennsylvania and Texas.

I am a member of Insurance Section of the Oklahoma Bar Association.  I am a former member of the International Association of Defense Counsel, the American Bar Association, and the Oklahoma Association of Defense Counsel.  I have been selected for inclusion in *SuperLawyers* on the subject of insurance coverage for the State of Oklahoma for 13 consecutive years, and have been AV rated by Martindale-Hubbell for over 30 years.

Q. BEESON_M. WELCH 00007

**B. Insurance Practice.**

My practice consists in part of civil litigation of all types, including insurance coverage claims of all sorts and insurance bad faith cases for insureds and insurers. My practice also includes advising insurers, insureds, lawyers and public adjusters on insurance coverage issues and claims. This advice has resulted in the preparation of an estimated thousand or more written opinions concerning a wide variety of issues arising as a result of claims made under insurance policies. I also have reviewed and approved preparation of numerous coverage opinions by other lawyers under my supervision.

I have evaluated liability and damages in hundreds of cases, more than half of which were cases based upon bodily injury or death. Through my experience in insurance litigation, as an advisor to insurers, insureds, lawyers and public adjusters, and as a drafter of insurance coverage policy provisions, I have addressed issues under umbrella and excess liability and property insurance policies, workers compensation and employer liability policies, motor carrier policies, personal and business auto policies, homeowners and farmowners policies, individual and group life, health, accident and disability policies and certificates, professional liability policies, directors and officers liability and corporate indemnification policies, commercial general liability and property coverage policies, inland marine floater policies, crime policies, builders risk policies, and reinsurance contracts.

I have supervised hundreds of investigations of insurance claims. I also have personally conducted some such investigations when the expense was deemed warranted by a client. I

8

have trained adjusters and their supervisors concerning claims investigation techniques and procedures, the construction and interpretation of insurance policies, evaluation of claims, and standards for claims handling intended to comply with the covenant of good faith and fair dealing, and with insurance case and statutory law. I have evaluated thousands of claim files, including uninsured motorist claim files, for insurers and insureds (and their lawyers) to determine if the files include all information appropriate to make a determination concerning coverage, liability, and damages or losses, whether the investigation and handling of the claim is consistent with the applicable law, the obligations of good faith and fair dealing, and insurance industry standards. In addition, I have qualified as an expert witness on a wide variety of coverages. Some of these cases are identified in Section III, *infra*.

I participated in drafting the anti-stacking provisions of auto uninsured motorist (UM) coverage subsequently upheld by the Oklahoma appellate courts in <u>Withrow v. Pickard</u>, 905 P.2d 800 (Okla. 1995); <u>Breakfield v. Oklahoma Farmers Union Mut. Ins. Co.</u>, 910 P.2d 991 (Okla. 1995); and <u>Kinder v. Oklahoma Farmers Union Mut. Ins. Co.</u>, 943 P.2d 617 (Okla. 1997).

I have drafted and revised many other types of clauses for use in various insurance policies, including auto, homeowners, farmowners, dwelling, commercial lines, insurance agent's professional liability, commercial general liability, commercial property, and umbrella and excess liability coverages. I have prepared drafts of entire business and personal auto policies.

Q. BEESON_M. WELCH 00009

I have presented client positions on insurance coverage issues to the Oklahoma Insurance Department (OID) and advised OID informally on insurance coverage issues.  I have participated in drafting proposed legislation relating to insurance in Oklahoma and Idaho, including an amendment to the Oklahoma Declaratory Judgment Act, 12 O.S. §1651, to permit declaratory judgments concerning issues arising under liability insurance policies, effective November 1, 2004.  This amendment brought Oklahoma declaratory judgment law in line with the law of the vast majority of states and with the Federal Declaratory Judgment Act.  I also participated in the revision of the motor vehicle insurance laws in Title 47 of the Oklahoma Statutes contained in Senate Bill 1161, which was passed by the first regular session of the 2009 Legislature.

### C.  Published Decisions.

See attached Exhibit 1 for list of cases.

### D.  Teaching Experience.

I have lectured and prepared seminar materials for continuing legal education programs sponsored by Oklahoma Bar Association (OBA), Oklahoma Association of Defense Counsel, Oklahoma Trial Lawyers Association, University of Oklahoma School of Law, Oklahoma City University School of Law, and The Conference on Consumer Finance Law.  These presentations have been approved as continuing education programs for Oklahoma lawyers, Oklahoma, Texas and California adjusters, and Oklahoma insurance agents.  Selected titles

Q. BEESON_M. WELCH 00010

include: *Allocation of Fault-Identifying All Angles*, OBA CLE (Feb. 1989); *Identifying and Using Insurance Coverages Commercial Liability*, OBA CLE (Feb. 1990); *Documenting the Agreement*, OBA CLE (Dec. 1991 and Mar. 1995); *Replacement Cost Property Insurance Coverage Without Replacement: Coblentz v. Oklahoma Farm Bureau Mut. Ins. Co.*, The Conf. on Cons. Fin. Law (Dec. 1996); *There are Many People Who Want Your Client's UM Money: Pitfalls in the Settlement of UM Claims*, OBA & Oklahoma Insurance Department approved CE (Oct. 2009); *Substantial Certainty Tort Claims By Injured Employees Against Their Employers: What Workers Compensation Professionals Should Know*, 11th Annual Spring Insurance Update Seminar (April, 2010, Oklahoma City/Dallas), an Oklahoma Insurance Department approved CE; and *Basic Elements of Auto Liability Coverage and Case Law Restrictions, What Must be Proved to Prevail on a UM Claim, The Interface Between Auto Liability and UM Coverages when the Claim's Value Potentially Exceeds the Liability Coverage Limit*, Last Minute Continuing Legal Education (Leflore County Bar Ass'n. Dec. 16, 2010). I was program planner and moderator for the OBA and Oklahoma Insurance Department approved CE seminar, *What The Other UM Seminars Didn't Tell you: How To Settle And (If All Else Fails) Try UM Cases* (Oct. 2009).

I also have served as an adjunct professor at the Oklahoma City University School of Law.

## III. Prior Testimony.

See attached Exhibit 2 for cases in which I testified as an expert witness.

Q. BEESON_M. WELCH 00011

## IV.  Compensation.

I am charging your firm $295.00 per hour for my services as an expert witness on behalf of your client in this case.

## V.  Documents Reviewed.

I reviewed the following documents prior to the preparation of this interrogatory response:

1.  Documents filed in *Beeson v. Safeco Ins. Co. of America*, Case No. 20-CV-327-SLP, United States District Court for the Western District of Oklahoma;

2.  Documents produced in discovery but not filed as exhibits in *Beeson v. Safeco*, including a partial copy of claim notes for Mrs. Beeson's claim under the UM coverage of her auto policy issued by Safeco, letters, faxes and emails in the claim file, medical records of Mrs. Beeson in the claim file, and excerpts from Safeco/Liberty Mutual claim handling materials used for handling bodily injury, including uninsured motorist (UM) claims;

3.  Colorado Private Passenger Auto Policy issued to Mrs. Beeson and her husband, Robert Beeson, by Safeco effective February 15, 2017 to February 15, 2018 but cancelled July 7, 2017;

4.  Insurance industry and governmental publications, actual and model insurance statutes and regulations, case law, and secondary insurance, legal and medical resources; and

5.  Transcript of deposition of one of the adjusters assigned to Mrs. Beeson's UM claim, Barbara Myers, and of plaintiff Quinda Beeson.

Q. BEESON_M. WELCH 00012

If I am furnished additional documents, any deposition transcripts or other sources of information after the date of this report, I reserve the right to supplement this report based upon information obtained after the date of this report, with permission of the Court if required.

## VI. Exhibits.

I anticipate using one or more of the documents identified in Section V.

## VII.   National Standards For Adjustment of Insurance Claims.

National standards exist which are generally applicable in the insurance claims adjustment industry, regardless of the type of policy under which a claim is made and regardless of the status of the person making the claim, i.e. whether a person is a first party or a third party claimant.  Standards also exist more specifically applicable to first and third party bodily injury claims including UM claims under motor vehicle policies.[1]  These standards are identified in claims handling insurance literature, model legislation prepared by the National Association of Insurance Commissioners (NAIC), case law which incorporates specific insurance industry standards, and standards which are known to me from my experience over 45 years as described in Section II, *supra.*

---

[1] Mrs. Beeson is a first party claimant because she made a claim directly for payment of benefits under the UM coverage of the auto policy issued by Safeco.

13

National standards serve an important goal of establishing consensus understanding of what good claims handling practices are.[2]  The identification and publication of consensus standards serves to protect both first and third party claimants from "unscrupulous, unethical or poorly trained adjusters who are looking for ways to deny a claim, as opposed to simply conducting the evaluation" of the claim.[3]  The NAIC developed model legislation which has as its purpose "to set forth standards for the investigation of claims arising under policies and certificates."[4]

### A.  Investigation Standards.

The insurance industry and its regulators recognize that investigation of any insurance claim must be thorough, timely, fair and balanced, taking into account not only the insurer's interest in making a profit from the sale of insurance, but also the interest of the insured/claimant to be compensated for a loss under a policy for which he/she (or a third party) has paid a premium.  To accommodate these interests, insurance companies must give equal consideration to the interests of the insureds/claimants as they do to their own interests.[5]

---

[2] *See e.g.,* Douglas Howser, *The Unfair Claims Settlement Practices Act,* 15 THE FORUM 336 (1979), and James K. Markham et al. *The Claims Environment* at 297 (Ins. Inst. Of Am. 1993) (hereinafter referred to as *Claims Environment*).

[3] Michael T. Murdock, *Claims Operations – A Practical Guide* (Int'l Risk Mgmt. Instit., Inc. 2010) at 129 (herein referred to as *Claims Operations*).

[4] *Model Unfair Claims Settlement Practices Act* §§ 1 & 3 (NAIC 1990) (Model Act).

[5] *See e.g.,* the Introduction to *Claims Handling Principles & Practices* (Am. Instit. For Charter Prop. Cas. Underw. 2006) §§ 2.37 & 5.3 (hereinafter *Claims Handling P&P*); *Claims Operations, supra.,* at 415.  Oklahoma law follows this standard.  *See e.g.,* Magnum Foods, Inc. v. Continental Cas. Co., 36 F.3d 1491, 1504 (10th Cir. 1994) ("[w]hile the insurance company may properly give consideration to its own interest, *it must in good faith, give at least equal consideration to the interests of the*

14

"Implicit in the duty to investigate is the requirement that the investigation be fair and adequate.  Adequacy and fairness means that the insurer has a duty to diligently search for evidence which supports [the] insured's claim and not merely seek evidence upholding its own interests."[6]

An insurer cannot give equal consideration to the interest of an insured/claimant if it treats the insured/claimant as an adversary.  As one industry publication put it, "[t]he adjustment process is not a contest in which either the company or the insured win and the other loses.  This type of attitude creates an adversarial relationship from the beginning which is hard to overcome."[7]  An insurer may not treat its own insured in the manner in which it may treat a third party claimant making a claim against the insured.[8]  For example, a UM insurer may not actively seek to defeat its insured's suit against the alleged uninsured motorist.[9]  Consequently, "good faith investigation requires collection and consideration of facts that are favorable to the position claimed by the insured as well as the position that favors the interest of the insured [sic]."[10]  It is for this reason that burdens of proof of which apply in lawsuits do not apply to the adjustment of first party claims.  As a court observed in a UM bad faith case.  Plaintiff… did not have any burden to prove she was entitled to UM benefits *at the time she*

---

*insured*....") quoting from American Fid. & Cas. Co. v. G.A. Nichols Co., 173 F.2d 830, 832 (10th Cir. 1949) (applying Okla. law – emp. by ct.).

[6] Steven Plitt et al., COUCH ON INS. § 207-25 (3rd ed. 2019).

[7] *The Claims Environment, supra.,* at 299.

[8] This standard is specifically recognized by the Oklahoma Supreme Court: "An insurer may not treat its own insured in the manner in which an insurer may treat third-party claimants to whom no duty of good faith and fair dealing is owed." Newport v. USAA, 11 P.3d 190, 196 (Okla. 2000), *reaffirmed in* Badillo v. Mid-Century Ins. Co., 121 P.3d 1080, 1093 (Okla. 2005), and Hensley v. State Farm Fire & Cas. Co., 398 P.3d 11, 19 n.22 (Okla. 2017).

[9] Brown v. Patel, 157 P.3d 117, 130 (Okla. 2007).

[10] Barry Zalma, 2 *Insurance Claims: A Comprehensive Guide* at 861 (1st ed. 2015) (hereinafter *Ins. Claims*).

15

*field her claim.* The case law does not require that she prove anything before triggering State Farm's duty to investigate, evaluate and pay her UIM claim...".[11] These basic principles should be adhered to in the most important part of the processing of a claim, its investigation.

Insurance industry training materials illustrate just how important the investigation of the claim is:

> Claims investigations are critical and represent the foundation of the evaluation and assessment of a claim.  The key to a proper evaluation is to review all of the investigation and documentation material and then summarize the key elements of the claim in terms of liability and damages.  The claim investigation serves as the basis for the coverage analysis and evaluation of the claim.  **If the investigation is inadequate or incomplete, then the evaluation may be flawed or incorrect.**[12]

As this quotation makes clear, the industry recognizes that an adequate and timely claim investigation is intrinsic to an insurer's duty to timely pay a valid claim.[13]  "Timely investigation is necessary of all aspects of the claim is," as the Liberty/Safeco <u>Claims Handling Guidelines</u> state, critical to setting accurate reserves." (1808).  The NAIC's Model Act also encourages insurance companies to "adopt and implement reasonable standards for the prompt investigation and settlement of claims arising under its policies".[14]  In my experience many insurers do adopt such standards.  If a claim is not paid or denied and an

---

[11] <u>Peden v. State Farm Mut. Auto. Ins. Co.</u>, 2018 WL 3496735 at *2 (D. Colo. July 20, 2018) (emp. by ct.).

[12] *Claims Operations, supra.,* at 115 (emp. add.).  See also p. 155 and NAIC 900-1, Model Act § 4.F (claim denials should not be made "without conducting a reasonable investigation").  This standard has been incorporated into Oklahoma law: "[t]o determine the validity of the claim, the insurer must conduct an investigation reasonably appropriate under the circumstances." <u>Buzzard v. Farmers Ins. Co. Inc.</u>, 824 P.2d 1105, 1109 (Okla. 1991).

[13] *See e.g., Claims Handling P&P, supra.,* § 525 and *Claims Operations, supra.,* at 109-110.

[14] Model Act § 4C.

Q. BEESON_M. WELCH 00016

insured sues the insured for payment, the insurer has a continuing duty to investigate a first party claim.[15]

Of course, an investigation must be tailored to the nature of the claim.  The kind of information necessary to evaluate a claim for damage to insured property is not the same as the information necessary to investigate a claim under the UM coverage of the Beeson policy. The investigation may involve the interpretation of policy language, liability under the coverage, the statutes and regulations applicable to the policy and court decisions, or of the benefits which are payable under the coverage.  Documents which I consider to be claims handling directions or instructions created by Safeco have been produced which provide some guidance on the investigation of bodily injury claims generally and UM claims specifically. Nevertheless, certain principles of investigation generally apply regardless of the type of claim.

It is a standard practice to identify claims for which additional assistance is needed from experts to address issues which have arisen in the course of investigation or evaluation of the

---

[15] See e.g., Fullbright v. State Farm Mut. Auto. Ins. Co., 2010 WL 274217 at 83 (W.D. Okla. Jan. 15, 2010) (having authorized the deposition of an insurer's corporate representative on the UM claim after the insured sued the insurer for bad faith delay in payment of the claim, the court concluded that "Plaintiffs may conduct discovery regarding processing and investigation of their claim by the adjuster or adjusters who replaced [the initial adjuster]" after suit was filed; Morgan v. Valley Ins. Co., 2009 WL 3755076 at *3 (W.D. Okla. Nov. 5, 2009) ("activities of Defendant in the nature of the continuation of claim evaluation, processing, and payment or non-payment post-litigation will be generally deemed admissible"); Butterfly-Biles v. State Farm Life Ins. Co., 2010 WL 346838 at *3 (N.D. Okla. July 17, 2014); Morrison v. Chartis Prop. Cas. Co., 2014 WL 840592 at *2 (N.D. Okla. March 4, 2014); and Stroud v. Liberty Mut. Ins. Co., 2016 WL 10038543 at *1 (N.D. Okla. April 7, 2016).

Q. BEESON_M. WELCH 00017

particular claim.[16]   For example, where interpretation of a policy is an issue, "before major claim decisions are made, claims representatives will want legal opinions on coverage...."[.17] For UM claims insurers must recognized that the courts have produced an extensive body of case law which addresses a multitude of issues which arise in processing UM claims.   Advice of counsel may be needed to determine if case law exists addressing a particular issue which has arisen in the course of processing a UM claim.   In my experience the failure to obtain good advice of competent Oklahoma counsel about UM claims has cost insurers millions of dollars.

Analysis of projected loss of earning capacity may require consultant economists be hired. In catastrophic injury claims, vocational rehabilitation consultation may be advisable.   For claims in which liability is at issue it may be advisable to hire an accident reconstructionist. For third party and first party bodily injury claims medical consultants may be needed to assess the nature of the claimant's condition, the cause of the condition, appropriate treatment past and future, and estimated cost of future treatment.[18]   Sometimes a review of the claimant's medical records is sufficient.   On other occasions the consultant may be requested to conduct an examination of the claimant.   Safeco utilizes an outside vendor to arrange for

---

[16] See e.g., *Managing Bodily Injury Claims* (Am. Instit. For Charter Prop. Cas. Underw./Ins. Instit. Of Am. 2d ed. 2001) at 2-14; *The Claims Environment, supra.,* at 20-22.

[17] *The Claims Environment, supra.,* at 21.

[18] The failure to consult a medical expert either to examine the claimant or review her records has been found to violate industry standards.  See e.g., Peden v. State Farm Mut. Auto. Ins. Co., 841 F.2d 887, 893 (10th Cir. 2016) (Colo. law – failure to have medical consultant conduct IME or review insured's medical records); Thompson v. State Farm Mut. Ins. Co., 457 F.Supp. 998, 1004-1005 (D. Colo. 2020) (failure to obtain expert advice on whether insured's fatal overdose of medication prescribed for pain caused by injuries sustained in accident); Sterling v. Provident Life & Acc. Ins. Co., 619 Fed.Supp.2d 1241, 1253 (M.D. Fla. 2009) (failure to have IME conducted); and Valdez v. Allstate Ins. Co., 2008 WL 3916017 at *5 (D. Ariz. Jan. 29, 2008) (failure to have plaintiff's psychological condition evaluated).

Q. BEESON_M. WELCH 00018

review of medical records by medical consultants as will be discussed in more detail in section IX., *infra*.

Experts of course should be qualified to address the issue in question, and should be truly "independent".[19]   Like reliance on other deficient aspects of investigation, reliance on the opinions of unqualified, uninformed or biased professionals creates a risk that the ultimate decision regarding a particular claim will be incorrect, and clearly is not consistent with industry standards applicable to the investigation of claims.[20]

Proper claims investigation may also require a claims representative to identify potential human sources of factual information necessary to properly evaluate a claim, including the person making the claim.   For example, if a question exists concerning whether an alleged uninsured motorist was at fault in causing an accident, it may be advisable to interview the alleged uninsured motorist and any witnesses to the accident.[21]   The uninsured motorist also can identify any applicable auto liability insurance.   Interviewing these sources, including the claimant, can provide significant information about liability and damages.[22]     Thus,

---

[19] 2 *Ins. Claims, supra.,* at 1185-86.

[20] The Supreme Court's decision in <u>Barnes v. Oklahoma Farm Bur. Mut. Ins. Co.</u>, 11 P.3d 162, 171-174 (Okla. 2000) illustrates the potential adverse consequence of an insurer's reliance on its expert's advice.

[21] See e.g., <u>Peden v. Allstate</u>, *supra.*, 841 F.3d at 892-93 (failure to interview UM insured, an occupant of underinsured vehicle, and other passengers concerning whether they knew driver was drunk when they got in vehicle, and accepting driver's statement they did know he was drunk, was evidence of deficient investigation).

[22] See e.g., *The Claims Environment, supra.,* at 46 ("The basic purpose of a statement is to gather information in a logical and orderly fashion so that claims representatives can make decisions necessary for the disposition of claims.").

Q. BEESON_M. WELCH 00019

"statements are a necessary component of the investigation process" in many circumstances.[23] The Liberty/Safeco Claims Handling Guidelines emphasize "[s]tatements of involved parties and witnesses are necessary to establish liability; and suggest adjuster [p]robe for detailed injury information when talking to claimant...". (1807 – See also 1855).

Recording of a statement, or even the taking of contemporary notes of what it said in the statement, can head off future disputes concerning exactly what was said during the course of the recording.[24]  Moreover, by scheduling an interview of the claimant/insured, an adjuster can also take the opportunity to explain what the particular policy requires to establish a covered claim, and assist the claimant/insured if needed in getting such information.[25]

In my experience claims based on bodily injury require access to healthcare provider bills and records and may require asking questions of providers who treated the claimant, such as to clarify statements in the records or to address issues not identified in the records.  Because bodily injury claims usually involve some intangible damages, such as physical and mental pain and suffering, in my experience it is important to look for descriptions of pain in medical and hospital records and to interview the claimant to assess how he/she articulates pain and suffering and whether it may have causes unrelated to the incident involved in the claim.  If the claimant asserts a loss of earnings as an element of damage it may be necessary to obtain employment records directly from current and previous employers.  The Claims Handling

---

[23] *Claims Operations, supra,.,* at 118.  See also *Ins. Claims, supra.,* at 425-426.
[24] *See e.g., The Claims Environment, supra.,* at 46.
[25] See e.g., 1 *Ins. Claims, supra.,* at 384-385.

20

<u>Guidelines</u> require adjusters to "[o]btain medical records, including prior records when necessary, and loss of earnings documentation." (1807).

Insurers have access to data bases showing previous insurance claims by the claimant. Depending on the nature of the previous claim, it may be appropriate to seek further information about a particular previous claim. Similarly, if the claimant received treatment prior to the accident in question for a condition he/she currently asserts was caused by the accident, it may be appropriate to obtain records of the prior treatment and to interview the claimant about the prior treatment and injuries.

UM claims are unique to the extent that claims personnel who handle these claims must know whether the allegedly at-fault driver was insured and, if so, what is the applicable limit of liability, i.e. maximum amount of liability insurance. Consequently, the <u>Claims Handling Guidelines</u> instruct that all potential sources of applicable bodily injury coverage be investigated and the liability insurers contacted to verify how much bodily injury liability coverage exists (1816, 1854). The <u>Claims Handling Guidelines</u> also require the adjuster to determine if the Collateral Source Rule applies and to investigate other sources of payment of some or all of the insured's damages (1854).

Most policies contain provisions which allow the insurer to obtain information in the course of an investigation of a claim. For example, **PART E – DUTIES AFTER AN**

Q. BEESON_M. WELCH 00021

ACCIDENT OR LOSS in the Beeson policy states in pertinent part: "**B.** A person seeking any coverage must: **1.** Cooperate with us in the **a.** Investigation…. **3.** Submit, as often as we reasonably require **a.** to physical examinations by physicians we select…. **b.** to examination under oath and subscribe the same…. **4.** Authorize us to obtain: **a.** medical reports; and **b.** other pertinent records." (56).

Sometimes an adjuster cannot obtain cooperation from an insured/first party claimant. However, if the insurer can obtain information from sources other than the insured, a first party claim should not be denied and closed for lack of cooperation.[26]  After all, "[t]he insurance adjuster knows better than an insured what is needed to prove a claim."[27]  Since the insurer is the contracting party which has the responsibility to investigate a claim made under a policy, the insurer should not try to shift that responsibility to the claimant/insured, particularly when the insurer already has the means to obtain information about the claim.[28]

This is not to say the insurer cannot request the claimant, including a claimant represented by counsel, to provide pertinent information.  The insurer always has the right to insist the claimant and his/her representative reasonably cooperate in the investigation.  Any lack of

---

[26] See e.g., 2 *Ins. Claims, supra.*, at 867-868.
[27] 2 *Ins. Claims, supra.*, at 863.
[28] Courts have condemned this practice as well. *See e.g.*, Christie v. State Farm Mut. Auto. Ins. Co, 2015 WL 4755836 at *8 (E.D. Okla. Aug. 11, 2015) ("[D]espite having apparently valid medical authorizations in its possession, State Farm continually requested new medical authorizations be submitted, and continually requested Plaintiff's counsel provide a narrative report instead of simply requesting it directly from Dr. Browne"; and State Farm also "repeatedly requested Plaintiffs' counsel provide an estimate of the cost of knee replacement surgery, even though it arguably should have been able to arrive at a reasonable estimate of such cost on its own").

Q. BEESON_M. WELCH 00022

such cooperation should be documented in the claim file, and the claimant informed of any policy provision requiring cooperation.[29] The Casualty, UM UIM SOP directs the adjuster to "point to the policy language for the duties owed after a loss." (1855). If the requested information is not provided to the insurer, the claims representative must seek out other sources of pertinent information. If the information cannot be obtained from third party sources, the insurer should inform the claimant that the investigation cannot be completed due to the claimant's failure to cooperate.

### B. Documentation Standard.

Proper claims handling requires adequate documentation.[30] This is because "[t]he claim file is the basic foundation on which all claims are resolved."[31] Significant actions taken on a claim should be documented, and should include a description of communications with other persons, the actions taken by claim representatives, and other documents pertaining to a claim, including dates and identification of persons participating in material events both for the insurer and third parties.[32] The file should include any letters or other mode of communication between claim a representative and other persons, including the claimant or his/her legal representative. All documents obtained from outside sources, as well as

---

[29] See e.g., Bryant v. Sagamore Ins. Co., 597 Fed. Appx. 968, 972-73 (10th Cir. 2015) (in affirming summary judgment for insurer in bad faith case on ground of insured's failure to cooperate, Court noted insurer's efforts to gain cooperation, including sending "reservation of rights letters… noting his continued failure to respond to other inquiries, explaining that the policy required his cooperation, quoting in full the policy's language requiring cooperation").

[30] See e.g., Claims Operations, supra., at 123-124.

[31] 1 Ins. Claims, supra., at 656.

[32] See e.g., Steven Plitt, The Claim Adjuster's Automobile Liability Handbook § 6.16.A(1); 1 Ins. Claims, supra., at 590-92 & 659-660.

23

Q. BEESON_M. WELCH 00023

generated by claim representatives, should be in the claim file. Photos, videos and audible recordings should be in the file.

"The claim file should [also] reflect the thought processes that were followed in the investigation of the claim. Whatever process was used to arrive at the conclusions or opinions concerning coverage or payment should be included in the file".[33] This aspect of the standard is particularly important. For example, because of an insurer's duty to timely make an offer (or denial) of payment after investigation of a UM claim, it is very important that the claim file show how the adjuster arrived at the dollar amount for each element of recoverable damages, and why some elements of damage may not have been included in the calculations used to arrive at a total sum of damages.

"[A]ll claim activities documented in the claim file notes need to be clear so that any person reviewing the claim file will know the status of the investigation and the adjustment of the claim".[34] In my experience, insurer internal claims handling standards require claims supervisors to periodically review claim files for a variety of reasons (although the Safeco claims handling documents I received do not address this subject). The law in many states likewise requires insurance regulators to audit claim files.[35] Therefore, proper documentation "can serve as excellent evidence that [an adjuster] handled a claim with dispatch, providing timely and continual communication", and will provide evidence of good faith claims

---

[33] 1 *Ins. Claims, supra.*, at 662-63.
[34] *Claims Operations, supra.*, at 123.
[35] *See e.g.*, 36 O.S. § 1250.4(A): OKLA. ADMIN. CODE § 365:15-3-3(a); 1 *Ins. Claims, supra.*, at 656.

Q. BEESON_M. WELCH 00024

handling and competency of the claim representative.[36]  Ultimately, the purpose of adequate documentation is, as the NAIC has stated, to provide "[d]etailed documentation... in each claim file in order to permit reconstruction of the insurer's activities relative to each claim."[37]

## C. Communication Standard.

Prompt and clear communications by the insurer with the claimant/insured, his/her representatives, and relevant third parties is a national standard of claims handling, during both the investigation phase of a claim and at the point when a decision on a claim is made.[38] During the adjustment process, an insurer should keep the insured in a third party claim and the claimant on a first party claim informed of the progressive status of the claim, and explain the claim adjustment process including what is expected of the insured/claimant.  The Model Act as well as statutes and regulations in most every state require insurers to communicate claim decisions within a certain limit to first party claimants, or to advise the claimant that more time is needed to complete investigation of the claim.[39]  Liberty Mutual/Safeco claims handling documents require all communications to comply with timeliness requirements imposed by law.  Claims Handling Guidelines (1806).  Communication of a claim denial must explain why the insurer made its decision, whether to deny a claim or to pay less than the claimant seeks.  For example, "[a]ll coverage declinations should... [e]xplain why and how...

---

[36] Willis Park Rokes, *Aggressive Good Faith and Successful Claims Handling* at 115 (Ins. Instit. of Am. 1987).
[37] Unfair Property/Settlement Claims Settlement Practices Model Regulation § 4.B (NAIC 902-1); and 36 O.S. § 1250.7(A)(C).
[38] *See e.g.,* MODEL ACT § 6.D (insurer to provide necessary forms, instructions and reasonable assistance to permit the claimant/insured to comply with his obligations in the claims handling process).
[39] See Steven Plitt, *Supplementing the NAIC's Model Unfair Claims Settlement Practices Act: Accompanying State Regulations § B(2),* 27 CAL. INS. LAW & REG. RPTR. No. 2 (March 2015).

Q. BEESON_M. WELCH 00025

policy language works to exclude coverage in the subject claim."[40]   Insurers also should provide "a reasonable and accurate explanation for" both claim denials or offers of compromise.[41]

### D. Insurer's Knowledge of Applicable Law.

It is a standard in the insurance claims industry that insurers have knowledge of the law applicable to claims handling, interpretation of policies, and of any state laws which apply to the particular type of claim being investigated, and communicate this information to its claims personnel.[42]   An insurance claims training publication summarizes the standard: "[c]laims professionals should have expert knowledge of insurance policy coverages, the law and determination of damages."[43]   This is because "[i]nsurance claims handling not only involves the proper investigation, evaluation and settlement of claims, but also, and frequently on a daily basis, the interpretation and application of policy provisions."[44]   This industry standard has, in Oklahoma, been followed by the law[45].

---

[40] Bill Wilson, WHEN WORLDS COLLIDE: *Resolving Insurance Coverage & Claims Disputes* at 284 (2018).  The consequences of a failure to specify the grounds for denial can be severe.  See e.g., discussion in Gallegos v. Safeco Ins. Co. of America, 646 Fed.Appx. 689, 694 (10th Cir. 2016).
[41] Model Act § 7.L.
[42] *See e.g.*, Charles Miller, *The Scope of Expert Testimony in Insurance Bad Faith Cases*, 15 CONN. INS. LAW JRL. 2011, 2017.
[43] *The Claims Environment, supra.*, at 12-14.
[44] *The Scope of Expert Testimony in Insurance Bad Faith Cases, supra.*.
[45] *See e.g.*, Timmons v. Royal Globe Ins. Co., 653 P.2d 907, 913-14 (Okla. 1982) ("The insurance company's decision not to defend plaintiff was made on a determination that coverage did not extend to this accident, and was presumably made in the face and knowledge of applicable Oklahoma law. The reasonableness of that decision must be judged in light of the applicable law); Willis v. Prudential Ins. Co. of Am., 50 F.3d 793, 799-800 (10th Cir. 1995) (same statement of principle as quoted from

26

### 1. The Beeson Policy.

I am evaluating Safeco's handling of Mrs. Beeson's UM claim. Therefore, the specific laws about which the adjusters who handle the claims should have knowledge include the terms of the applicable UM statute, and the case law interpreting this statute.

The Beeson policy is entitled **COLORADO ESSENTIAL PERSONAL AUTO POLICY** (28). The DECLARATIONS of the policy identifies the **NAMED INSURED** as "Robert Beeson Quinda Beeson 5548 S. Ireland Way, Centennial, CO 66210-2126" (16). Attached to the policy is a **Colorado private passenger automobile insurance summary disclosure form** (18). As the form states it "is a basic guide of the major coverages and exclusions in your policy." This disclosure form is required by Colorado law, COLO. REV.

---

Timmons); Brown v. Patel, 157 P.3d 117, 122 (Okla. 2007) ("bad-faith actions have been based upon an insurers' failure to follow judicial construction of insurance contracts or available applicable law"); Barnes v. Oklahoma Farm Bur. Ins. Co., 11 P.3d at 171 (Okla. 2000) (insurer did not follow "the law readily available to insurer and its counsel" in its application of the Oklahoma UM statute); Wolf v. Prudential Ins. Co. of Am., 50 F.3d 793, 800 (10th Cir. 1995) (insurer deemed to know that when policy language subject to more than one reasonable interpretation, policy is ambiguous, and ambiguous policy language is to be construed in favor of the insured); Crews v. Shelter Gen. Ins. Co., 393 Fed.Supp.2d 1170, 1178 (W.D. Okla. 2005) (insurer is "charged with knowledge that under Oklahoma law insurer cannot void an insurance policy on the basis of an alleged misrepresentation unless the misrepresentation was made with intent to deceive"); Tomlinson v. Combined Underw. Life Ins. Co., 708 F.Supp.2d 1284, 1295-96 (N.D. Okla. 2010) (claim representatives' lack of understanding of "cancer and dread disease" policy precluded dismissal of bad faith claim); and Stroud v. Liberty Mut. Ins. Co., 2017 WL 10038544 at *2 (N.D. Okla. Oct. 11, 2016) (in denying Liberty's motion "to exclude any reference to their knowledge that a violation of its obligations under the Oklahoma Uniform Jury Instructions (OUJI 22.2) or Oklahoma law renders it amenable to suit", court stated "LM's general's knowledge of its obligations in processing UM claims is plainly relevant to Stroud's action here.")

Q. BEESON_M. WELCH 00027

STAT. (CRS) § 10-4-636(c).  The form content of the disclosure is prescribed by regulation, COLO. ADM. CODE (CAC) § 702-5:5-2-16 Appendix.  The DECLARATIONS describe two vehicles, a 2013 BMW and a 2009 Mercedes.  Coverages include liability, medical payments with a limit of $5,000, uninsured/underinsured motorists with limits of $100,000 per person and $300,000 per accident, and collision (16-17).

**PART C** of the policy is the **UNINSURED/UNDERINSURED MOTORISTS COVERAGE** (43-47).  The **INSURING AGREEMENT** of this part states:

**A.** We will pay damages which an **insured** is legally entitled to recover from the owner or operator of an:

    **1.** **Uninsured motor vehicle**; or

    **2.** **Underinsured motor vehicle**;

Because of **bodily injury**:

    **1.** Sustained by that **insured**; and

    **2.** Caused by an accident.

The owner's or operator's liability for these damages must arise out of the:

    **1.** Ownership;

    **2.** Maintenance; or

    **3.** Use;

Of the **uninsured motor vehicle** or **underinsured motor vehicle**.

We will pay damages caused by an accident with an **underinsured motor vehicle** only if **1. or 2.** below applies:

    **1.** The limits of liability under any applicable bodily injury liability bonds or policies have been exhausted by payment of judgments or settlements; or

28

    **2.** A tentative settlement has been made between an **insured** and the insurer of the **underinsured motor vehicle** and we:

        **a.** Have been given prompt notice of such tentative settlement; and

        **b.** Advance payment to the **insured** in an amount equal to the tentative settlement within 30 days after receipt of notification. (43).

    Words in bold in the policy are specifically defined in it. **Insured** is defined in **PART C** to include "You". Although "You" is not bolded it is specially defined in the **DEFINITIONS** section of the policy. Section **A.1.** defines "you" to include "[t]he 'named insured' shown in the Declarations" (30). Robert and Quinda Beeson are shown in the DECLARATIONS as the named insureds. Therefore, Quinda Beeson is a "You" and an **insured** in **COVERAGE C**. The policy also specially defines "we", "us" and "our" as the company issuing the policy, Safeco. See **DEFINITIONS** § **B** (*Id.*).

    An **underinsured motor vehicle** is defined in **COVERAGE C** section **C.** in pertinent part as:

    A land motor vehicle, the ownership, maintenance or use of which is insured or bonded for bodily injury at the time of the accident but the amount paid is not enough to pay the full amount the **insured** is legally entitled to recover as damages. (43).

    It is obvious that **COVERAGE C** is worded to comply with the Colorado UM/UIM statute, CRS § 10-4-609 which in pertinent part states:

    (1)(a)  No automobile liability or motor vehicle liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle shall be

29

delivered or issued for delivery in this state with respect to any motor vehicle licensed for highway use in this state unless coverage is provided therein or supplemental thereto, in limits for bodily injury or death set forth in section 42-7-103(2), C.R.S., under provisions approved by the commissioner, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom; except that the named insured may reject such coverage in writing.

(b) This subsection (1) shall not apply to motor vehicle rental agreements or motor vehicle rental companies.

(c) The coverage described in paragraph (a) of this subsection (1) shall be in addition to any legal liability coverage and shall cover the difference, if any, between the amount of the limits of any legal liability coverage and the amount of the damages sustained, excluding exemplary damages, up to the maximum amount of the coverage obtained pursuant to this section.  A single policy or endorsement for uninsured or underinsured motor vehicle coverage issued for a single premium covering multiple vehicles may be limited to applying once per accident.  The amount of the coverage available pursuant to this section shall not be reduced by a setoff from any other coverage, including but not limited to, legal liability insurance, medical payments coverage, health insurance, or other uninsured or underinsured motor vehicle insurance.

***

(4) Uninsured motorist coverage shall include coverage for damage for bodily injury or death that an insured is legally entitled to collect from the owner or driver of an uninsured motor vehicle.  An underinsured motor vehicle is a land motor vehicle, the ownership, maintenance, or use of which is insured or bonded for bodily injury or death at the time of the accident.

### 2.  Which State's Law Applies To Determine Validity And Construction Of The Beeson Policy?

Since the Beeson policy was issued to comply with Colorado law and delivered to the Beesons at their Colorado address[46] the question arises concerning whether Colorado law

---

[46] The policy is a renewal of a prior policy.  See January 2, 2017 Safeco-Beeson letter (04), which was sent to the Beesons at their Colorado address along with identification cards and a CUSTOMER ACCOUNT SUMMARY dated January 2, 2017 which showed the premiums for auto and homeowners policies purchased by the Beesons (06).

Q. BEESON_M. WELCH 00030

where the policy was issued and delivered and under which the UM/UIM coverage was provided, or Oklahoma law where the accident occurred, should apply to the interpretation of the policy.

An insurer is required by industry standard and applicable law to determine which state's law applies to the coverage under which a claim is presented where the possibility exists that the law of more than one state could apply. In the case of the Beeson policy, the language of the UM/UIM statute must first be considered. The Colorado UM/UIM states that UM/UIM coverage is required to be provided in any "automobile liability or motor vehicle liability policy… delivered or issued for delivery in this state." CRS § 10-4-609(a). The Colorado Supreme Court has stated the obvious: "The statute applies only to policies that are delivered or issued in Colorado." Apodaca v. Allstate Ins. Co., 255 P.3d 1099, 1105 (Colo. 2011). The Beeson policy was issued for delivery and delivered to the Beesons in Colorado and includes UM/UIM coverage as defined in the Colorado statute.

In contrast, Oklahoma's UM statute, 36 O.S. § 3636(A) states: "No policy insuring against loss resulting from liability proposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of the motor vehicle shall be **issued, delivered, renewed, or extended in this state** with respect to **a motor vehicle registered or principally garaged in this state** unless the policy includes the coverage described in subsection B of this section." (emp. add.).

31

Q. BEESON_M. WELCH 00031

The Oklahoma Supreme Court has construed the emphasized language of section 3636(A) to mean the statute does not apply to policies issued in other states which insure vehicles registered and principally garaged in those states at the time the policies were issued. <u>Bernal v. Charter County Mut. Ins. Co.</u>, 209 P.3d 309 (Okla. 2009).[47]  In <u>Bernal</u>, an Oklahoma resident was fatally injured in a one vehicle accident in Oklahoma when he was a passenger in a truck owned by Texas residents, principally garaged in Texas, and insured by an auto policy issued to the owner in Texas.  The Texas policy excepted from the definition of "uninsured motor vehicle" a vehicle "'owned or available for the regular use of you or any family member.'"[48]  The insurer denied the UM claim of the injured passenger on the basis of this provision.  The provision would at the time of the accident not have been enforceable in a policy subject to the Oklahoma UM statute.  Nevertheless, the Supreme Court held that Oklahoma law did not apply to render the definition of "uninsured motor vehicle" unenforceable because the Oklahoma UM statute only applies to policies issued in Oklahoma to insure vehicles registered and principally garaged in Oklahoma.[49]

Although <u>Bernal</u> is the definitive word in Oklahoma on the issue of which state's law applies to UM coverage, pre-<u>Bernal</u> decisions of the Oklahoma Court of Civil Appeals and

---

[47] In <u>Martin v. Gray</u>, 385 P.3d 64 (Okla. 2016) the Supreme Court of Oklahoma held that <u>Bernal</u> does not control the choice of law for a UM bad faith case.  The court held that the "most significant relationship" choice of law rule applicable to tort claims in Oklahoma governs the choice of law applicable to an insurance bad faith claim.

[48] <u>Id.</u> 209 P.3d at 310 fn.2.

[49] <u>Id.</u> 316-17.  The reasoning of <u>Bernal</u> was subsequently applied where auto policies were issued in Texas to Texas residents on vehicles registered and principally garaged in Texas and the named insured's son, a resident of Oklahoma, was injured in an Oklahoma accident.  The court held that Texas law governed the UM claim, thus the insured had to obtain an adjudication of fault of the uninsured motorist and of damages before he could pursue a UIM claim, as required by Texas but not Oklahoma law.  <u>Redd v. Allstate Ins. Co.</u>, 2017 WL 11139925 (W.D. Okla. July 5, 2017).

Q. BEESON_M. WELCH 00032

the 10th Circuit Court of Appeals reached similar conclusions by application of Oklahoma's traditional choice of law rules applicable to insurance policies. In Herren v. Farm Bur. Mut. Ins. Co., 26 P.3d 120 (Okla. Civ. App. 2001) Missouri and Kansas laws were applied where policies were issued in Missouri and Kansas to the injured person and her husband, respectively, while the wife and husband were residents of Missouri and Kansas and their vehicles garaged in those states. As did Quinda Beeson and her husband, husband and wife moved to Oklahoma after the policies were issued and wife suffered bodily injury in an Oklahoma accident. Wife was a passenger in a vehicle driven by her daughter, an Oklahoma resident. Both Missouri and Kansas law were held to apply to the interpretation of the definition of "underinsured motor vehicle" in the policies which complied with the Missouri and Kansas UM statutes. This definition was more limited than the definition of "uninsured motor vehicle" in the Oklahoma UM statute, section 3636(C).

In Roby v. Bailey, 856 P.2d 1013 (Okla. Civ. App. 1993) Roby, a resident of Arkansas, purchased an auto policy in Arkansas which included "pure" UM coverage but not "UIM" coverage. The court held that the negligent driver causing a collision with Roby's vehicle in Oklahoma who had liability insurance did not qualify as a "pure" uninsured motorist within the Arkansas policy issued to comply with Arkansas law, even though under the Oklahoma UM statute no distinction is made between "pure" uninsured vehicles and "underinsured" vehicles.

Q. BEESON_M. WELCH 00033

In <u>Burgess v. State Farm Mut. Auto. Ins. Co.</u>, 77 P.3d 612 (Okla. Civ. App. 2003) an auto policy was issued to a Kansas resident in Kansas. The Kansas resident was injured in Oklahoma while riding in a vehicle driven by his daughter, an Oklahoma resident. The injury was caused by a drunk driver with $10,000 maximum of bodily injury liability coverage. The court held that the policy provision prohibiting stacking of UM coverage as authorized by the Kansas UM statute, was enforceable, limiting recovery to a single $100,000 per person limit. At the time of the accident such a provision would not have been enforceable in Oklahoma unless only a single premium was charged for UM coverage on multiple insured vehicles.[50]

The federal courts in Oklahoma have also applied traditional Oklahoma choice of law rules to reach similar conclusions. In <u>Rhody v. State Farm Mut. Ins. Co.</u>, 771 F.2d 1416 (10th Cir. 1985) a Texas resident was killed by an uninsured motorist in an accident in Oklahoma. An auto policy issued in Texas to the parents of the deceased, Texas residents, insured the son for UM coverage but Texas law prohibited stacking of that coverage. The court held that the policy provision was enforceable and thus the then applicable Oklahoma case law permitting stacking where separate premiums are charged did not apply. In <u>Gilbertson v. State Farm Mut. Auto. Ins. Co.</u>, 845 F.2d 245 (10th Cir. 1988) Minnesota residents were injured and one was killed in an Oklahoma accident. The policy on the vehicle the individuals were occupying was issued in Minnesota to a Minnesota resident. The court held that Minnesota

---

[50] The UM statute was amended in 2014 to add a sentence to 36 O.S. § 3636(B): "Policies issued, renewed or reinstated after November 1, 2014, shall not be subject to stacking unless expressly provided for by an insurance carrier." Merely charging separate premium for UM coverage on multiple insured vehicles no longer is sufficient to stack UM coverage due to this amendment. <u>Thurston v. State Farm Mut. Auto. Ins. Co.</u>, 478 P.3d 415 (Okla. 2020).

Q. BEESON_M. WELCH 00034

law, not Oklahoma law, applied to determine whether the injury arose out of the use of an uninsured motor vehicle, as required by the UM coverage of the policy.[51]

A knowledgeable auto insurer would inform itself about the foregoing authorities. Such an insurer would have, therefore, examined the Colorado UM statute which describes the required UM/UIM coverage as follows.

### 3.   The Colorado UM/UIM Statute.

Under the Colorado statute coverage is "provided for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom....".   CRS § 10-4-609(1)(a).   The coverage "shall cover the difference if any, between the amount of the limits of any legal liability coverage and the amount of the damages sustained, excluding exemplary damages, up to the maximum amount of coverage obtained pursuant to this section....".   *Id.* (1)(c). The amount of the coverage available pursuant to this section shall not be reduced by a set off from any other coverage, including, but not limited to, legal liability insurance, medical payments coverage, health insurance, or other uninsured or underinsured motor vehicle insurance." *Id.*

---

[51] See also <u>Spangler ex rel. Estate of Spangler v. State Farm Mut. Auto. Ins. Co.</u>, 2008 WL 2782708 at *3 (E.D. Okla. July 7, 2008) (policy issued in Arkansas to Arkansas resident who was allegedly killed by uninsured motorist in Oklahoma would be construed under Arkansas law).

Q. BEESON_M. WELCH 00035

The statute also defines an underinsured motor vehicle: "uninsured motorist coverage shall include coverage for damages for bodily injury or death that an insured is legally entitled to collect from the owner or driver of an underinsured motor vehicle.  An underinsured motor vehicle is a land motor vehicle, the ownership, maintenance or use of which is insured or bonded for bodily injury or death at the time of the accident." *Id.* (4).  The Oklahoma UM statute, 36 O.S. § 3636(C), does not make a distinction between "pure" uninsured and "underinsured" vehicles in the definition of "uninsured motor vehicle."[52]  However, to avoid confusion I refer to UM and UIM as a purely uninsured motorist or uninsured motor vehicle and an "underinsured motorist" or "underinsured" motor vehicle.

Colorado courts have consistently held that the phrase "legally entitled to recover damages" in section 10-4-609(1)(a) means that the uninsured or underinsured motorist "was negligent and the extent of the damages."[53]  Likewise, Oklahoma courts have construed the phrase "legally entitled to recover damages" in the Oklahoma UM statute as meaning that the uninsured motorist was at fault in causing bodily injury to the insured under the law of torts and the nature and amount of the insured's damages.[54]

---

[52] Burch v. Allstate Ins. Co., 977 P.2d 1057, 1063-64 (Okla. 1998) (noting other states have UM statutes which, like Colorado, distinguish between "uninsured" and "underinsured" vehicles.
[53] Briggs v. American Fam. Mut. Ins. Co., 833 P.2d 859, 861 (Colo. App. 1992).  See also Thompson v. State Farm Mut. Auto. Ins. Co., 789 Fed.Appx. 90, 92 (10th Cir. 2019).
[54] See e.g., Uptegraft v. Home Ins. Co., 662 P.2d 407, 412-13 (Okla. 1993).

36

Q. BEESON_M. WELCH 00036

Under Colorado law any personal immunity of the alleged uninsured or underinsured motorist may have against liability to the UM insured is irrelevant to the question of whether the insured is legally entitled to recover damages from the uninsured or underinsured motorist.[55] Oklahoma case law has reached the same conclusion.[56] The immunity of the at fault co-employee driver effectively makes the vehicle he was driving uninsured.[57] However, if the injured insured's damages are less than the cap on recoverable damages in the Governmental Tort Claims Act, the vehicle driven by the at fault immune state employee was held not to be an "uninsured motor vehicle".[58]

---

[55] See e.g., Barjas v. State Farm Mut. Auto. Ins. Co., 33 P.3d 1265, 1269 (Colo. App. 2001) (governmental immunity of negligent police officer and his city employer under Colorado Governmental Tort Claims Act did not preclude insured from recovering on UM claim because the immunity rendered the police officer driver an uninsured motorist not legally responsible for his fault and thus left the insured in the same position he would have bene in if the at fault driver did not have any auto liability insurance.) The court cited and discussed in support of its decision Karlson v. City of Okla. City, 711 P.2d 72 (Okla. 1985). See also American Fam. Mut. Ins. Co. v. Ashour, 410 P.3d 753 (Colo. App. 2017) writ. den'd 2018 WL 495647 (Colo. Jan. 22, 2018) (insured injured by negligent driving of co-employee in course and scope of employment who could not sue co-employee due to workers compensation immunity could recover under the UM/UIM coverage of his personal auto policy, citing and discussing Barfield v. Barfield, 742 P.2d 1107 (Okla. 1987) and Torres v. Kansas City Fire & Marine Ins. Co., 849 P.2d 407 (Okla. 1993) in support of its holding.)

[56] See e.g., Karlson v. City of Okla. City, supra., (holding immunity under former Political Subdivision Tort Claims Act for damage above $50,000 of negligent police officer and his employer did not preclude recovery pursuant to injured person's UM coverage when damages exceeded the tort claims act cap); Barfield, supra., (widow of employee killed in motor vehicle accident caused by negligence of co-employee could recover for death of husband pursuant to UM coverage of his personal auto policy notwithstanding widow received workers compensation death benefits and co-employee driver was immune from civil liability under workers compensation immunity statute; Torres, supra. (extending reasoning of Barfield to claim of injury to employee of commercial auto policyholder under UM coverage of employer's policy despite immunity of negligent co-employee driver under workers compensation law).

[57] See e.g., Stands v. Hudson Ins. Co., 2017 WL 11474147 (N.D. Okla. Nov. 2, 2017) and Anaya-Smith v. Federal Mut. Ins. Co., 2021 WL 4229067 (W.D. Okla. Sept. 16, 2021) app. filed on other gds. (10th Cir. Sept. 28, 2021) (holding that Barfield and Torres decisions make no sense unless the effect of immunity is to render co-employee/driver uninsured).

[58] Carlos v. State Farm Mut. Auto. Ins. Co., 935 P.2d 1182 (Okla. Civ. App. 1996)

Q. BEESON_M. WELCH 00037

Colorado courts have construed section 10-4-609(c)(1) to mean that the UIM coverage must "cover the difference between the damage the insured party suffered and the limits of any liable party's legal liability coverage, regardless of whether the insured party's recovery from the liable party exhausted that limit."[59] Oklahoma law also does not require exhaustion of the applicable limit of the uninsured motorist's auto bodily injury liability coverage.[60] Consequently, even if the uninsured motorist insured settles with the underinsured motorist for less than the maximum amount of his coverage, or doesn't collect a dime from the liability insurer, the injured person can pursue a UM claim **if** his damages exceed the applicable limit of the bodily injury liability coverage.[61]

As a consequence of this holding, UIM insurers in Colorado, like UM insurers in Oklahoma, may not enforce provisions in their policies which require an insured to first exhaust the bodily injury liability coverage of the at fault driver.[62]  However, under Colorado law, if the insured's damages are less than the bodily injury liability limit of the at fault driver, the UM insured cannot recover the difference between the amount for which he or she settled his negligence claim against the underinsured motorist and the maximum amount of his UIM 's coverage from his UIM insurer.[63]  In effect, the UIM insurer is not required to pay the "gap" between the amount recovered from the at fault driver's insurer (if less than his maximum coverage) and the maximum amount of the bodily injury liability coverage.   Although Oklahoma's UM statute is worded differently, Oklahoma courts have ruled that where the

---

[59] Tubbs v. Farmers Ins. Exch., 353 P.3d 924, 926 (Colo. App. 2015).
[60] See e.g., Buzzard v. Farmers Ins. Co., 824 P.2d 1105, 1112 (Okla. 1991).
[61] Tubbs v. Farmers, 353 P.3d at 926.
[62] Id. and Buzzard v. Farmers, 824 P.2d at 1112.
[63] Jordan v. Safeco Ins. Co. of Am., 348 P.3d 443 (Colo. App. 2013).

Q. BEESON_M. WELCH 00038

insured's damages are less than the bodily injury liability coverage of the at fault driver (as is often evidenced by settlement for less than the limit of the bodily injury coverage), the at fault vehicle does not qualify as an "uninsured motor vehicle" as defined in 36 O.S. § 3636(C).[64]

The Colorado UM statute very explicitly prohibits offsets to reduce the amount of recovery under UM or UIM coverage by the amount an insured receives under any other coverage, giving as nonexclusive examples of prohibited offsets payments from liability insurance, auto medical payments coverage, health insurance, and other UM/UIM insurance. CRS § 10-4-609(1)(c). The Colorado Supreme Court has interpreted this provision to prohibit a reduction of the amount of the insured's compensatory damages which she is entitled to recover under the UM or UIM coverage by the amount paid under other coverages. Calderon v. American Fam. Mut. Ins. Co., 383 P.3d 676, 679 (Colo. 2016). The Colorado court held that $5,000 paid under medical payments coverage of the insured's auto policy could not be used to reduce the amount of the insured's damages. In Menapace v. Alaska Nat'l Ins. Co., 491 Fed.Supp.3d 924 (D. Colo. 2020) the court held CRS 10-4-609(1)(c) does not allow workers compensation benefit payments to reduce the amount recoverable by the injured worker under UIM coverage.

---

[64] See e.g., Gates v. Eller, 22 P.3d 1215, 1218-19 (Okla. 2001); Boyer v. Oklahoma Farm Bur. Mut. Ins. Co., 902 P.2d 83 (Okla. Civ. App. 1992); Lamfu v. GuideOne Ins. Co., 131 P.3d 712, 715 (Okla. Civ. App. 2001).

Q. BEESON_M. WELCH 00039

**4. Case Law Does Not Allow Setoffs Or Reductions Of The Amount Of Recoverable Damages Under UM/UIM Coverage.**

Even without the benefit of an explicit statutory prohibition for offsets in UM and UIM coverage, the Colorado courts, like Oklahoma courts, have consistently refused to reduce UM or UIM recoveries by the amount the insured received from other types of insurance.  See e.g. Adamscheck v. American Fam. Mut. Ins. Co., 815 F.3d 576 (10th Cir. 2016) (UM recovery cannot be reduced by the amount received in workers compensation benefits); Barnett v. American Fam. Mut. Ins. Co., 843 P.2d 1302 (Colo. 1993) (social security disability benefit payments cannot reduce amount of insured's UM/UIM recovery); Newton v. Nationwide Mut. Ins. Co., 594 P.2d 1042 (Colo. 1979) (amount paid in personal injury protection benefits under insured's auto policy pursuant to prior Colorado No Fault Act cannot be used to reduce the amount of recovery under UM coverage); Cral v. American Hardware Mut. Ins. Co., 784 P.2d 759 (Colo. 1989) (subrogation and trust agreement requiring insured to reimburse UM insurer 15% of any recovery from UM unenforceable to the extent payment to UM insurer from third party settlement would cause insured not to receive full compensation for injuries); and Nationwide Mut. Ins. Co. v. Hillyer, 509 P.2d 810 (Colo. App. 1973) (amount recoverable from UM coverage cannot be reduced by payments made to insured as workers compensation benefits).

Oklahoma's UM statute and case law also bar setoffs against UM coverage.  Aetna Cas. & Sur. Co. v. State Bd. for Prop. & Cas. Rates, 637 P.2d 1251, 1257 (Okla. 1981) (payments of

Q. BEESON_M. WELCH 00040

medical expenses under medical payments coverage of auto policy do not reduce the amount owed under UM coverage of same policy); Chambers v. Walker, 653 P.2d 931, 935 (Okla. 1982) (amount of UM recovery cannot be reduced by payments made to the insured in workers compensation benefits); Raymond v. Taylor, 412 P.3d 1141 (Okla. 2017) (UM insurer which did not follow "substitution of liability coverage offer" procedure in section 3636 could not assert subrogation against at fault driver to access excess/umbrella liability policy also providing coverage to at fault driver in addition to auto liability policy).

**5. Oklahoma Insurance Department Regulation Prohibits Reduction of UM Recovery Because Of Health Insurance.**

A regulation promulgated by the Oklahoma Insurance Commissioner has done what the Colorado UM statute does to prohibit attempts to setoff payments from other sources against a UM recovery. Okla. Adm. Code (OAC) § 365:15-1-17 (2002) states:

> No insurance policy or contract shall be made, issued or delivered by any insurer or by any agent or representative thereof that limits or reduces medical payments or uninsured motorist coverage because the injured party has insurance through a life and or health insurance provider.  The Insurance Commissioner may waive this requirement.  If the Insurance Commissioner waives this requirement, the initial page of the policy shall include a conspicuous notice indicating that the contract reduces or limits the medical payments or uninsured motorist coverage, because the injured party has insurance through a life and health provider and advising the policyholder to read its provisions.

Q. BEESON_M. WELCH 00041

Regulations have the force and effect of law and are subject to the same rules and construction of statutes.[65]  So "relevant provisions must be considered together to give full force to each if possible" but "[a]n inept word choice will not be construed in a manner to defeat the obvious purpose of a legislative enactment."[66]  The language of the regulation prohibits an auto insurer from reducing or limiting medical payments or UM coverage because the injured person (who is also the insured in the medical payments and UM coverage) has insurance through a health insurer.


As it turns out, the Colorado UM/UIM statute has similar language prohibiting reduction of an insured's recoverable UM benefits by the amount received under other coverages.  In Calderon v. American Fam. Mut. Ins. Co., 383 P.3d 676 (Colo. 2016) similar language in the UM/UIM statute, CRS § 10-4-609(1)(c), was construed by the court to prohibit a reduction of the amount of UM benefits a jury found the plaintiff insured was entitled to recover by the amount of medical expenses paid under the insured's auto med pay coverage.  As previously stated, the statute provides: "**the amount of the [UM/UIM] coverage** available pursuant to this section shall not be reduced by a setoff from any other coverage, including, but not limited to,… medical payments coverage, health insurance, or other uninsured or underinsured motor vehicle insurance." (emp. add.)  After trial the insurer attempted to reduce the amount of damages awarded by the jury by the amount it had paid under the medical payments coverage, $5,000.  The trial court allowed the offset and the Colorado Court of Appeals affirmed on the ground the phrase "the amount of [UM/UIM] coverage" refers to the

---

[65] Charlson v. State ex rel. Dept. of Pub. Safety, 125 P.3d 672, 674 (Okla. 2005); Cole v. State ex rel. Dept. of Pub. Safety, 473 P.3d 467, 470 (Okla. 2020).
[66] Raymond v. Taylor, 472 P.3d at 1145-46.

42

Q. BEESON_M. WELCH 00042

limit of the coverage, not the amount the insured was entitled to recover, as fixed by the jury verdict.  The Colorado Supreme Court reversed, holding:

> The second phrase of the prohibition provides that the amount of the UM/UIM coverage available "shall not be reduced by a set off from any other coverage, including, but not limited to,... medical payments coverage (cit. omit.).  This portion of the provision refers to a set off of **the amount actually paid** pursuant to a particular subject, not simply the coverage limit.[67]

This interpretation of the Colorado UM statute set off prohibition is persuasive in considering the scope of the same prohibition in the Oklahoma regulation.  The regulation prohibits the reduction of UM coverage because the insured has health insurance.  In this context the phrase "reduces... uninsured motorist coverage" in the regulation refers to a reduction of the recovery of the amount actually owed (or if already paid) the amount actually paid under the UM coverage by any amount paid by health insurance.

## 6. Limitations On Subrogation And Reimbursement Against UM/UIM Recovery.

By statute Colorado law prohibits health insurers and health benefit plans from obtaining recoupment of payments of a qualified person's medical bills, whether through subrogation or right of reimbursement, which pays the person for damages the person is entitled to recover from a third party, including from UM/UIM coverage.  CRS § 10-1-135(3)(a)(I) and (b):

---

[67] 383 P.3d at 678 (emp. add.).

Q. BEESON_M. WELCH 00043

(3)(a)(I) Reimbursement or subrogation pursuant to a provision in an insurance policy, contract, or benefit plan is permitted only if the injured party has first been fully compensated for all damages arising out of the claim. Any provision in a policy, contract, or benefit plan allowing or requiring reimbursement or subrogation in circumstances in which the injured party has not been fully compensated is void as against public policy.

***

(b) if the injured party is fully compensated and reimbursement or subrogation of benefits is authorized, the reimbursement or subrogation amount cannot exceed the amount actually paid by the payer of benefits to cover benefits under the policy, contract, or benefit plan or, for healthcare services provided on a capitated basis, the amount equal to eighty percent of the usual and customary charge for the same services by health care providers that provide health care services on a non capitated basis in the geographic region in which the services are rendered.

An "injured party" is defined as "a person who has sustained bodily injury as a result of the act or omission of a third party, has pursued a personal injury or similar claim against the third party **or** who has made a claim under his uninsured motorist or underinsured motorist coverage, and has received benefits as a policyholder, participant or beneficiary from the payer of benefits....". *Id.* ¶ (3)(b). "Payer of benefits" means "any insurer, health maintenance organization, health benefits plan, preferred provider organization, employee benefit plan, other insurance policy or plan, or any other payer of benefits....". *Id.* (3)(c)(1). "Benefits" includes "payment or reimbursement of health care expenses....". *Id.* (3)(a).

If the "payer of benefits" does seek reimbursement or subrogation the amount recovered "shall be reduced by an amount equal to the payer of benefits' proportionate share of the attorney fees and expenses incurred by or on behalf of the injured party in making the recovery, based on the ratio of the amount of attorney fees and expenses incurred to the amount of the recovery." *Id.* ¶ 3(c).

44

Q. BEESON_M. WELCH 00044

The statute concludes by declaring "[a]ny language in an insurance policy, contract, or benefit plan that is contrary to this section is void and unenforceable....". *Id.* (¶ 9).[68] The statute as a whole has been said to "essentially codify the common law principles of the make whole doctrine and the common fund doctrine.... [T]he statute sets out a definitive framework for resolution of subrogation claims in Colorado."[69]

Although Oklahoma does not have an anti-subrogation/reimbursement statute as broad as the Colorado statute, Oklahoma case law regulates the right of those who pay medical bills and then seek to recover the payment via subrogation to the patient's claims against the tortfeasor or other sources of recovery, or to obtain reimbursement of the payments directly from the injured person after he or she recovers some amount from the tortfeasor or other source of compensation.  To begin with, Oklahoma, like the majority of states, does not recognize subrogation claims by health insurers and healthcare plans unless such rights are expressly created in the policy or plan.  Aetna Cas. & Sur. Co. v. State Bd. for Prop. & Cas. Rates, 637 P.2d 1251, 1255 (Okla. 1981) ("the general rule is that an insurer is not subrogated to the insured's rights or the beneficiary's rights under contract of personal insurance which

---

[68] The statute also provides the procedure for resolution of disputes between the injured party and payer of benefits when they disagree on whether the injured party has been "made whole" by the amount recovered from a third party or UM or UIM coverage. See CSR § 10-1-35(3)(d)(4) & (6).

[69] Christopher P. Koupal, *CRS § 10-1-135 and the Changing Face of Subrogation Claims In Colorado*, 40 COLO. LAWYER 41 (Colo. Bar. Assoc. 2011), cited in Delta Airlines, Inc. v. Scholle, 484 P.3d 695, 700 (Colo. 2021).

Q. BEESON_M. WELCH 00045

includes medical, accident, disability and life insurance.").  The majority of courts follow this view with respect to health insurance.[70]

Even if policies of "personal insurance" have provisions authorizing recovery of payments of medical expenses from third parties, the Oklahoma courts will not enforce these provisions if to do so will deprive the injured person of the sufficient compensation to pay all of her damages pursuant to the "make whole rule".  Equity Cas. & Sur. Co. v. Youngblood, 927 P.2d 572, 576-77 (Okla. 1996) (healthcare plan without provision for recovery from third party); Reeds v. Walker, 157 P.3d 100 (Okla. 2006) (healthcare plan included subrogation provision but its language did not negate make whole rule as it failed to create a priority of payment in favor of the healthcare plan from a third party); American Med. Servs. v. Josephson, 15 P.3d 976, 979-80 (Okla. Civ. App. 2000) (under subrogation provision of personal health insurance policy a fact question existed concerning whether the insured had been fully compensated for his bodily injury by the amount received in settlement with the tortfeasor).  However, if a policy or plan not only creates a right of subrogation or reimbursement, but also clearly establishes the right of the insurer or plan to be paid before the injured person is made whole, this language will be enforced.  See e.g. Sollars v. Healthcare Recoveries. 147 P.3d 289, 294-95 (Okla. Civ. App. 2006).  Oklahoma law also includes principles pursuant to which the

---

[70] See e.g. Schultz v. Gotlund, 561 N.E.2d 652, 654 (Ill. 1990); Frost v. Porter Leasing Corp., 436 N.E.2d 387, 394 (Mass. 1982); American Pioneer Life Ins. Co. v. Rogers, 753 S.W.2d 530, 532-33 (Ark. 1988); Perreira v. Rediger, 778 A.2d 429, 437-38 (N.J. 2001); and Wolters v. American Republic Ins. Co., 827 A.2d 197, 200-01 (N.H. 2003).

Q. BEESON_M. WELCH 00046

courts have required subrogated insurers to pay a proportionate share of the attorney fees and expenses of the injured person's lawyer in obtaining a recovery from a third party.[71]

Finally, even a health benefit plan created pursuant to ERISA as an "employee benefit plan" subject to federal common law must include subrogation or reimbursement provisions negating the make whole rule as the default priority rule in order to obtain priority of payment over the employee.[72] Moreover, ERISA plans which are not self-funded but are funded by insurance are subject to state laws regulating subrogation whereas ERISA preemption prohibits application of such state laws to self-funded plans. FMC Corp. v. Holliday, 498 U.S. 52, 64 (1990); Wurtz v. Rawlings Co., Inc., 761 F.3d 232, 240-41 (2nd Cir. 2014); Singh v. Prudential Health Care Plan, Inc., 335 F.3d 278, 286-87 (4th Cir. 2003); Medical Mut. of Ohio v. DeSoto, 245 F.3d 561, 572-74 (6th Cir. 2001); and Coleman v. Blue Cross & Blue Shield of Ala., Inc., 53 So.3d 1052 (Fla. App. 2010).

---

[71] See e.g., Carter v. Wooley, 321 P.2d 793 (Okla. 1974) (recognizing implied in law or quasi-contractual obligation of subrogated insurer to pay proportionate share of injured person's attorney fees owed for obtaining settlement of tort claims for bodily injury damages); Phillips v. State Farm Mut. Auto. Ins. Co., 73 F.3d 1535, 1541 (10th Cir. 1996) (UM insurer seeking subrogation for payment required to pay pro rata share of insured's attorney fees in pursuing tort claim against uninsured motorist).

[72] See e.g., Alves v. Silverado Foods, Inc., 6 Fed.Appx. 694, 703-04 (10th Cir. 2001); Administrative Committee of the Wal-Mart Assoc. Health & Welfare Plan v. Willard, 302 Fed.Supp.2d 1367, 1378-80 (D. Kan. 2004) aff'd 393 F.3d 1119 (10th Cir. 2004); John Deere Health Benefit Plan for Salaried Emp'ees v. Chubb, 45 Fed.Supp.2d 1131, 1138-39 (D. Kan. 1999).

Q. BEESON_M. WELCH 00047

## 7.  The Collateral Source Rule.

Both Oklahoma and Colorado law include the Collateral Source Rule.  Under Oklahoma law the measure of damage for a tort is statutory.  23 O.S. § 61 states: "for the breach of an obligation not arising from contract the measure of damages, except where otherwise expressly provided by this chapter, is the amount which will compensate for all detriment proximately caused thereby, whether it could be anticipated or not."  This statute has consistently been construed to incorporate the Collateral Source Rule:

> Under our statute upon commission of a tort it is the duty of the wrongdoer to answer the damages wrought by the wrongful act, and that is measured by the whole loss so caused.  Under the statute the receipt of compensation by the injured party from a collateral source wholly independent of the wrongdoer would not operate to lessen the damages recoverable from the person causing the injury.

Denco Bus Lines v. Hargis, 229 P.2d 560, 564 (Okla. 1951).[73]

The Collateral Source Rule "traditionally applies in the context of common law tort actions to determine the amount of compensatory damages."[74]  The Collateral Source Rule

---

[73] Many cases concur with this statement.  See e.g. Mariani v. State ex rel. Okla. State Univ., 348 P.3d 194, 196 (Okla. 2015) (Collateral Source Rule prohibited government tortfeasor from setting off damages it is liable to pay under Governmental Tort Claims Act by amount injured person received from his auto UM coverage); Blythe v. University of Okla., 82 P.3d 1021 (Okla. 2003) (Collateral Source Rule barred reduction of workers compensation benefits by the amount of prescription bills paid by the injured employee's own health insurance under prior Workers Compensation Act); and Weatherly v. Flournoy, 929 P.2d 296 (Okla. App. 1996) (Collateral Source Rule prohibited liability insurer of underinsured motorist from reducing amount it is liable to pay on behalf of the underinsured motorist by the amount the plaintiff paid for the wrongful death of his wife from her own UM coverage).

[74] Blythe v. Univ. of Okla., 82 P.3d at 1026.

Q. BEESON_M. WELCH 00048

has both a substantive and evidentiary component.  The Oklahoma Supreme Court explained as follows: "If reimbursement had been made to plaintiff... from a collateral source,... this reimbursement could not... lessen the damages recoverable... and evidence of the reimbursement is inadmissible."[75]  The 10th Circuit explained the reasoning for the evidentiary component of the Collateral Source Rule in Prager v. Campbell Cty. Mem. Hosp., 731 F.3d 1046 (10th Cir. 2013).  The court rejected the defendant's argument that "evidence of medical-provider discounts or write-offs extended to an insurer (such as Workers Compensation)... is a more accurate reflection of Mr. Prager's medical expenses".  Id. at 1059.  The court reached this conclusion because "this condition conflicts with a fundamental tenet of the Collateral Source Rule: that a tortfeasor may not reap the benefit of any special payment arrangement involving a collateral source."  Id.

As a rule of substantive evidence federal courts in diversity actions apply the evidentiary component of the Collateral Source Rule as well as its substantive law component.[76]

The Collateral Source Rule in Oklahoma applies to medical expenses and prevents reduction of the amount which an injured person can recover as damages by the amounts paid on the bills by health insurance or other collateral sources or by the amounts "written off" by providers who accept less than the total amount of the bill as full satisfaction.  See e.g., Blythe

---

[75] Porter v. Manes, 347 P.2d 210, 212 (Okla. 1959).  The amounts paid on an injured person's medical bills cannot, therefore, be admitted as evidence of the reasonable value of medical services.  See e.g. Covington v. George, 597 S.E.2d 143, 144-45 (S.C. 2004); Rudvany v. Davis, 551 S.E.2d 347, 348 (Va. 2001); Wills v. Foster, 892 N.E.2d 1018, 1032-33 (Ill. 2008); and Weston v. AK Happytime LLC, 445 P.3d 1015, 1027-28 (Alaska 2019).
[76] Macsenti v. Becker, 237 F.3d 1223, 1241 (10th Cir. 2001).

Q. BEESON_M. WELCH 00049

v. University of Okla., 82 P.3d 1021, 1026 fn.2 (Okla. 2003); Handy v. City of Lawton, 835 P.2d 870, 874 (Okla. 1992); Mascenti v. Baker, 237 F.3d 1223, 1241 (10th Cir. 2001); and Simpson v. Saks Fifth Ave., Inc.. 2005 WL 3388739 at *2 (N.D. Okla. Aug. 8, 2008). Finally, the Collateral Source Rule in Oklahoma limits the scope of discovery: "[r]ecords relating to an injured party's private medical insurance coverage are not relevant to the issues in a personal injury action, such insurance is a collateral source which may not inure to the benefit of the defendant, and it is inadmissible at trial."[77]

In jurisdictions where the Collateral Source Rule applies to UM claims, the courts have reached the same conclusions, holding evidence of collateral payments is not admissible. See e.g. Brethern Mut. Ins. Co. v. Suchoza, 66 A.3d 1073, 1079-80 (Md. Sp. App. 2013) *rev. den'd* 75 A.3d 317 (Md. 2013) (evidence of the amount accepted by providers as full payment of their bills for services provided to the plaintiff through workers compensation was correctly excluded from evidence to prove the reasonable value of the medical services); Miller v. State Farm Auto. Ins. Co., 993 A.2d 1049, 1053 (Del. 2010) (reversible error for trial court to admit evidence that workers compensation paid UM insured's medical bills); Orlowski v. State Farm Mut. Auto. Ins. Co., 810 N.W.2d 775, 782 (Wis. 2012) (rejecting UM insurer's argument that Collateral Source Rule is limited to tort actions and that applying it to action to recover under UM coverage would not further one of the basis of the Collateral Source Rule, because other policy grounds for the rule – "Insuring that a person injured by tortious conduct is fully compensated is no less important in a UIM case than it is in a negligence action"); Lomax v. Nationwide Mut. Ins. Co., 964 F.2d 1343 (3rd Cir. 1992) (Md. law); McCarty v. Liberty Mut.

---

[77] Nitzel v. Jackson, 879 P.2d 1222, 1223 (Okla. 1994).

Q. BEESON_M. WELCH 00050

Ins. Co., 2017 WL 676459 at *5 (D. Wyo. Feb. 3, 2017); Williamson v. Metropolitan Prop. & Cas. Ins. Co., 2018 WL 1787510 at *4 (D. N.M. April 12, 2018). In Stroud v. Liberty Mut. Ins. Co., 2016 WL 10038541 at *2 (N.D. Okla. Oct. 7, 2016) the court excluded evidence that a UM insured's medical bills had been paid by a collateral source under Oklahoma law.

The Colorado Collateral Source Rule is of common law origin but has been modified by statute. CSR § 13-21-111.6 requires reduction of the amount of damages awarded for a tort by any amount the plaintiff has or will receive as indemnity or compensation for the same damages from "any other person, corporation, insurance company, or fund." Volunteers of Am. Colo. Branch v. Gardenswartz, 242 P.3d 1080, 1084 (Colo. 2010) ("Section 13-21-111.6 has two contrasting clauses. The first clause partially negates the collateral source rule. It directs a trial court, following a damages verdict, to adjust the plaintiff's award by deducting compensation or benefits that plaintiff received from collateral sources (i.e. sources other than the tortfeasor)").

However, the statute contains what has been called by the courts as the "contract exception" clause or the "contract clause". It states "that the verdict shall not be reduced by the amount by which such person, his estate, or his personal representative has been or will be wholly or partially indemnified or compensated by a benefit paid as a result of a contract entered into and paid for by or on behalf of such person." This language restores the substantive component of the Colorado common law Collateral Source Rule.[78] The contract

---

[78] Smith v. Jeppsen, 277 P.3d 224, 228 (Colo. 2012).

Q. BEESON_M. WELCH 00051

clause "'clearly denies the set off of benefits that result from private insurance contracts for which someone pays monetary premiums'" or "'for which a plaintiff gives some form of consideration.'"[79]  Thus, in including the contract clause in the statute "[t]he General Assembly wrote the contract clause to preserve the common law collateral source rule and prevent a windfall to a tortfeasor when a plaintiff received benefits arising out of the plaintiff's contract."[80]


The Colorado courts have held that the contract clause applies to payments of an injured person's medical bills by any source other than the tortfeasor, and to the "write-offs" which result if the person's medical providers accept payment of less than the amount billed as full satisfaction for the services.  Volunteers of Am. v. Guardenswartz, 242 P.3d at 1085-86 (health insurance policy purchased by plaintiff); Smith v. Jepsen, 277 P.3d 224, 227-28 (Colo. 2012) (trial court correctly excluded evidence of payments to plaintiff's medical providers by his health insurer and further correctly refused to reduce the verdict by the amount of such payments); Forfar v. Wal-Mart Stores, Inc., 436 P.3d 580, 586-88 (Colo. App. 2018) (payments made by Medicare on plaintiff's medical bills not admissible and not a setoff against amount of damages awarded at trial); Smith v. Kenningham, 328 P.3d 258 (Colo. App. 2013) (payments of bills by Medicaid agency not admissible to prove value of medical services and cannot be credited to reduce the amount of damages awarded by a jury).

---

[79] Id., at 84-85, quoting from Van Waters & Rogers, Inc. v. Keelan, 840 P.2d 1070, 1078 (Colo. 1992) (court held disability payment received by plaintiff was within contract clause because the plaintiff, a firefighter, gave consideration for the benefit in the form of his employment services).
[80] Id. at 1075.

Q. BEESON_M. WELCH 00052

When the contract clause restores the substantive component of the Collateral Source Rule, the evidentiary portion of the common law rule applies to preclude evidence of the amount plaintiff's healthcare providers were paid by a collateral source. Wal-Mart Stores, Inc. v. Crossgrove, 276 P.3d 562, 567 (Colo. 2012); Forfar v. Wal-Mart Stores, 436 P.3d at 583. As in Oklahoma, the value of necessary medical services is the amount recoverable when a person seeks to recover damages for bodily injuries caused by the tort of another.[81] The Collateral Source Rule in Colorado, like the rule in most states, prohibits evidence of the amount actually paid to a medical provider. 10-1-135(10)(a) reinforces this rule stating: "Nothing in this section modifies: (a) The requirement of section 13-21-111.6, C.R.S., regarding the reduction of damages based on amounts paid for the damages from a collateral source. The fact or amount of any collateral source payment or benefit shall not be admitted as evidence in any action against an alleged third-party tortfeasor or an action to recover benefits under section 10-4-609", the UM/UIM statute. Thus, the Collateral Source Rule applies to the determination of the amount of damages an insured is entitled to be paid pursuant to UM/UIM coverage. Sunahara v. State Farm Mut. Auto. Ins. Co., 280 P.3d 649 (Colo. 2012).

### 8. Elements Of Recoverable Damages.

In assessing the value of Mrs. Beeson's claim, Safeco is charged with knowledge of the elements of damage which a claimant/insured can recover on a tort claim against the owner or

---

[81] Crossgrove, 276 P.3d at 566.

Q. BEESON_M. WELCH 00053

operator of the vehicle alleged to be uninsured or underinsured. It is important for UM/UIM insurers to recognize that "plaintiff…did not have any burden to prove she was entitled to UIM benefits *at the time she filed her claim*. The case law does not require that she prove anything before triggering [insurer's] duty to investigate, evaluate and pay her UIM claim, and the insurance policy only requires that she give [insurer] notice of her claim." Peden v. State Farm Mut. Auto. Ins. Co., 2018 WL 3496735 at *2 (D. Colo. July 20, 2018) (emp. by ct.).

Such damages commonly include under both Oklahoma and Colorado law physical and resulting mental pain and anguish both past and future, past reasonable and necessary medical expenses and the reasonably likely cost of necessary future treatments, physical impairment, permanence of injury, disability, disfigurement, loss of wages or other income and loss of future earning capacity.[82] Recovery for future medical treatment does not necessarily require proof of the cost of the anticipated treatment, and may be based on evidence of prior treatment costs.[83] Moreover "[a]ny permanent injuries or future medical expenses would naturally have been a part of the Plaintiff's UIM claims, and Plaintiffs were not required to engage an expert to provide testimony regarding future treatment or permanent injuries in submitting their UIM claims to Defendant."[84]

"The question of future pain is generally more or less speculative, because its existence or nonexistence is a matter very largely within the knowledge of the injured person alone; but

---

[82] *See e.g.,* OUJI 2d – Civil No. 4.1, Colo. Jury Inst., Civil No. 6:1.
[83] M.K.O. Airline Transit Co. v. Deckard, 397 P.2d 888, 889 (Okla. 1964); Bitler v. A.O. Smith Corp., 400 F.3d 1227, 1241-42 (10th Cir. 2005); CeBuzz, Inc. v. Sniderman, 466 P.2d 457, 461 (Colo. 1970).
[84] Stewart v. Brotherhood Mut. Ins. Co., 2018 WL 4092018 at *2 (N.D. Okla. July 10, 2018).

Q. BEESON_M. WELCH 00054

where there is evidence of a permanent injury, and of present pain produced thereby, the jury may consider such facts, and conclude therefrom that future pain may be suffered."[85]   A jury may infer permanent injury from long standing symptoms and pain that started with or surfaced after the original injury.[86]   Damages may be recovered for an aggravation of a preexisting injury or condition even if the claimant's preexisting injury or disability makes the person, even an "eggshell plaintiff", more susceptible to the possibility of further injury than a normally healthy person.[87]   Therefore, these elements of damage should be included in the evaluation of an UM claim if information is available to support them.[88]

---

[85] Philips v. Monarch Recreation Corp., 668 P.2d 982, 987 (Colo. App. 1983); Zertuche v. Montgomery Ward & Co., 706 P.2d 424, 428 (Colo. App. 1985).

[86] Lawson v. Safeway, Inc., 387 P.2d 127, 130 (Colo. App. 1994); Morgan v. Board of Water Works of Pueblo, 837 P.2d 300, 304 (Colo. App. 1992); Edwards v. Chandler, 308 P.2d 295, 297-98 (Okla. 1957); Peppers Gasoline Co. v. Weber, 98 P.2d 1087, 1091-92 (Okla. 1940).

[87] OUJI 2d – Civil No. 4.10, Colo. Jury Inst. 6.7, 6.8; Cantrell v. Henthorn, 624 P.2d 1056, 1058-59 (Okla. 1981); Newberry v. Vogel, 379 P.2d 811, 813 (Colo. 1963); McLaughlin v. BNSF Ry. Co., 300 P.3d 925, 936-38 (Colo. App. 2012) cert. den'd 2013 WL 1192590 (Colo. May 25, 2013); Hellard v. Mid-Century Ins. Co., 2020 WL 6587658 at *6 (N.D. Okla. Nov. 10, 2020) (failure to take into account evidence UM insured's surgeon recommended future cervical spine surgery in evaluation of UM claim).

[88] See e.g., Parker v. Liberty Mut. Fire Ins. Co., 2017 WL 11143787 at *8 (W.D. Okla. Jan. 31, 2017) (failure to account for documented pain and suffering in insured's medical records in initial offer to resolve UM claim); Brambl v. GEICO Gen. Ins. Co., 2015 WL 463774 at *5 (N.D. Okla. Feb. 13, 2012) (undervaluing future medical costs contrary to reports of UM Insured's treating neurosurgeon); Krajicek v. Auto Club Inter-Ins. Exch., 2009 WL 3254904 at *9 (N.D. Okla. Oct. 7, 2009) (failure to include any damages for possible two level future cervical fusion or cervical foraminotomy ignored in evaluation of UM claim); Stroud v. Liberty Mut. Ins. Co, 2016 WL 10043499 at *3-4 (N.D. Okla. Oct. 7, 2016) (pre-bad faith suit evaluations of UM claim did not include possible future surgery but post-suit evaluation by different adjuster which resulted in payment of maximum amount of UM coverage, $50,000, did take into account future surgery); Thompson v. State Farm Mut. Auto. Ins. Co., 457 Fed.Supp.3d 998, 1004-1005 (D. Colo. 2020) (failure to obtain expert medical advice on whether motor vehicle accident caused insured to overdose on pain medication taken to treat injuries suffered in accident); Peden v. State Farm Mut. Auto. Ins. Co., 841 F.3d 887 (10th Cir. 2016) (Colo. law – failure to have medical consultant conduct IME or review insured's medical records before evaluating damages where evaluation did not include future non-economic damages); Sterling v. Provident Life & Acc. Ins. Co., 619 Fed.Supp.2d 1241, 1253 (M.D. Fla. 2009) (failure to conduct IME); and Valdez v. Allstate Ins. Co., 2008 WL 3916017 at *5 (D. Ariz. Jan. 29, 2008) (failure to obtain IME to evaluate plaintiff's psychological condition).

Q. BEESON_M. WELCH 00055

## E.  Evaluation Standard.

Ultimately the insurer's goal is to evaluate and make a decision about the claim presented, and then either deny the claim or offer payment.  In doing so, as previously stated, the person making the evaluation must assess the available information objectively, recognizing that a first party claimant cannot be treated as an adversary.  Where there is equally persuasive evidence favorable to the first party claimant and not favorable to this claimant, the scales should tip in favor of the claimant.  This result is the consequence of the non-adversarial relationship between the insurer and first party claimant and the fact that insurers must give "at least equal consideration of the insured's interests as to their own interest."[89]  If a claim is not denied or paid and a first party claimant sues the insurer for payment of the claim, the insurer has an ongoing duty to evaluate the claim after suit is filed.  Even if a claim is denied pre-suit the insurer should continue to evaluate the claim if new information comes to light during litigation.[90]

During the life of a claim leading up to the evaluation insurers are required, sometimes by law, sometimes by internal standards, to create a "reserve" for a claim (case reserve).  A case reserve generally is a sum which represents the insurer's best estimate at the time the reserve is set of the probable value of a claim, and is updated as more information becomes

---

[89]Magnum Foods v. Continental Cas., *supra.*, 36 F.3d at 1504 (int. qt. mks. omit.).
[90]*See e.g.,* Linn v. Oklahoma Farm Bur. Mut. Ins. Co., 479 P.3d 1013, 1021-22 (Okla. Civ. App. 2020) (fact insurer is being sued does not immunize it from the continuing duty to pay what it finds out it owes, and if it fails to pay, the failure may be further evidence of bad faith).

Q. BEESON_M. WELCH 00056

available.[91]  "Insurance companies rely on claim reserves (case reserves) to set aside funds to pay future claims."[92]  As previously discussed, the Claims Handling Guidelines stress the importance of timely investigation in establishing and to continually evaluate the reserve.

In my experience insurers that recognize the non-adversarial relationship they have with first party claimants do not disregard a claimant's complaints merely because they seem extravagant to the evaluator.  Malingering, for example, is a real issue in some claims but it must be shown to actually exist with information the insurer can use in court.  If the evaluator suspects the complaints currently made were actually the result of a pre-existing condition, actual evidence showing the same type of complaints were previously made must be shown to exist.  Often medical records identify previous treatment.  The reports of claims obtained from ISO also may show prior bodily injury or the same or similar conditions to those for which the claimant/insured is seeking compensation.  The recorded statement of the claimant/insured should cover medical and employment history, and health insurance or self-insured healthcare plans under which the claimant/insured is covered.  All of this provides potential sources of information about pre-existing conditions.  For active duty and honorably discharged military personnel there are unique resources for medical treatment from Veteran's Administration hospitals and other facilities as well as hospitals and clinics on military bases.  Moreover, in some cases, the evaluator must be aware some such complaints can result from the aggravation of a preexisting condition caused by the accident which is the subject of the current claim, and the aggravation is compensable as damages.

---

[91] *See e.g.,* Claims Operations Ch. 16 at 183-186.
[92] *Id.* at 183.

Q. BEESON_M. WELCH 00057

The evaluation of a UM/UIM claim must address all of its required elements. If as is common some or even most of the elements are not in doubt, the documentation of the evaluation should identify the uncontested elements. All elements of damage for bodily injury recognized by the applicable law which are recoverable must be examined to determine which elements of damage exist. If the evaluator questions the reasonableness of a bill for examination or treatment of a UM claimant, in my experience he/she should recognize that what is a reasonable charge is measured by community standards and is to some degree a range of charges for a particular service, and that actual evidence of excessive charges must exist. It is well to remember that what is recoverable is not the amount billed or paid but the **value** of the medical services.[93] Safeco resources explain that "'Reasonable Value' means that a party is entitled to recover the reasonable value of the medical services provided based on the evidence presented." (1778). One of the ways Safeco evaluates reasonable value is submitting medical bills to Mitchell Decision Point (MOP), a computer program provided by an outside vendor which contains a database of amounts paid to providers by insurers and Medicare. (1855). Safeco also acknowledges that the "reasonable value" standard applies under Oklahoma law due to the Collateral Source Rule. See 50 State Survey -- Medical Specials – Recovery of Amounts Billed vs. Amounts Incurred (1799).

---

[93] "[T]he focus is on the reasonable value of the treatment, not the actual charge. In other words '[t]his is a recovery for their value and not for the expenditures actually made or obligations incurred.'" Koffman v. Leichtfuss, 630 N.W.2d 201, 209 (Wis. 2007), quoting from McLaughlin v. Chicago, Milwaukee, St. Paul & Pac. Ry. Co., 143 N.W.2d 32, 40 (Wis. 1966), quoting 22 AM JUR 2d Damages § 207.

Q. BEESON_M. WELCH 00058

If the evaluator suspects treatment was unnecessary, he/she must recognize that information must exist that will establish overtreatment or treatment was not needed in the first place. In my experience large insurers have online medical libraries, and, of course, medical literature is available from a number of other publicly accessible sources, with which to conduct initial assessment. But ultimately any argument that the amount of medical bills is excessive or treatment was unnecessary must be supported by expert medical opinion. That is why the Beeson policy authorizes Safeco to have a claimant/insured examined by a doctor of its choice, have claimant's records received by the doctor, and to obtain medical reports from consultant doctors or treating doctors.

Some elements of damage for bodily injury are commonly referred to as "general damages", i.e. non-economic damages.[94] Physical and resulting mental pain and anguish resulting from an injury and treatment of the injury are the most common general damages. Good evaluators in my experience comb the records of the claimant's healthcare providers for evidence of complaints of pain because the scope of medical treatment is relevant to the issue of whether and to what extent the injured person suffers, will suffer, or has suffered pain and suffering.[95] Good evaluators interview the claimant to find out whether he/she has complaints of pain and whether they are associated with the accident in question. The fact that the claimant can testify to his/her own physical pain and suffering makes taking a statement even

---

[94] *See e.g.,* Government Emp'ees Ins. Co. v. Quine, 264 P.3d 1245, 1247 fn. 2.
[95] *See e.g.,* Pinkett v. Dr. Leonard's Healthcare Corp., 2021 WL 1634565 at *2 (D.D.C. April 27, 2021) ("the scope of Plaintiff's medical treatment is certainly relevant" to the issue of Plaintiff's alleged pain and suffering); Campbell v. Garcia, 2016 WL 4769728 at *7 (D. Nev. Sept. 13, 2016) ("[t]he type of medical treatment that [plaintiff] received after the accident is relevant" to "Campbell's purported pain and suffering."); DeBower v. Spencer, 2021 WL 5023147 at *1 (N.D. Iowa Oct. 28, 2021).

Q. BEESON_M. WELCH 00059

more important. [96]   However, "'there is no logical or experimental correlation between the monetary value of medical services required to treat a given injury and the quantum of pain and suffering endured as a result of the injury."[97]

Sometimes medical records contain complaints of pain but do not clarify whether the provider associates the complaints with the accident in question.  If the evaluator suspects the pain complaint may not be associated with the accident in question or may suggest malingering, the evaluator can request the provider to state whether he/she believes the pain complaints are associated with the accident in question or from some other cause, or whether the complaints indicate the claimant is malingering.

In my experience the value of physical and mental pain and suffering in non-catastrophic injury cases depends in part on the ability of the claimant to articulate the complaints.  As just discussed, past pain and suffering can be established by the testimony of the injured person. This may not seem very objective but pain is largely a subjective complaint.  When I am representing a defendant in a case to recover damages because of bodily injury I want to depose the claimant who filed suit.  I can better evaluate the general damages by listening to the claimant talk about his/her pain and whether and how it restricts activities.  Face-to-face interviews of claimants by adjusters are much less common today than they were earlier in my

---

[96] *See e.g.,* Reed v. Scott, 820 P.2d at 450; Godfrey v. Meyer, 833 P.2d at 944; DeBuzz v. Sniderman, 466 P.2d at 461.

[97] Payne v. Wyeth Pharmac., Inc., 2008 WL 4890760 at *6 (E.D. Va. Nov. 12, 2008), quoting from Carlson v. Bubash, 639 A.2d 458, 462 (Pa. Super. 1994) app. den'd 655 A.2d 982 (Pa. 1995), quoted with approval in Pinkett, *supra.*, 2021 WL 1634565 at *2, Cambell, *supra.*, 2016 WL 4769728 at *7; and Bridges v. Wal-Mart Stores, East, LP, 2021 WL 1579920 at *1 (W.D. Okla. April 21, 2021).

Q. BEESON_M. WELCH 00060

career, but remain the gold standard.  Nevertheless, the adjuster will still benefit from taking the claimant's recorded statement and listening to how pain complaints are described.

There is no mathematical formula for the calculation of General Damages such as past or future physical and mental pain and suffering.  This does not mean the insurer should take advantage of the lack of such a formula and minimize the value of pain and suffering or other General Damages.  This practice is common in evaluating third party bodily injury claims. Unfortunately, the practice has spilled over to first party claims when insurers do not properly train and monitor claims representatives and instill recognition in them that a first party claim should not be handled as if the claimant is an adversary.  The need to avoid an adversarial stance toward first party claimants, as industry standards mandate, requires that a claimant's documented pain and suffering not be minimized.

Adjusters must realize that a variety of persons and organizations may claim some right to all or a part of the damages being evaluated.  These include healthcare providers of the claimant who may file liens which attach to liability and/or UM insurance proceeds; Medicare; health insurance and healthcare plans; Medicaid; other government agencies; and workers compensation insurers.[98]  While it is clear that some of these liens and claims do or

---

[98] *See e.g.*, 85A U.S. § 43(B)(4) (creating rights of subrogation and reimbursement for employers and insurers which pay workers compensation benefits against a third party liable in tort for causing injury to an employee for which compensation benefits paid, and against the employer's UM coverage if the injured employee has a claim under that coverage); 42 U.S.C. § 1395y(b)(2)(B) and 42 C.F.R. § 411.24 (various rights of Medicare agencies to recover from beneficiary, his/her lawyer, and auto insurance including UM coverage for conditional payments of beneficiary's medical expenses); 63 O.S. § 5051.1 (Oklahoma Health Care Authority has lien on proceeds payable to Medicaid participant

61

do not apply to UM coverage, it is not clear whether other rights of reimbursement or liens extend to UM coverage.  Therefore, it is of upmost importance to know the various sources of potential rights to some or all of a UM recovery.  The Claims Handling Guidelines address this briefly: "All liens, including Medicare, should be addressed throughout the life of the claim." (1814).

### F. Negotiation Standard.

Because a first party claimant is not an adversary, an insurer's negotiation strategies cannot mirror the strategies used to negotiate third party claims.  Of necessity this takes away some of the advantages the insurer has in negotiating third party claims.  No time limits generally exist for an insurer to make offers on third party claims.  No rules generally prohibit offers which are less than what the insurer evaluates the claim is worth.  No obstacles exists to discourage the insurer from forcing the third party claimant to either sue to get reasonable compensation or accept an objectively unreasonable offer and get some money now instead of years later.[99]

---

by third party or insurer); 43 O.S. § 46 (physician's lien attaches to proceeds of liability or UM coverage payable to patient); 43 O.S. § 43 (hospital lien attaches to "claim against an insurer", abrogating Kratz v. Kratz, 905 P.2d 753 (Okla. 1995); and 56 O.S. § 237(b)(E) (Dept. of Human Serv. has child support lien on proceeds of injured delinquent parent's recovery from insurer).  This is not an exhaustive listing of entities having potential rights of reimbursement or subrogation, or statutory and contractual liens.
[99] The only limit imposed by law in negotiating third party claims is the duty of good faith and fair dealing owed to the at fault party, the insured, not the injured party as in first party claims.  This duty requires the insurer to evaluate a claim against an insured to determine if its value reasonably exceeds the maximum applicable liability coverage and, if it does, make an offer to settle within the amount of coverage.  *See e.g.,* Badillo v. Mid-Century Ins., *supra.* at 1094-95.  However, unless the insured is

Q. BEESON_M. WELCH 00062

Time limits do exist for offers to be made on first party claims.[100]  For example, insurers in Oklahoma have 60 days from receipt of proof of loss to deny a claim or make an offer of payment.[101]  If more time is needed to investigate, an insurer can so advise the first party claimant within the 60 day window, and further 60 day extensions may be obtained if investigation remains incomplete.[102]  Insurers should not force first party claimants into litigation with "low ball" offers which are inconsistent with the non-adversarial relationship insurers should have with first party claimants.[103]  Consequently, first party insurers which recognize the nature of this non-adversarial relationship ultimately should offer the highest value which the evaluator has put on a first party claim.[104]  Insurers which do not honor this standard gamble that the claimant will not sue and if he/she does sue, the insurer can always offer the highest evaluated value for the claim after suit is filed.

---

held liable for a sum exceeding the maximum amount of coverage, any alleged failure to settle within such coverage amount is generally not actionable.  *See e.g.,* Milroy v. Allstate Ins. Co., 151 P.3d 922, 927-29 (Okla. Civ. App. 2006).

[100] These are contained in 36 O.S. § 1250.7, a part of the Unfair Claims Settlement Practices Act, and 36 O.S. § 3629(B).  *See* Hamilton v. Northfield Ins. Co., 473 P.3d 22, 26-28 (Okla. 2020) (recognizing purpose of the statutes is to encourage prompt payment of claims).

[101] 36 O.S. § 1250.7(A)(C); 36 O.S. § 3269(B).

[102] 36 O.S. § 1250.7(C).

[103] This aspect of the Negotiation Standard is also a well-established part of Oklahoma law.  *See e.g.,* Newport v. USAA, 11 P.3d 190, 197 (Okla. 2000) (offers on UM claim below top end of evaluation); Falcone v. Liberty Mut. Ins. Co., 391 P.3d 105, 107 (Okla. 2017) ("Defendant offered less than the maximum amount of its evaluations after taking the position the L2 trauma treatment was unwarranted"); Miller v. Liberty Mut. Fire Ins. Co., 191 P.3d 1221, 1225 (Okla. Civ. App. 2008) (last offer on UM claim was $20,763 where insurer had evaluated claim at a range of $16,353 to $30,963). See also Highland Partners Holdings, LLC v. National Union Fire Ins. Co. of Pittsburg, PA, 475 P.3d 869, 875 (Okla. Civ. App. 2020) (adjuster failed to increase $7 million offer made at mediation to her maximum authority of $7.5 million "because it would not settle the case", among other reasons against insured).

[104] Falcone v. Liberty Mut., 391 P.3d at 107 (holding that whether Liberty Mutual acted in bad faith was jury question where it "offered less than the maximum amount of its evaluations after taking the position the L2 trauma treatment was unwarranted" but "[m]ore than once, it offered the low figure instead of the higher one.").

Q. BEESON_M. WELCH 00063

This is an altogether too common tactic, and is inconsistent with a non-adversarial relationship. Its improper use is illustrated by the testimony of Safeco adjuster BM. In response to questioning about why she did not obtain statements from Mrs. Beeson's medical providers that they accepted the partial payments on their bills as full satisfaction of the bills, as required by 12 O.S. § 3009.1(A), she testified she would get the statements if suit was filed by Mrs. Beeson to recover more than the $25,000 offer BM made on behalf of Safeco. Meyer depo. 138, 140. In effect, the insurer makes a decision to take the calculated risk a first party claimant will give in, accept a low ball offer and not sue. The insurer has a much greater ability to absorb this risk than a first party claimant. However, exercising this financial strength in the negotiation of any one individual claim is inconsistent with the non-adversarial nature of an insurer's relationship with a first party claimant/insured.

## G. Internal Insurance Company Standards.

Insurance companies should have internal standards for the handling of claims:

[L]ack of formal operational policies and procedures can have a detrimental effect on the claims organization....Policy and procedures guide the staff in addressing operational requirements, technical claims handling issues, development of a consistent approach to claims handling and establishment of a foundation to create ongoing goals and objectives. Of the many types of internal company standards which should be formalized, the one probably most important in the context of a bad faith case is the so-called "claims manual" which "[d]etail[s] the processes and procedures in handling claims".[105]

---

[105] *Claims Operations, supra.*, at 78.

Q. BEESON_M. WELCH 00064

In my experience a claims manual can greatly assist in the training of claims personnel and provide a ready reference guide when personnel have questions in the course of processing a specific claim. These manuals may be hard copy or in electronic form. They may be in one all-inclusive document or in separate documents which address different subjects. Commonly, these manuals explain the basic principles for the interpretation of insurance policies, provide a step-by-step explanation of relevant policy language, and explain how the process and systems of the company operate. Such a manual normally includes information that should be obtained in the investigation of a claim, and the ways in which such information can be obtained. A good claims manual explains how to evaluate a claim, along with how to process it within the organizational structure of the insurer. These manuals also explain how and when to communicate with a claimant/insured. Finally, most claims manuals I have reviewed in recent years include a description of the covenant of good faith and fair dealing, general insurance laws such as unfair claims practices acts which apply to claims handling, and laws which apply to specific policies or claims under specific policies. [106]

Typically knowledge of all of the standards described *supra.* is conveyed to claims personnel in their training during which claims manuals are among the source material used to train.[107] This is because the insurance industry recognizes that adequate training is necessary

---

[106] *See e.g.,* Aggressive Good Faith, at 87, a book intended for use by claims personnel seeking the designation of Associate in Claims (AIC), where the authors recommend the reader "memorize the substance of the fourteen points" in the Model Unfair Claims Practices Act.
[107] *See e.g., Claims Operations, supra.,* at 1, 78-79.

Q. BEESON_M. WELCH 00065

to minimize the risk that claims which should be paid are paid, and claims which should not be paid are not paid.

I have been provided excerpts from what I would characterize as claims handling material utilized by claims personnel who handle bodily injury, including UM, claims under Safeco policies. I have identified several provisions of these materials throughout my discussion of industry standards to show that Safeco recognizes some of the national standards I have discussed.

**VIII.   Mrs. Beeson's Medical Evaluation And Treatment.**

Mrs. Beeson was taken by ambulance from the scene of the accident to Integris ER (1008-11). She complained "of neck pain... upon palpation" to the EMSA personnel and also back pain and pain "to chest across sternum". She was tender "in epigastric region." She also complained "of right shoulder; right sided neck and sternum pain." (*Id.*).

At the ER (1031-33) Mrs. Beeson complained of pain in her neck, sternum and over her right breast. Examination found tenderness across the sternum and diffuse tenderness in the cervical area. She told the staff in the ER she had been involved in a similar incident about a year previously. An x-ray of the cervical spine was read by a radiologist to show at C4-5 "degenerative calcification of the exterior ligament or small fractured osteopyte", and "at C5-6

66

degenerative changes."   The doctor informed Mrs. Beeson of these findings.   She was prescribed Flexaril and Hydrocodone.

On May 24, 2017 Mrs. Beeson went to see Dr. Soo (1062-64).  She gave him a history of "surgery to right shoulder 2006."[108]  She "complained of pain located in right side of neck and bilateral shoulders", and advised of the similar rear end accident she had previously been in. She reported she "was doing better after the treatment [after previous rear-end collision] and was able to function with some Narcotics."  She said "back pain is worsened after this new MVA with new radicular symptoms to left shoulder.  The pain is described as sharp, burning, stabbing.   The pain radiates to [sic] down the right second finger [and] she is feeling numbness.  The severity of the pain is 8/10 average.  The timing of the pain is continuous.... [T]he pain is getting worse."

On palpation her cervical spine was tender and painful and range of motion reduced.  She was also tender on palpation of the thoracic spine.  An x-ray of her cervical spine was read by Dr. Soo to show loss of lordosis which is the normal curvature of the cervical spine.[109]  Dr. Soo's assessment was: "1. Sprain of muscle, facet and tendon at neck level.  2. Sprain of

---

[108] This history is not recorded elsewhere, whether for treatment of the May 12, 2017 injuries or for treatment of the 2015 injuries discussed *infra.* and not followed up by Safeco.
[109] See www.scoliosiseducationcenter.com (last visited 10/15/21).

Q. BEESON_M. WELCH 00067

ligaments of thoracic spine. 3. Spondylosis with radiculopathy, cervical region.[110]  4. Pain in right shoulder. 5. Pain in left shoulder. 6. Other forms of scoliosis thoracic spine."

Dr. Soo prescribed a course of physical therapy for Mrs. Beeson. The therapy started on May 31, 2017 at Physical Therapy Central (1074-95). Mrs. Beeson initially had complaints of neck and right shoulder pain since the May 12 accident. She was also seen in therapy on June 1, June 16, June 27, June 29, July 5, July 6 and July 10. On the last date the therapist reports that Mrs. Beeson feels like her neck, shoulder and back symptoms "flared up" and she plans to follow up with a physician to go over additional treatment options.

While undergoing physical therapy Mrs. Beeson returned to see Dr. Soo again on June 2, 2017 (1068-69). She complained of pain in the right shoulder, wrist and hand. Dr. Soo gave her an injection in her right shoulder joint with a corticosteroid and a local anesthetic, lidocaine. This is a standard treatment to relieve pain and inflammation.[111]  On June 4, 2017 while in Colorado Quinda Beeson was seen for wrist pain which is recorded to have arisen since the May accident at an urgent care center in her former hometown of Centennial, Colorado. She was diagnosed with a wrist sprain (1095-96).

---

[110] "Cervical spondylosis is a general term for age-related wear and tear affecting the spinal disks in your neck. As the disks dehydrate and shrink, signs of osteoarthritis develop, including bony projection along the edges of bones (bone spurs).... Sometimes, cervical spondylosis results in a narrowing of the space [in] the spinal cord and the nerve roots that pass through the spine to the rest of the body", and "the nerve roots become pinched." **Cervical spondylosis** (Mayo Clinic Staff), www.MayoClinic.org/diseases-conditions/cervical-spondylosis/symptoms-causes/syc-20370787 (last visited 10/15/21).
[111] **Cortisone shots** (Mayo Clinic Staff), www.MayoClinic.org/tests-procedures/cortisone-shots/about/pac-20384794 (last visited 10/15/21).

Q. BEESON_M. WELCH 00068

Dr. Soo saw Mrs. Beeson on July 19, 2017 after her last physical therapy session (1068-69). She "complains right shoulder pain as her worst problem" and headaches. She also has pain in the right hand the more she uses it. On exam she remained tender to palpation in the cervical and thoracic spine. "Overall there has been no significant improvement in her symptoms." Dr. Soo refilled a prescription for pain medication and referred Mrs. Beeson for magnetic resonance imaging of her spine and right shoulder.

On July 26, 2017 at OneCore Health a cervical spine MRI was conducted (1097-1100). The radiologist read the MRI to show: C5-6 annular disc bulge causing "mild spinal canal stenosis and moderate bilateral foraminal stenosis."[112] The next day on July 27, 2017 MRIs were conducted of the thoracic spine and right shoulder. The radiologist read the thoracic spine MRI to show disc protrusions at T5-6 and disc bulges at T6-7 and T7-8 causing spinal canal stenosis (1160). The shoulder MRI was reported by the radiologist to show a "full-thickness supraspinal tendon tear with retraction to the level of the acromioclavicular joint and major supraspinatus muscle atrophy." (1109).

---

[112] Cervical spine stenosis is a narrowing of the spaces within the cervical spine "which can put pressure on the nerve that travels through the spine" with symptoms including numbness and tingling in the hand, weakness in the hand, and neck pain. Causes include bone spurs growing into the spinal canal, cracks (herniations) of the exterior of spinal disks allowing inner disk material to escape and press on the spinal cord or nerves. **Spinal stenosis** (Mayo Clinic Staff), www.MayoClinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961 (last visited 10/15/21).

Q. BEESON_M. WELCH 00069

The supraspinatus tendon is one of the tendons which constitute the rotator cuff. The rotator cuff forms a cover over the large arm bone (humerus) and attaches the head of the humerus to the shoulder blade to help in lifting and rotating the arm. The bone on the top of the shoulder is the acromion. A full thickness tear is a complete tear of a tendon from the head of the humerus. "With a full thickness tear, there is basically a hole in the tendon."[113] A torn rotator cuff tendon can no longer hold the head of the humerus in the glenoid joint, allowing the humerus to move upward and against the acromion. This bone on bone contact can cause arthritis to develop.[114] A rotator cuff tear causes pain at rest, when lifting or rotating the arm, and results in weakness from lifting and rotating the arm. A cracking sensation (crepitus) can occur when moving the shoulder.[115]

After the MRIs Mrs. Beeson returned to see Dr. Soo on August 2, 2017 (1071-73). She complained "of right shoulder/neck pain as her worst problem" and she continued to have flare ups of pain in her right hand with use. On her examination she continued to be tender to palpation in the cervical and thoracic spines. Dr. Soo reviewed the MRIs with Mrs. Beeson. He concluded: "overall there has been no significant improvement in her symptoms." He referred Mrs. Beeson to a surgeon.

---

[113] George S. Adwal, M.D. & April D. Armstrong, M.D., **Rotator Cuff Tear**, American Academy of Orthopedic Surgeons (last reviewed March, 2017), www.orthoinfo-aaos.org/en/diseases-conditions/rotator-cuff-tears (last visited 10/15/21).

[114] George S. Adwal, M.D. & J. Michael Rwiter, M.D., **Arthritis of the Shoulder**, American Acad. Of Ortho. Surg. (last revised March, 2021), www.Orthoinfo-aaos.org/en/diseases-conditions/arthritis-of-the-shoulder (last visited 10/15/21).

[115] **Rotator Cuff Tear**, *supra.*

70

Q. BEESON_M. WELCH 00070

On the same day she last saw Dr. Soo, August 17, 2017, Mrs. Beeson also saw Dr. Derek West with Southwest Orthopaedic & Reconstructive Specialists (1112-14).  Dr. West records Quinda Beeson as stating "She is having a sharp, burning, throbbing achy pain…. The pain occurs all the time.  The pain occurs on the right side only."

Mrs. Beeson also saw the surgeon Dr. Calvin Johnson on August 17 (1115).  His history records Mrs. Beeson as having right shoulder pain with popping and crepitus, reduced range of motion and throbbing.  "The pain is aggravated by physical activity, any movement, sports activities, work duties, overhead activity, lifting and throwing."  He recommended she continue to apply ice to her shoulder, avoid heavy lifting, limit overhead and away from body movement of the arm.

On August 26, 2017 Dr. West saw Mrs. Beeson again and recommended arthroscopic right shoulder surgery to repair the rotator cuff tear, excision of the distal clavical and subacromial decompression.  On August 28, 2017 Mrs. Beeson saw Dr. Johnson again (1120-22).  She had the same complaints as at her first exam by Dr. Johnson.  He recorded: "The patient has exhausted non-operative management for their [sic] shoulder injury.  These include weight loss, activity modification, over the counter and/or prescription medication, physical therapy and injections."  The proposed surgery was discussed and agreed to by Mrs. Beeson.  She was referred for a pre-surgery evaluation by Momentum Physical Therapy.

Q. BEESON_M. WELCH 00071

On September 7, 2017 Mrs. Beeson was evaluated at Momentum Physical Therapy for post-surgery therapy (1162-63). The evaluator records Mrs. Beeson reporting "[p]ain in neck and shoulders, pain is described as burning, stabbing and aching that stays constant." Pain was estimated at 8/10. Pain was aggravated by movement such as lifting and driving. The pain was said to radiate into the right scapula (shoulder blade) and down to the right elbow.

On September 8, 2017 Mrs. Beeson underwent outpatient arthroscopic shoulder surgery by Dr. Johnson at HPI Community Hospital (1124-25). Dr. Johnson observed "full-thickness cuff tear involving entire supraspinatus insertion, retracted back to the AC [acromioclavicular] joint." Dr. Johnson sutured the torn supraspinatus tendon, excised the distal clavicle and conducted a subacromial decompression. The subacromial decompression is "designed to release the tight ligament of the coraacromial arch and to shave some of the under surface of the acromion [the bone on top of the humerus]. This raises the roof of the shoulder, allowing more room for the rotator cuff tendons to move underneath… breaking the cycle of rubbing and swelling of the tendon."[116]

The repair of the rotator cuff tendon involves reattaching it to the head of the humerus.[117] A rotator cuff tear can cause abnormal positioning of the humeral head which in turn creates

[116] **Subacromial Decompresson – Arthroscopic** (St. George Surgical Center), www.stgeorgesurgical.com/wp-content/upload/2015/OS/subacromial.jpg (last visited 10/15/21).
[117] George S. Athwal, M.D. & April D. Armstrong, M.D., **Rotator Cuff Tears** (American Acad. Of Ortho. Surg.), www.orthoinfo.aaos.org/en/diseases-conditions/rotator-cuff-tears (last visited 10/15/21).

Q. BEESON_M. WELCH 00072

pressure on the AC joint.[118]  The distal clavical excision is a procedure in which the outer end of the clavicle (collarbone) where it joins the acromion to form the AC joint.  The goal of removing part of the clavicle bone is to decompress the AC joint to help reduce pain and loss of motion caused by impingement of soft tissue between the head of the humerus and the acromion.[119]

Mrs. Beeson underwent physical therapy after the surgery in 16 sessions from October 4, 2017 through October 30, 2017 (957-974).  At the last session on October 30 she "reports twinges of pain, but overall stays at 3-4/10 for daily pain level.  Notices it gets more sore in the evenings….".

On September 26, 2017 Mrs. Beeson saw the surgeon, Dr. Johnson, eighteen days post-surgery (1125-27).  Dr. Johnson records her "symptoms are much improved compared to preoperative" and her "[p]ost operative pain has been mild."  She was instructed to continue her physical therapy, home CPH, ice four times daily and use a sling for her arm.  She was also cautioned to "avoid vulnerable positions and avoid heavy lifting, and use compression and elevation daily.  Dr. Johnson discharged Mrs. Beeson from his surgical care at this point.

---

[118]  **Distal   Clavicle   Excision**   (Total   Sports   Medicine   &   Orthopedics),
www.totalsportsmedicine.com/distal/clavicleexcision-orthopedics-sports-medicine-surgeon/las-vegas-nv.html (last visited 10/15/21).
[119] *Id.*

73

Q. BEESON_M. WELCH 00073

I have not been furnished any additional medical records for evaluation or treatment of Mrs. Beeson following May 12, 2017.


## IX. The Adjustment of Quinda Beeson's UM And Medical Payments Claims.


Quinda Beeson reported the rear-end accident to Safeco on May 13, 2017, the day after the collision (Loss Notice Report 1648). This Loss Notice Report described Mrs. Beeson's injuries as to the "STOMACH, LEFT ARM, RIGHT ARM, NECK, HEAD" and provides the auto liability insurance for the driver of the Pontiac Grand Am that struck her car in the rear, Allstate. The report also shows that Quinda Beeson's car was towed to a private address in Oklahoma City. The report confirms that the Colorado auto policy issued in the names of Quinda Beeson and her husband Robert, with an address of 5548 S. Ireland Way in Centennial, Colorado was in effect on the date of the accident. The report notes the policy includes "UM/UIM BI" coverage with limits of $100,000 per person and $300,000 per accident, and "MEDICAL PAYMENTS" coverage with a $5,000 limit.


Also on May 13 Quinda Beeson called Safeco about a rental car while her car was being repaired (1644). On May 15 Joie Jolivette (JJ) sent the Beesons a letter to inform them of a Colorado statute prohibiting discriminatory trade practices in the adjustment of claims for damaged motor vehicles, and attached the copy of the Colorado Statute, COLO. STAT. ANN. § 10-4-120. The letter further informed the Beesons of the conditions under which Safeco

Q. BEESON_M. WELCH 00074

would reimburse them for "all reasonable and necessary towing and storage fees" as required by the cited statute. This letter was sent to the Colorado address of the Beesons shown on their policy (1513, 1517). A letter dated May 15, 2017 from adjuster JJ advised the Beesons that she had been assigned to claim number 105873756039 (1510). This letter was addressed to the Beesons at the Colorado address but was returned to Safeco.

Also on May 15 adjuster JJ spoke to an Allstate adjuster who advised "LIAB accept 100%" for Allstate's insured, Marcus Salgado (1635). Since bodily injury to both Quinda Beeson and a passenger in her car, her mother Wilma Briley, had been reported, adjuster JJ requested a claim be opened under the medical payments coverage of the Beeson policy (001634).

On May 16, 2017 adjuster JJ took a telephone statement from Quinda Beeson (1627). According to JJ's claim note Mrs. Beeson stated she was trying to get onto I-40 eastbound in Oklahoma City but had stopped behind traffic leading onto the ramp when her car was rear-ended. A witness stopped and told her "he noticed the clmt didn't even brake & it looked like clmt was looking down at his phone." Mrs. Beeson further stated she "believes her sternum is bruised and she had a cut on her left knee. She went to the ER and is still in pain but does not have a PCP as of yet."[120] She also advised her "elderly mother", Mrs. Briley, was also injured.

---

[120] I believe PCP is an acronym for primary care physician.

Q. BEESON_M. WELCH 00075

On May 16, 2017 adjuster JJ made a note that "Oklahoma minimum limits 25/50 for BI" which, translated from adjusterese means the minimum limit of automobile liability coverage for bodily injury under Oklahoma law is $25,000 for bodily injury to one person injured or killed in an accident subject to a limit of $50,000 for all bodily injury and death in one accident. This note is correct. The note also indicates the Allstate adjuster had refused to disclose the bodily injury liability coverage limits for Mr. Salgado's auto policy.

On May 16, 2017 the Beeson claim was reassigned from JJ to Daniel J. Kraft (DK) (1625). In a separate note a request was made on the same date: "Please xfer claim to co med/pip adjuster as policy is rated a co policy" (1624). The reference to "co" in context is a reference to Colorado. Adjuster DK advised Mrs. Beeson of his assignment as the adjuster for her claim in a letter dated May 16, 2017 (1627). By letter dated May 17, 2017 Tom Ventura of the law firm Carr & Carr advised Safeco of his representation of Quinda Beeson and her mother, Wilma Briley, and that his clients potentially have claims under the UM coverage of the Beeson policy (1616-18). Mr. Ventura requested Safeco to provide him with the declarations of the Beeson policy and of the limits of the UM and medical payments coverage.

The Ventura letter was either preceded or followed up on the same day with a call to Safeco from Tammy at Carr & Carr to advise of its representation of Mrs. Beeson and her mother (1620). The first of many requests for prior claims by Quinda Beeson and her mother was also made to a company which provides this information (1621).

76

Adjuster DK responded to Ventura's May 17, 2017 letter with a May 18, 2017 form letter in which he requested Quinda Beeson's recorded statement, copies of her "Paid vs. Incurred medical bills for his/her treatment resulting from the accident", her medical records and reports, a medical authorization signed by Mrs. Beeson, the names and addresses of her medical providers and employer, and confirmation of whether she was a Medicare beneficiary.[121] The DK letter continued, requesting confirmation of any "settlement and/or release" (if UIM claim being presented). It also requested "copy of other carrier's denial letter" (if UM being presented).

On May 19, 2017 Quinda Beeson's claim was reassigned for the second time to a third adjuster in six days, Jacob Mitzel (JM) and Mrs. Beeson's lawyer was so advised (1540 and 1531). Adjuster JM called for the Allstate liability adjuster and for Tom Ventura on May 19 and May 23 and left messages (1538, 1537, 1534 & 1533). When informed of the new Allstate adjuster, DK attempted without success to contact her on May 24 and May 28 (1532 & 1526). JM spoke to Tiffany at Carr & Carr on May 25 (1627). According to his claim note she would speak to the attorney about the request for Mrs. Beeson's recorded statement, and informed JM that Carr & Carr notifies any UM carrier of a potential claim on all auto bodily injury clients, and based on limited information Mrs. Beeson's injuries were to the neck, right shoulder, left knee, chest and low back.

---

[121] Auto insurers are required to confirm whether claimants are Medicare beneficiaries and advise the federal government. See 42 U.S.C. § 1395y(b)(8).

Q. BEESON_M. WELCH 00077

Adjuster JM also attempted to contact the other driver for his recorded statement on May 25, 2017 (1525) and followed up this attempt with a letter to Mr. Salgado at his address in El Paso, Texas (1524). The claim file does not show that a recorded statement was ever taken of Mr. Salgado or that he responded to JM's letter.

Adjuster JM performed a "BI Initial Analysis" undated (1521). He notes for the second time in the claim file that Allstate has accepted liability of its insured, Salgado, stating "Assessing liability 100% adverse clmt" referring counterintuitively to the driver of the rear-end vehicle, Salgado (who wasn't making any claims to Safeco). Otherwise he notes the analysis is incomplete since JM does not have a recorded statement from Mrs. Beeson or medical records and bills. In a post script to the document JM correctly states "we do not have enough information to verify there is a UIM claim" (1520).

On May 26, 2017 Safeco ordered the police report of the May 12, 2017 accident (1518) which was received on June 9 (1505). The Official Oklahoma Traffic Collision Report (1506-09) states the collision occurred at approximately 5:52 p.m. on May 12, 2017 on I-40 eastbound in Oklahoma City approaching the exit to I-44 southbound when Unit 1 (Quinda Beeson) "STOPPED FOR TRAFFIC. Unit 2 CONTINUED ON, REAR ENDING UNIT 1". According to the report Salgado told the investigating Oklahoma Highway Patrolman he "LOOKED AT HIS GPS PRIOR TO THE COLLISION". The report fixes the point of impact between the vehicles in the outside eastbound lane approximately 0.1 mile west of I-44 southbound.

78

On June 28, 2017 adjuster JM spoke to an Allstate adjuster who told him "she does not foresee a UIM claim" (1498).

On August 10, 2017 legal assistant Carrie Harris of Carr & Carr sent adjuster DK a letter enclosing "schedule 'A' – Medical Bills of Quinda Beeson" and "schedule 'B' – Medical Records of Quinda Beeson". The letter requests that the bills be placed in line for payment under the medical payments coverage of the Beeson auto policy (1444-46). The only attached bill on schedule A is for emergency room services at Integris Baptist Medical Center in the amount of $8,507.57, and the only records are also from the Integris visit.

A medical payments adjuster, Aleisha Honeyman (AH) requested all of Mrs. Beeson's medical bills in an August 16, 2017 form letter to Carr & Carr and also requested Mrs. Beeson sign a medical authorization (1400-1408). On August 15 adjuster AH uploaded the Integris bill and records into the "Mitchell Decision Point" database for review. Mitchell provides insurers with access to computer programs which review medical bills and makes recommendations for reductions based on pricing information contained therein (1343).

In an August 16, 2017 letter to Carr & Carr med pay adjuster AH requested confirmation of whether Mrs. Beeson was a Medicare beneficiary (1504-07). Mrs. Beeson was not a Medicare beneficiary.

79

Q. BEESON_M. WELCH 00079

An Explanation of Review form based on the Mitchell Decision Point algorithms analysis of the Intregris bill allowed the full amount for a CT of the spine ($3900) an ER visit ($1075) and $25 of the charge for the CT to the head (for which the charge was $2925) (1661). The total sums allowed was $5,000, the limit of the medical payments coverage in the Beeson auto policy. On September 18, 2017 Safeco issued a check to Mrs. Beeson for the $5,000 in medical payments coverage (1672) and advised Carr & Carr that the medical payments limit was exhausted (1431).

By letter dated November 7, 2017 from Alex Belair to med pay adjuster AH, OPTUM advised Safeco "that UnitedHealthcare Services has retained Optum to pursue a recovery for medical benefits that have been or may be paid on behalf of Quinda D. Beeson for the treatment of injuries sustained in the above referenced date of injury" (1325). The letter identifies a "Group/Client" as "TURNER CORPORATION". The claim file does not show that Safeco made any effort to confirm the representations made by OPTUM in the November 7, 2017 letter and subsequent letters Safeco received from OPTUM. Nor did it request a copy of any documentation which would normally show whether and to what extent the healthcare plan or health insurance insurer had a right of subrogation or reimbursement for payments of medical expenses made on behalf of a beneficiary or insured.

Tom Ventura sent adjuster AH a letter dated February 23, 2018 (971) which requested Safeco to evaluate Quinda Beeson's UM claim "and make payment of your insured's

Q. BEESON_M. WELCH 00080

Underinsured Motorists policy limits as outlined in the Burch v. Allstate case."[122]  Attached to this letter is Schedule A, an itemized list of Mrs. Beeson's medical bills and copies of the bills, totaling $63,393.13 (981-1006). Two of the listed bills are not included. Schedule B to the letter is a list of attached medical records of Quinda Beeson (1007).

By letter dated March 30, 2018 OPTUM advised Mr. Ventura of its pursuit of payment on Mrs. Beeson's medical bills (186). Although the letter does not so state, these are bills paid by UnitedHealthcare. Attached to the letter is a "medical payment summary" created March 30, 2018 showing bills submitted and amounts paid (187-189). The total of the bills submitted is $62,722.93. The total amount paid is $18,869.00. Also attached to the letter is a "Pharmaceutical Payment Summary" also created on March 30 (190). A total of $93.70 is shown to have been paid by UnitedHealthcare for various pain medications.

On March 5, 2018 Mr. Ventura sent adjuster AH an updated list of Mrs. Beeson's medical bills which included the previously missing bills, now totaling $63,962.13 (936-940). Med pay adjuster AH called Ventura to advise the med pay coverage limit already had been paid and Ventura responded "the letter is for the UIM adjuster" who was JM (934). On March 20, 2018 Brett W, a supervisor for JM, told JM he agreed with his plan "to send for an IMR", and authorized JM to consent to Mrs. Beeson's settlement with Allstate and its insured should

---

[122] In Burch v. Allstate Ins. Co., 977 P.2d 1057 (Okla. 1998) the Oklahoma Supreme Court held that UM coverage in Oklahoma is primary and, accordingly, a UM insurer has a duty to investigate and evaluate a UM claim without regard to whether the liability insurer of an "underinsured motorist" has paid or offered to pay any amount under the bodily injury liability coverage of the underinsured motorist's policy.

81

such settlement be made (914).   IMR stands I believe for "independent medical records review".   On March 19 JM spoke to legal assistant Carrie Harris at Carr & Carr who advised they did not know the limits of liability of Allstate's policy (915).

On March 20, 2018 adjuster JM submitted a Liberty Mutual "Peer Review – Claims Referral Form" (908-911) to an outside vendor, requesting review of Mrs. Beeson's medical records by an orthopedic doctor.   JM spoke to an Allstate adjuster on March 23 who advised no settlement offer had been made to Mrs. Beeson (884).   On March 29 adjuster JM discussed with Dr. Dennis Foster, an Oklahoma City orthopedic surgeon who reviewed Mrs. Beeson's medical records (893).   Dr. Foster told the adjuster:

> Her neck pain is likely related to this incident given she has multiple degenerative issues shown on MRI.... Chest pain would also be related as it appears to be a limited complaint, at the ER, and it could be caused by seat belt.  She also could have had mid back and lumbar pain as she has scoliosis.

> He advised he understood main concern is right shoulder pain given she has a rotator cuff tear and surgery.  He advised he agrees there is a questionable injury mechanism but that he cannot definitively say accident could not have aided in the tearing of her rotator cuff without insured's prior records for review.  He advised without seeing her history he cannot make a concrete opinion on this injury in relation to this accident. He advised he would be willing to supplement his report and his opinion if we obtain priors.

Other than this claim note there is no documentation of Dr. Foster's opinions regarding his review of Mrs. Beeson's medical records such as an email, letter or formal report.

**Q. BEESON_M. WELCH 00082**

Based on the discussion with Dr. Foster adjuster JM discussed the claim with his supervisors, concluding that without knowledge of Allstate's bodily injury limit of liability the evaluation of Mrs. Beeson's UIM claim could not be completed and, based on its discussion with Dr. Foster, he would request five years of Mrs. Beeson's prior medical records (892).  JM informed legal assistant Carrie Harris at Carr & Carr of the request for prior medical records on March 29 and also for the limits of the Allstate bodily injury liability coverage (891).  He confirmed these requests in a letter of March 9 as well (890).  Not having received the requested information JM sent the same letter but dated April 30 and May 29, 2018 (889 & 861).

By letter of June 22, 2018 Mr. Ventura sent prior medical records of Mrs. Beeson to the former med pay adjuster AH, not the UIM adjuster JM (456).  The letter obviously got to the right adjuster because JM again requested "policy limits of the at fault party's insurance carrier" in a July 22, 2018 letter (451).  Amanda S., a higher level supervisor, advised adjuster JM and his supervisor Brett W. to "go ahead and evaluate the case to see where we are with medicals and value" so when confirmation of Allstate's bodily injury liability coverage limits is received, there will be no delay in completing the evaluation of Mrs. Beeson's UIM claim (450).

The prior records show Mrs. Beeson (then Heinrichs) was involved in another rear end collision in Denver on April 30, 2015 for which she was taken by ambulance to the ER (Denver Health Med Ctr. records, 699-702).  She complained of neck and chest pain and pain

Q. BEESON_M. WELCH 00083

in her left forearm.  On May 1 she went to another ER with complaints of headache, nausea and right sided neck pain (721).  She saw a neurologist in May and June 2015 complaining of severe right sided neck pain, right shoulder pain, sharp pain in back of her head with nausea. Examinations revealed tenderness to palpation in lumbar but not cervical spine and cognitive deficits. (739 et seq.).  She received some care for cognitive deficits but appears not to have completed the course.

Subsequently, she received extensive chiropractic care through December 2015 (805 et seq).  She complained of neck pain, headache, upper back/shoulder pain, right shoulder and arm pain, right jaw pain, chest pain, back pain, memory loss, blurred vision, fatigue, increased irritability and trouble sleeping.       Dr. Higgins, the chiropractor, referred Mrs. Beeson for MRIs of her cervical spine and right shoulder.  The cervical MRI on July 17, 2015, unlike the cervical MRI taken in 2017 after the May 12, 2017 rear end accident, did not find any disc protrusions or foraminal or spinal stenosis[123] at the C2-3, C3-4, and C4-5 levels but did not find moderate foraminal stenosis at C5-6 (but no disc protrusion or bulge like the later MRI). At C6-7 a mild annular bulge without protrusion was found but no stenosis (826).

The right shoulder MRI was conducted on August 10, 2015 (823).  "No retracted rotator cuff macrotear" was found, unlike the MRI after the May, 2017 accident, which was

_____

[123] As previously noted, spinal stenosis is a narrowing of the spinal column which causes pressure on the spinal cord, or narrowing of the foramina (openings) where spinal nerves leave the spinal column.

Q. BEESON_M. WELCH 00084

confirmed at the time of rotator cuff surgery in September 2017. The 2015 MRI was read to show diffuse tendinopathy and tendinosis.[124]

In a letter dated July 18, 2018 OPTUM once again advised Safeco that it was pursuing recovery of Mrs. Beeson's medical bills paid by UnitedHealthcare Services (7-18-18 OPTUM-Aleisha Honeyman letter, 447).

As a result of a further "Triage Discussion" adjuster JM was to send Mrs. Beeson's prior medical records "to our IMR expert to gauge his opinion on the surgery that was completed" (449). I did not find in the claim file any evidence that the prior medical records of Mrs. Beeson were actually submitted to Dr. Dennis Foster or any other doctor for review. The reference to surgery in the note is to arthroscopic right shoulder surgery performed by Dr. Calvin Johnson in which Mrs. Beeson's right rotator cuff tear was repaired.

By letter of July 27, 2018 Allstate offered its $50,000 per person bodily injury limit of liability in the Salgado policy to settle the claim against Salgado, and Mrs. Beeson accepted the offer (440-443). Ventura sent the Allstate letter confirming the offer to adjuster JM on July 31, 2018, confirming the $50,000 offer had been made by Allstate (439).

---

[124] Shoulder tendinopathy is basically an injury to the shoulder tendons, such as tendinitis (inflammation of tendon) or tendinosis (tiny tears in the tendon without significant swelling.) Uvahealth.com/services/sports-medicine/shoulder-tendinopathy (last visited 10/15/21)).

Q. BEESON_M. WELCH 00085

Another adjuster, Simon Linwood (SL) entered a claim note on August 13, 2018 confirming that Safeco consented to settlement by Mrs. Beeson with Allstate and its insured, and would waive any potential right of subrogation against the Allstate insured (350). Adjuster SL advised "Tony" Ventura he was the newly assigned UM adjuster and that Safeco consented to settlement with Allstate and its insured and waived any possible right of subrogation, in an August 13, 2018 letter (349). On August 20, 2018 adjuster SL spoke to a representative of Farmers Insurance Company. Farmers had been listed on the police report as the insurer for Mrs. Beeson. Farmers advised it had issued an auto policy to Robert Beeson but it had not been in effect on the date of accident, May 12, 2017 (347).

Also on August 20, 2018 adjuster SL discussed Mrs. Beeson's UIM claim with Mr. Ventura (346). According to SL's claim note Mr. Ventura informed him that Mrs. Beeson was a RN with patients in home health care but was not pursuing a claim for loss of earnings (L&E), and that she had been involved in a prior motor vehicle accident as a result of which she had made right shoulder complaints but had not had any surgery on the shoulder. On the same day as this conversation adjuster SL conducted a "BI Transfer Analysis" (344) which summarizes basic information about the Beeson and Briley UIM claims and setting a reserve of $100,000 for "UIM BI".

On August 21, 2018 a "Complex Triage" was conducted involving J. Wong and adjuster Barbara Meyer (BM). Mr. Wong's claim note states: "although CO policy, Insd now lives in OK. OK loss in OK ATTY involved." "CO" appears to mean Colorado. The relevance of

86

this statement is not clear in the claim file which does not contain any discussion of which state's laws, Colorado or Oklahoma, should govern the interpretation and application of the Beeson auto policy.

New UM adjuster BM emailed OPTUM on August 22, 2018 for "updated breakdown of the payments issued on behalf of Quinda Beeson for injuries resulting from the 5/12/2017 motor vehicle accident" (340). She also prepared a **Bodily Injury Evaluation (BIE) Worksheet** (139-144). Although the document is undated it is apparent it was prepared no later than August 24, 2018 when BM's claim note states "evaluation completed on Beeson, call for our offer" referring to a voicemail she had left for Mr. Ventura (165).

The evaluation of coverage and liability of the other driver in BM's evaluation did not change since the initial BI Analysis: no coverage issues were identified and Salgado, the Allstate insured and driver of the car which struck Quinda Beeson's car stopped in the roadway, was 100% at fault (139). Under the heading **Injury/Treatment** BM described **Injury/Diagnosis** as "Rotator Cuff (right tear)" and "Neck, back and chest injury" (*Id.*). Following this heading is a **Medical Treatment Summary** in which BM briefly describes the evaluation and treatment services of Mrs. Beeson's providers (139-142).

No reference is made in the evaluation worksheet to the review of Mrs. Beeson's medical records by Dr. Dennis Foster.

Q. BEESON_M. WELCH 00087

Under **Prior Medical History/Prior Accident** BM focused on records provided by Mr. Ventura for treatment of injuries Mrs. Beeson received from an April 30, 2015 rear-end auto accident.   According to the worksheet Mrs. Beeson did not complain of neck, back or right shoulder injuries in the ER on the date of accident, but during physical therapy starting on May 7, 2017 she complained of shoulder pain.   However, the "majority of treatment surrounds head and neck" with "consistent complaints of right sided pain".   An August 10, 2015 MRI of the right shoulder found tendinopathy of the rotator cuff with "supraspinatus bursal surface scuffing and undersurface scuffing of the central fibers of the subscapularis." The radiologist read the MRI which is reproduced in the worksheet as showing "No retracted rotator cuff macrotear."   The radiologist observed that bicep tendinosis was seen but "No evidence for high grade tear" of the biceps.   The third finding by the radiologist is "mild acromioclavicular arthropathy."   The last finding is more general: "Mild volumetric atrophy throughout the visualized musculature of the right shoulder."   In October, 2015 adjuster BM notes that Mrs. Beeson had a cervical facet injection.

Under the heading **Analysis/Decision** Safeco through adjuster BM translated Mrs. Beeson's injury and treatment into a monetary evaluation.   The first item evaluated is **Medical Specials (discussion of submitted/accepted)**.   Special Damages refer to such items as the reasonable cost of necessary medical treatment and likely future treatment, and lost wages or income while unable to work due to injuries.[125]   Mrs. Beeson did not submit any evidence of

---

[125] Government Emp'ees Ins. Co. v. Quine, 264 P.3d 1245, 1247 fn.2 (Okla. 2011).

Q. BEESON_M. WELCH 00088

loss of wages or other employment income. See 000143 **"Wage loss Specials**...: Not presented." Thus, the only special damages evaluated were for the services rendered by the medical providers to Mrs. Beeson. No reference is made in the **Analysis/Decision** to possible future medical treatment costs.

Two documents I was furnished from Liberty/Safeco claims handling documents refer to 12 O.S. § 3009.1. One document, entitled "OK Collateral Source Offset" with a "06/25/2020" date states: "When the collateral source rule is in effect, statute provides that the actual amounts of medical bills paid (not the amount billed) is evidence admissible at trial in personal injury cases", citing § 3009.1 and Blythe v. University of Okla., 82 P.3d 1021 (Okla. 2003) (1777).[126] The other document is a page out of a multipage document entitled "50 State Survey – Medical Specials – Recovery of Amounts Billed vs. Amounts Paid", dated "December 2015 – HO Legal." (1799). This document cites 3009.1 for the proposition that evidence of "amounts 'paid' will be admitted as evidence at trial, as opposed to the 'amounts billed,'...". However, the document notes section 3009.1 was amended November 1, 2015 to add paragraph C which is quoted.

The Worksheet calculates the total amount billed for all providers at $63,393.13. It calculates the total amount "paid" as $28,754.13. Neither the Worksheet or any other part of the claim file explains how Safeco calculated the amount "paid". Nor does the Worksheet

---

[126] Blythe applied the statutory Collateral Source Rule in the prior Workers Compensation Act to hold that the amount paid on an injured employee's prescription bills by his health insurance could not be used to bar or reduce his recovery under the Workers Compensation Act for the amount charged for the prescriptions. 82 P.3d at 1029-30..

Q. BEESON_M. WELCH 00089

identify the source of the evidence of the amounts paid.  Presumably this information came from OPTUM which was seeking recovery of the amounts paid by UnitedHealthcare Services on Mrs. Beeson's medical bills.  However, as discussed earlier, Safeco never requested any actual proof of the amounts paid by UnitedHealthcare nor did it request any documentation to show that UnitedHealthcare, acting through its recovery agent, OPTUM, was contractually entitled to be reimbursed for the amounts which United Healthcare had paid from either the medical payments or UM/UIM coverages of the Beeson policy.

In her deposition adjuster BM testified she chose to utilize the amount paid on Mrs. Beeson's medical bill by UnitedHealthcare because of 12 O.S. § 3009.1.  Meyer depo. at 133-34.  She acknowledged she did not obtain any signed statements from Mrs. Beeson's medical providers that they accepted the amounts paid by United Healthcare as full payment for their bills, as required by paragraphs A and B of section 3009.1, but testified Safeco didn't need the statements unless Mrs. Beeson sued Safeco, in which case Safeco would get the statements.  Depo. 138, 140.

Under the heading in the worksheet **General Damages (consider evaluate recovery period impact on lifestyle, permanency, disability)** BM evaluated the remainder of Mrs. Beeson's damages.  General Damages refer to damages which cannot be calculated precisely,

Q. BEESON_M. WELCH 00090

such as past and future physical and mental pain and anguish, permanence of injury, and disability caused by injury.[127]

Safeco through BM assigned a value of $40,000-$50,000 for the rotator cuff tear which BM states "appears to be an aggravation of prior condition, requiring (1) subacromial injection and draining, then surgery" plus "post operative PT" (143). The records reviewed in the worksheet also describes physical therapy prescribed for and provided to Mrs. Beeson prior to her shoulder surgery. See discussion of Physical Therapy Central for physical therapy from May 31, 2017 to July 10, 2017 (140) in section VIII. *supra.*

The obvious reason for characterizing the shoulder injury as an aggravation is that Mrs. Beeson had some shoulder complaints following the 2015 motor vehicle accident and had an MRI which, while showing some abnormal findings in the right shoulder, did not show a full thickness tear of the rotator cuff, whereas an MRI conducted after the May 12, 2017 accident showed a full thickness tear of the right rotator cuff. No evidence of any cause of the rotator cuff tear other than the trauma of the May 2017 collision was developed by Safeco.

Adjuster BM also assigned $8,000-$10,000 for "**Neck/chest seat belt contusion**" (143). She characterized the treatment for these injuries as "ER, diagnostics and PT", "6-8 wks treatment", and "aggr of prior condition". Pain is noted to radiate into her two fingers with

---

[127] Government Emp'ees Ins. Co. v. Quine, 264 P.3d at 1247 n.2.

Q. BEESON_M. WELCH 00091

numbness. It is not clear from the Worksheet what condition of the neck or chest was thought to have been aggravated or whether this reference is to a prior condition originating in the 2015 motor vehicle accident previously discussed in the Worksheet. The potential significance of the cervical spine MRIs which are quoted in the Worksheet may be that they show some aggravation of pre-existing conditions. The MRI showed stenosis at C5-6, C6-7, C6-7 and C7-8 due to annular disc bulges, and C5-6 spinal canal stenosis due to a disc protrusion (141). The MRI taken in 2015 as part of the evaluation and treatment of the prior injuries sustained in another rear end accident did not show disc bulge or protrusions, or stenosis at any level of the cervical spine except C6-7. See 826.

The two General Damages numbers are not broken down by elements so it is not clear which elements are included in the evaluation and how much money was allocated to each element, such as past and future physical mental pain and suffering, permanence of injury, disability from injury, or impact on lifestyle.

The foregoing evaluation is then summarized in a chart which confirms that the only element of special damages considered was the amount paid by UnitedHealthcare for Mrs. Beeson's medical treatment. Thus, the chart assigns a value range for special damages as $28.754.13 apparently based on information provided by OPTUM of the amounts paid by UnitedHealthcare Services, and $48,000-$60,000 general damages. Adding these together the total damages range is calculated as $76,754.13-$88,754.13. After subtracting the $50,000

**Q. BEESON_M. WELCH 00092**

paid by Allstate, the chart shows the value of Mrs. Beeson's UM claim as established by Safeco as between $26,754.13 and $38,754.13.

Under the heading **Current Reserve** in the worksheet the comment is made that no changes were recommended to the existing $100,000 reserve.

The worksheet also includes a **Negotiations** heading under which **Our Strengths** (referring to Safeco) and **Their Strengths** (referring to Quinda Beeson) are listed. Safeco's strengths are listed as "[q]uestionable mechanism for a right shoulder tear" which apparently comes from the former adjuster's discussion with Dr. Foster following his review of Mrs. Beeson's post-accident medical records (See 893), and "Excessive billing" (144). It is not clear why the latter statement was considered a strength when the amount assigned as the value of medical services was reduced to the amounts paid by UnitedHealthcare Services. In other words, the evaluation did not actually examine each bill and determine how much if any of it was excessive, but uniformly reduced all of the billed amounts to the amounts paid by UnitedHealthcaree.

Mrs. Beeson's "strengths" are listed as "Aggravated liability (claimant distracted with GPS)", "Aggravation of pre-existing conditions", "Confirmed shoulder tear with surgery", and "Insd has multiple pre-existing conditions and is somewhat egg-shellish." (*Id.*). Aggravated liability technically has no impact on the recoverable amount of damages. In my experience

Q. BEESON_M. WELCH 00093

the tortfeasor's conduct may be so egregious that an experienced personal injury lawyer can create an impression with the jury that the aggravated conduct should translate into more compensatory damages, particularly if punitive damages are also an issue and the amount of punitive damage will be capped by statute and will not be payable under UM coverage. However, this tactic is less likely to be successful if the tortfeasor is not sued and the UM insurer is.   The remainder of Mrs. Beeson's listed strengths really fold into one – she aggravated pre-existing conditions and surgery for the right shoulder aggravation.

On August 25, 2018 adjuster BM spoke to Carrie with Carr & Carr who advised "there were some unpaid balances" on Mrs. Beeson's medical bills, suggesting some providers may not have accepted the payment by UnitedHealthcare as full payment of their bills (000164). An August 31, 2018 letter from OPTUM to BM refers to a BM August 24 letter "stating benefits have been exhausted" (155).   Presumably this refers to the $5,000 medical payments coverage limit which was previously paid to Mrs. Beeson.

On September 4, 2018 Mr. Ventura emailed adjuster BM an itemization of Mrs. Beeson's medical expenses which shows the amounts billed, the amounts paid by UnitedHealthcare Services, amounts still owed, and a total amount (160-163).   The total billed is $63,962.13. Under NC payments as of March 30, 2018 is $25,461.64.   Amounts still owed are shown as $3,155.29 and $137.20.   The email also states:

> It is our position that it is not appropriate for a first party carrier to hold the "paid vs. incurred" statute against their insured unless you have fully complied with 12 O.S. § 3009.1…. The statute requires you obtain signed statements from the medical provider

Q. BEESON_M. WELCH 00094

that the provider will accept the amount paid as full payment of the obligations. I look forward to receiving your offer for the underinsured motorist claim shortly. (000163).

It is not clear why Mr. Ventura is discussing 12 O.S. § 3009.1 but it may be that BM had mentioned to his legal assistant in their August 24, 2018 telephone discussion that she evaluated Mrs. Beeson's claim using the amounts paid by UnitedHealthcare Services instead of the amounts billed for medical services.

Adjuster BM responded to Mr. Ventura's September 4 email with a September 14 email which in pertinent part states: "We have completed the evaluation for Quinda Beeson" (152). No response is included in this email to Mr. Ventura's argument that 12 O.S. § 3009.1 does not apply to the adjustment of Mrs. Beeson's UM claim. After several missed calls between BM and Mr. Ventura, the two spoke on September 28, 2018. According to BM's claim note of this conversation, she told Ventura "our evaluation will be based on the paid specials" and "[w]e understand should this matter not be resolved and go forward in litigation, we will be required to obtain affidavits from each provider, however, for the purpose of our negotiations, we will use the paid amount....". Ultimately, BM made an offer of $25,000 to settle Mrs. Beeson's UM claim.

By email of October 3, 2018 to Mr. Ventura, adjuster BM confirmed the $25,000 offer and further confirmed that Mr. Ventura requested Safeco to "hold off on any payment at this time" due to "outstanding OPTUM lien" (135). BM on several occasions refers to the UnitedHealthcare Services reimbursement claim being pursued by OPTUM as a "lien".

Q. BEESON_M. WELCH 00095

Under Oklahoma statutory law a lien is defined as "a charge imposed upon specific property by which it is made security for the performance of an act." 42 O.S. § 1. A lien can be created "1. By contract of the parties, or, 2. By operation of law." 42 O.S. § 6. A lien cannot be created by contract unless the person possessing the property on which a lien is claimed agrees to the lien.[128] No Oklahoma or Colorado statute creates a lien in favor of a health insurer or healthcare plan to the proceeds of auto medical payments or UM coverage. Safeco did not request or obtain any documentation from OPTUM or UnitedHealthcare Services to establish that UnitedHealthcare Services had a contractual lien. No evidence then exists of a "lien" in favor of UnitedHealthcare.

It appears that Mr. Ventura discussed with OPTUM the UnitedHealthcare Services claim for reimbursement because an October 23, 2018 OPTUM letter to him (1301) refers to their "previous communications". The letter states that UnitedHealthcare Services paid $25,461.54 in "medical expense benefits" and "[b]ased on a settlement of $75,000 the Plan will reduce the subrogation interest to $22,500." The letter also states "[t]he plan is set up under the Federal Employee Retirement Security Act of 1974 (ERISA)… 29 U.S.C. § 1001 et seq."

The reference to a $75,000 settlement seems to refer to $50,000 in bodily injury liability coverage paid by Allstate and the $25,000 offer by Safeco on Mrs. Beeson's UM claim. The last quoted comment regarding ERISA indicates that UnitedHealthcare Services may have made payments pursuant to an "employee benefit plan" created pursuant to ERISA, maybe by

---

[128] See e.g., <u>Williamson v. Winningham</u>, 186 P.2d 644, 649 (Okla. 1947).

Q. BEESON_M. WELCH 00096

Turner Corporation. However, because Safeco did not request any documentation to prove United paid Mrs. Beeson's bills and had a contractual right to recover the payments from the Allstate liability insurance payment or any payment to be made by Safeco under the UM coverage, we do not know if in fact an ERISA plan existed and, if it did, whether it was self-funded or insured.[129]   UnitedHealthcare Services likely served as the plan administrator or funded the plan benefits payments, or both. However, without the actual plan document the plan summary given to beneficiaries under an ERISA plan, I can only generalize about the basis for the payments made by UnitedHealthcare Services.

Allstate sent settlement checks to Carr & Carr on October 24, 2018. One is for $35,000 payable to Quinda Beeson and Carr & Carr. One is for $15,000, payable to OPTUM (126-129). These checks indicate that the $50,000 in bodily injury liability coverage was being allocated between Mrs. Beeson and UnitedHealthcare Services, $35,000 and $15,000, respectively. Copies of these checks and "reduction confirmation for the health insurance, OPTUM" were emailed by Carrie Harris of Carr & Carr to adjuster BM on October 30, 2018 (124). On the same date Safeco issued a check for $17,500 payable to Quinda Beeson and Carr & Carr, and another check for $7,500 payable to OPTUM. The total of the two checks is $25,000, the offer Safeco made on Mrs. Beeson's UM claim (1671). Thus, these payments indicate OPTUM did accept a total of $22,500 in satisfaction of UnitedHealthcare's claim.

---

[129] The nature of the funding is relevant to whether ERISA's preemption clause prohibits application of Oklahoma or Colorado law to UnitedHealthcare's claim, are discussed in section VII.D.6, *supra.*

Q. BEESON_M. WELCH 00097

On November 6, 2018 adjuster BM and Mr. Ventura spoke by telephone (120). According to BM's claim note Ventura advised her that the $25,000 offer would not be accepted as full payment of Mrs. Beeson's UM claim, and that he disputes the evaluation of the claim, including the use of the amounts paid by UnitedHealthcare Services to calculate recoverable special damages.   Mr. Ventura also mentioned that Quinda Beeson has "calcification in her right breast" which she relates to the seat belt when her car was rear-ended on May 12, 2017.  Mr. Ventura was to follow up and provide additional records relating to this condition to Safeco.

An "Updated Analysis" dated November 6, 2018 by adjuster BM (178) indicates that the settlement offer of $25,000 would now be treated as an "unconditional tender".  An "unconditional tender" in my experience is an offer to pay a sum certain without requiring the insured's acceptance of the payment as constituting a full and final settlement of the insured's claim.   Such a tender is also sometimes referred to as a payment of the "undisputed amount".[130]   BM confirmed to Ventura that the $25,000 was an unconditional tender in a November 6, 2018 email (119).

No further activity regarding Mrs. Beeson's UM claim is recorded in the claim file until Mr. Ventura faxed a September 10, 2019 letter to adjuster BM (88-91).  The obvious purpose of the letter is to persuade Safeco to reconsider its reduction of Mrs. Beeson's recoverable medical expenses to the amounts paid by UnitedHealthcare Services.  Mr. Ventura initially

---

[130] See the Quine case, *supra.*, 264 P.3d at 1248-51 for a discussion of unsuccessful attempts to impose an unconditional duty to pay the undisputed amount on a UM claim.

Q. BEESON_M. WELCH 00098

observes that 12 O.S. § 3009.1 applies in "civil actions arising from personal injury" and not the first party claim such as Mrs. Beeson's UM claim.  This indicates BM had told him Safeco applied section 3009.1 to the evaluation of Mrs. Beeson's special damages.  Secondly, he points out, assuming section 3009.1 could be lawfully applied to the adjustment of a UM claim, that the statute "is not self-executing" because it "places a burden on the party evoking the statute to obtain statements from the providers agreeing to accept the paid amounts as payment in full."  This is in fact a requirement under paragraphs A and B of section 3009.1. The letter continues, stating if the provider's statement required by paragraphs A and B are not obtained, provided to the opposing party and listed as an exhibit by the final pretrial hearing, "then the amount billed shall be admissible at trial subject to the limits regarding any lien filed in the case."  This too is an accurate paraphrasing of paragraph C section 3009.1.

In his letter Mr. Ventura requests Safeco to "show me you have obtained the required statements" from Mrs. Beeson's medical providers.  He points out that in his experience "I have never actually seen such a statement which complied with the statute".  Therefore, he asserts that Safeco's stated assumption (via BM as she later testified) that Safeco would obtain the provider statements should Safeco force Mrs. Beeson to sue it, and "to evaluate the UM claim on that basis" is in Mr. Ventura's view a violation of "the insurer's duty of good faith and fair dealing."

Mr. Ventura also discusses three Oklahoma Supreme Court decisions in the letter.  First, he points out that <u>Lee v. Bueno</u> upheld the constitutionality of the original section 3009.1

99

Q. BEESON_M. WELCH 00099

(enacted in 2011) which did not include paragraph C (added by the 2015 revision of the statute) which expressly provides that the plaintiff's medical bills are admissible and thus the amount of the bills are recoverable "if the defendant does not obtain the required statement (or sworn testimony) of the plaintiff's medical providers."

Mr. Ventura then cites the case of C&H Power Line Constr. Co. v. Enterprise Prod. Oper. LLC, 386 P.3d 1027 (Okla. 2016) for the proposition that "[u]nless you obtain the statements" of providers, "the default rule is that the collateral source doctrine is alive and well." The C&H Power case was not a personal injury case and did not involve consideration of 12 O.S. § 3009.1. The claim was for loss of the value of a business and other damages resulting from a pipeline explosion which occurred allegedly due to the negligence of the defendant. The explosion occurred in Texas where the plaintiff was working. Texas law applied to the substantive liability and damage issues which included the Texas Collateral Source Rule. The Supreme Court held that the fact plaintiff was paid by insurance for damages to some of its equipment caused by the explosion was properly excluded from evidence based on the Collateral Source Rule. The court cited Texas cases on the Collateral Source Rule and then added an Oklahoma case.

The third case cited by Mr. Ventura in his letter is Falcone v. Liberty Mut. Ins. Co., 391 P.3d 105 (Okla. 2017). As a sister company of Liberty Mutual, the defendant in that case, Safeco presumably is aware of it. In Falcone the Supreme Court reversed summary judgment for Liberty Mutual in a UM bad faith case where Liberty Mutual refused to pay for Level 2

Q. BEESON_M. WELCH 00100

trauma care ordered by the emergency room doctor for the insured following her motor vehicle accident, on the ground this heightened level of service was not medically necessary for the insured's treatment. Liberty Mutual also subsequently made multiple offers below its maximum evaluation of plaintiff's compensatory damages. The court held that "whether withholding payment for the costs of the trauma center as 'compensatory damages' was not unreasonable and in bad faith is a fact question for the jury.... The amount of the bill insured received for the treatment and the L2 trauma center is completely beyond her control as was the decision of the ER doctor to send her there in the first place."[131] The court further held that Liberty Mutual "offered less than a maximum amount of its evaluations after taking the position the L2 trauma treatment was unwarranted. More than once, it offered the low figure instead of the higher one. The change in offers also could be seen as an arbitrary attempt to close the case."[132]

I did not find any evidence in the claim file that adjuster BM evaluated Mr. Ventura's arguments or read the cases he cited, or solicited the advice of in-house or outside counsel concerning the potential significance of Mr. Ventura's arguments or of the cases he cited. Adjuster BM did discuss the September 10, 2018 letter with Ventura on September 27. According to her claim note Safeco's position that using the amounts paid by UnitedHealthcare Services on Mrs. Beeson's medical bills was the correct amount to include in the evaluation of her damages, and "[w]e have therefore issued to her our tender representing a fair evaluation of her claim" (87).

---

[131] 391 P.3d at 107.
[132] *Id.*

Q. BEESON_M. WELCH 00101

Three months later adjuster BM emailed Ventura inquiring if Mrs. Beeson "was interested in resolving this matter full and final at this time" (82). It appears this email was asking if Mrs. Beeson would accept the previous unconditional tender of $25,000 as a full and final settlement, even though the offer ultimately was made as an unconditional tender. I have not received any further documentation from the claim file for Mrs. Beeson's UM claim.

## X. Violation Of Standards.

In this section I identify acts and omissions in the processing of Mrs. Beeson's UIM claim which violate the Investigation, Training, Documentation, Knowledge of Law, Evaluation, and Negotiation Standards.

### A. Failure To Consider Choice Of Law Issues.

Safeco violated the Knowledge of Law, Training and Evaluation Standards by failing to address how to resolve choice of law issues when an auto policy including UM/UIM coverage is issued in one state to a resident of that state on a vehicle garaged in that state, and the accident and injury occurs in another state involving an underinsured motorist who is a resident of yet a third state. Safeco's claims handling materials and on-the-job training by peers as presented to me, failed to address such an issue. Nor was the issue considered in the

102

Q. BEESON_M. WELCH 00102

specific circumstances of Mrs. Beeson's UM/UIM claim. Had such consideration been given, Safeco would have proceeded to determine whether the Beeson auto policy should be interpreted under Colorado law to the extent it conflicts with Oklahoma law.

The fact the Beeson policy is entitled **Colorado Essential Personal Auto Policy**, contains coverages which are intended to comply with Colorado statutes (such as the UM/UIM coverage), and has disclosure forms attached which are required by Colorado statutes, should have put Safeco on notice that a choice of law issue may exist once it became known that the accident had not occurred in Colorado.

As discussed in section VII.D.2, *supra.*, the Oklahoma UM statute does not by its express terms apply to the Beeson policy, the Colorado UM/UIM statute's express terms do apply to the Beeson policy, and Oklahoma traditional choice of law rules application to breach of insurance contract claims suggest Colorado law would be applied by an Oklahoma court to Mrs. Beeson's UM claim. This is knowledge Safeco should have had because it is charged with knowledge of the UM statutes in the states in which it issues auto policies. Safeco's lack of the required knowledge and training of claims personnel on the knowledge of the scope of a state's UM statute impacts several aspects of the processing of Mrs. Beeson's UIM claim, as will be discussed in subsequent subsections.

Q. BEESON_M. WELCH 00103

**B. Low Ball Offer.**

Assuming for the purpose of argument only that the range of value Safeco assigned to Mrs. Beeson's UIM claim was reasonable, Safeco nevertheless violated the Negotiation Standard. It did this because the only offer Safeco made, $25,000, was less than the low end of the range of values Safeco assigned to Mrs. Beeson's UM claim, $26,754.13. Compare **Bodily Injury Evaluation (BIE) Worksheet** (139-144) with October 3, 2018 adjuster BM-Ventura email (135) and November 6, 2018 BM-Ventura email (119). Safeco's evaluator, BM, characterized the offer below the range of values as "a **fair evaluation** of her claim". (9-27-18 Claim Note describing her telephone conversation with Mrs. Beeson's lawyer, Tom Ventura, on that date, 87 (emp. add.)). Given that the lowest Safeco evaluation was $1,754.13 more than Safeco's only offer, the quoted statement was misleading at best.

The "low ball" approach is acceptable in negotiations of third party bodily injury claims but the non-adversarial nature of the relationship between an insurer and insured/first party claimant makes low ball offers contrary to industry standards and thus a violation of the Negotiation Standard. An insurer cannot give at least equal consideration to the insured's interests by withholding an offer within the insurer's own evaluation range. More importantly, the Negotiation Standard requires a first party insurer to eventually offer its maximum evaluation in the course of negotiations.[133]

---

[133] This standard is, as discussed in section VII.F., *supra.*, the law as well, because the Oklahoma Supreme Court held that when the insurer "offered less than the **maximum amount** of its evaluations

Q. BEESON_M. WELCH 00104

After Safeco made the $25,000 offer it subsequently changed the offer to an "unconditional tender" of the same amount.  However, this does not alter my conclusion that the offer, conditional or unconditional, was a low ball offer in either scenario, the offer made was below the lowest amount in the range of values Safeco assigned to Mrs. Beeson's claim, and Safeco never offered the maximum value of her claim in negotiation with her lawyer.

In the deposition of Safeco's evaluator, BM, she offered a *post hoc* justification for the $25,000 offer.  She testified that her evaluation range included a sum with a value of medical services provided to Mrs. Beeson represented by the amount which OPTUM told her that UnitedHealth Services had paid on Mrs. Beeson's bills, $28,754.00. Meyer depo. 182.  After her evaluation was conducted OPTUM offered to take less on its reimbursement claim than the amount its principal actually paid, $25,461.64.  *Id.* 195.  According to BM, if the $25,461.64 number is plugged into the evaluation of Mrs. Beeson's Special Damages in the evaluation she previously performed, the range of values "should have been reduced by $3,292.49".  *Id.* 182.  Later, OPTUM reduced the amount it would accept in settlement again to $22,500.  According to BM, by plugging this amount into the previously conducted evaluation as Special Damages, the value range for Mrs. Beeson's UIM claim was reduced to "about $4,500 less than what is reflected on that evaluation form." *Id.* 182.

---

after taking the position that [some] treatment was unwarranted", the insured's bad faith claim should have been submitted to the jury.  See Falcone v. Liberty Mut. Ins. Co., 391 P.3d 105, 107 (Okla. 2017).

Q. BEESON_M. WELCH 00105

BM also testified she conducted the evaluation by initially calculating Special Damages as only the amount paid by United HealthCare Services on Mrs. Beeson's medical bills, based on her training and instruction to apply 12 O.S. § 3009.1 to the adjustment of UM/UIM claims. Meyer depo. 133-34, 180.  Specifically, she relied upon the part of the statute that allows for the admission of the amount paid to a medical provider if the provider signs a statement or gives sworn testimony acknowledging the provider accepted the amount of payment made to it in full satisfaction for services rendered, thereby "writing off" the difference between the amount paid and the amount billed.  See section 3009.1(A) quoted *infra.*

Safeco was informed that United HealthCare paid $28,754.13 of the $63,393.13 billed by Mrs. Beeson's medical providers.  Assuming for this discussion only that section 3009.1(A) applies to the adjustment of a UM/UIM claim, section 3009.1 does not contemplate that a lesser amount will be offered as evidence at trial of a civil action involving personal injury, the context in which the statute applies, than the amount paid to the medical providers. Because Safeco utilized the amount paid to the providers to calculate Mrs. Beeson's Special Damages, purportedly representing the amount of Special Damages she is legally entitled to recover from the at fault underinsured motorist, now minus the amount paid by the uninsured motorist's liability insurer, it is totally irrelevant that the payor on the medical providers' bills ultimately compromised its subrogation or reimbursement claim for less than the amount paid. In other words, the amount United HealthCare through OPTUM ultimately agreed to accept in satisfaction of its subrogation/reimbursement claim does not represent the amount of Mrs. Beeson's Special Damages if in fact Safeco was attempting to apply section 3009.1(A) as adjuster BM testified.

106

Moreover, as will be discussed *infra.*, Safeco never determined if United HealthCare Services had a contractual right of subrogation or reimbursement to the proceeds of Mrs. Beeson's UIM claim, and did not consider whether United's claim was prohibited under Oklahoma or Colorado law pursuant to the "make whole" rule. In the absence of such information, Safeco had no reason to believe that United HealthCare Services and thus OPTUM had any right to share in any sum Mrs. Beeson recovered on her UIM claim, further rendering the amount for which OPTUM was willing to compromise irrelevant.

Safeco also never revised its initial evaluation of the value of Mrs. Beeson's claim to reflect the reduction of Special Damages to the amount for which OPTUM agreed to compromise United's subrogation/reimbursement claim, even though the form is electronic and easily modified, revised, or added to. This would be a violation of the Documentation Standard if in fact Safeco's position was that the amount recoverable as Special Damages by Mrs. Beeson was equal to the amount for which an insured's health insurer is willing to compromise its subrogation/reimbursement claim, rather than the amount the health insurer paid on the insured's medical bills.

Ultimately, adjuster BM's after-the-fact justification for the low ball offer does not address Safeco's failure to comply with the Evaluation Standard by offering the maximum amount of the evaluation of Mrs. Beeson's claim, $38,754.13 in the course of negotiations, not to

107

Q. BEESON_M. WELCH 00107

mention the amount for which the evaluation worksheet shows the reserve for Mrs. Beeson's claim to be - $100,000. See **Current Reserve** section of the worksheet (139-144).

### C.  Failure To Evaluate All Elements Of Potentially Recoverable Damages.

Safeco violated the Evaluation Standard by failing to evaluate all potentially recoverable elements of damage Mrs. Beeson would have been legally entitled to recover from the underinsured motorist, based upon the information in Safeco's own claim file and other information about which adjusters had knowledge but failed to pursue.

### 1.  Improper Application of 12 O.S. § 3009.1 To Reduce The Amount Of Mrs. Beeson's Special Damages.

In Oklahoma and Colorado, as discussed in section VII.E., *supra.*, the reasonable value of necessary medical services to evaluate and treat a person's bodily injury is a recoverable element of damages in a tort action against a person whose fault caused the injuries. Historically, the amounts billed for medical services have been the default evidence of the value of the services.  Indeed, Oklahoma has even eliminated the need for the plaintiff to call an expert witness to testify as to the reasonableness of the charges of medical providers and the necessity of the treatment.  Under 12 O.S. § 3009 (not 3009.1) the injured person or member of her family can authenticate the bills and medical records and testify they are for

**Q. BEESON_M. WELCH 00108**

treatment of the injuries in question, in which case it is not necessary to have expert testimony to establish the reasonableness of the charges or the necessity of the treatment.  Moreover, the Collateral Source Rule in Oklahoma and Colorado prevents admission into evidence of the amounts which the injured person's providers received from health insurance or health benefit or employee benefit plans as proof of the reasonable value of the provider's services, as discussed in section VII.D.7, *supra.*

### a. Failure To Consider Whether The Colorado Collateral Source Rule Applied To The Evaluation Of Mrs. Beeson's Special Damages.

Under Colorado law when the "contract exception" to CSR § 13-21-111.6 applies, the amount paid by health insurance or health benefit plans cannot be applied to reduce the amount of recoverable damages in an action "to recover damages for a tort resulting in death or injury to a person", or in an action to recover UM/UIM benefits, as discussed in section VII.D.7, *supra.*  According to Safeco, however, 12 O.S. § 3009.1 authorized it to use the amount paid by the health insurer or plan as the amount which Mrs. Beeson can recover as damages for the value of the services rendered to evaluate and treat the injuries she sustained in the May 2017 accident, in the course of its adjustment of her UIM claim.

There is no evidence Safeco ever considered whether the right of Mrs. Beeson to recover UIM benefits under her Colorado policy was governed by Colorado or Oklahoma law.  This

Q. BEESON_M. WELCH 00109

was, as previously discussed, a violation of the Knowledge of Law, Training and Evaluation Standards. While in many respects the laws of Oklahoma and Colorado are substantially the same with regard to UM/UIM coverage claims (e.g. elements of recoverable damages in tort, meaning of the phrase "legally entitled to recover damages"), there is a potential conflict between the laws of Oklahoma and Colorado if, for argument sake only, one accepts Safeco's position that section 3009.1 applies to the adjustment of UIM claims. However, under the Bernal decision of the Oklahoma Supreme Court discussed in section section VII.D.2, *supra.*, the Beeson policy is not subject to Oklahoma law because it was not issued or delivered to the Beesons in Oklahoma to insure vehicles garaged in Oklahoma, but was issued in Colorado when the Beesons lived in Colorado from 2014 until they moved to Oklahoma in May 2017, and insured vehicles garaged in Colorado.

Safeco did not address whether the "contract exception" in CSR § 13-21-111.6 applied to the adjustment of Mrs. Beeson's claim because it never considered whether that claim is subject to Colorado law. Under Colorado law the contract exception applies not only to tort claims against underinsured motorists but to UM claims, as discussed in § section VII.D.7, *supra.* Therefore, if in the interpretation of the UM/UIM coverage in the Beeson policy, the contract exception must be considered in deciding what damages Mrs. Beeson is legally entitled to recover from the underinsured driver of the vehicle which rear ended her vehicle, the Colorado common law Collateral Source Rule should have been applied by Safeco in evaluating her Special Damages.

Q. BEESON_M. WELCH 00110

The Collateral Source Rule comes into play in a UIM claim in calculating the damages an insured is legally entitled to recover from an underinsured motorist.  If the Collateral Source Rule applies the UM/UIM insurer is not able to offer evidence of payment of the insured's medical bills by a collateral source, or evidence that the balance of the bills were "written off" by the providers.  Nor would the insurer be able to limit the insured's recovery of damages for the reasonable value of services provided to the amount providers accepted in payment from a collateral source.  Consequently, if the Colorado Collateral Source Rule applies to Mrs. Beeson's claim, 12 O.S. § 3009.1 does not apply, even assuming as Safeco claims that the statute can be utilized in the adjustment of UM/UIM claims.

For my purposes it is not necessary to opine on whether the Colorado Collateral Source Rule actually governs the interpretation of the Beeson's auto policy.  My task is to identify violations if any of insurance industry standards.  Safeco's failure to consider the very distinct possibility that the Beeson policy should have been interpreted in accordance with Colorado law, including the contract exception to CSR § 13-21-111.6 which restored the common law Collateral Source Rule to the determination of damages the insured was legally entitled to recover from an underinsured motorist, violated the Knowledge of Law, Training and Evaluation Standards.  Moreover, if Safeco recognized that Colorado law likely applied to the interpretation of the Beesons' policy, it would necessarily have to consider whether any restrictions exist on the recoverable damages a UM insured would be legally entitled to recover from an uninsured or underinsured motorist, and in the context of a claim like Mrs. Beeson's claim, where the policy was issued in one state, the accident happened in another state with an underinsured motorist who was a resident of a third state.

111

A limited number of cases have considered this issue. In general, the courts have applied their states' choice of law rule for contract actions to the interpretation of the UM/UIM coverage. Then, after reaching a decision on which state's law applies to the interpretation of the contract, these courts then apply the choice of law rules of that state to determine which state's damages law should be applied when determining what damages an insured is legally entitled to recover for the underinsured motorist.[134]

If Colorado contract law governs the interpretation of the Beesons' policy, the reasoning of the cited cases would lead to application of Colorado's choice of law rules for contract actions in order to determine which state's damages law should be applied in determining the damages which Mrs. Beeson is legally entitled to recover from the driver who rear ended her vehicle. Colorado follows the RESTATEMENT (2nd) OF CONFLICT OF LAWS (1971) for both contract and tort actions. See e.g., Kipling v. State Farm Mut. Auto. Ins. Co., 774 F.3d 1306, 1310 (10th Cir. 2004) (Kipling I).

By application of the applicable RESTATEMENT principles in section 6, 187 and 193, Colorado courts have held that the law of the state in which the policy was issued and delivered to a resident of that state to insure a vehicle garaged in that state applies when an accident occurs in another state involving an at fault driver from the other state in determining

---

[134] See e.g., State Farm Mut. Auto. Ins. Co. v. Gillette, 641 N.W.2d 662 (Wis. 2002); Traders Indem. Co. v. Luke, 594 A.2d 38 (Del. 1991); and Shah v. State Farm Mut. Auto. Ins. Co., 377 Fed.Supp.2d 748 (D. N.D. 2005).

112

Q. BEESON_M. WELCH 00112

which law applies to UM/UIM claims. See e.g., <u>Ackerman v. Foster</u>, 974 P.2d 1, 3 (Colo. App. 1998) (California law applied to the interpretation of policy where named insured was resident of California, policy issued and delivered to him in California insuring a vehicle then garaged in California, daughter of named insured with insured vehicle later relocated to Colorado where accident occurred); <u>Bowers v. Buckeye State Mut. Ins. Co.</u>, 2019 WL 141703 at *9 (D. Colo. Jan. 9, 2019) (Kansas law applied where policy issued in Kansas to Kansas resident on vehicles garaged in Kansas when the policy was issued, daughter of named insureds and one of the insured vehicles relocated to Colorado after the policy was issued, and named insured's daughter was injured in Colorado by an underinsured motorist); <u>Loibl v. GEICO Gen. Ins. Co.</u>, 2020 WL 1470802 at *4 (D. Colo. March 26, 2020) (Texas law applied where policy issued and delivered in Texas to Texas resident named insured and insured vehicle garaged in Texas, the plaintiff was a resident of Colorado and was insured in the UIM coverage by virtue of her occupancy in the insured vehicle when it was struck by an underinsured motor vehicle in Colorado).[135]

---

[135] Where, as in <u>Bowers</u> and <u>Ackerman</u>, the insured property, motor vehicles, and an insured in possession of one of the vehicles relocated to another state after the policy was issued and subsequently was involved in an accident in the other state with an uninsured or underinsured motorist, and the insurer did not know of the relocation of the insured or of the insured vehicle, under RESTATEMENT principles the law of the state where the policy was issued and delivered and the insured vehicles garaged at the time the policy was issued continues to be applicable. See <u>Bowers</u> 2019 WL 141703 at *3-4, discussing RESTATEMENT § 193. This result is consistent with Oklahoma law as applied in the <u>Herren</u> case, discussed in section VII.D.2, <i>supra</i>. The <u>Herren</u> insureds resided in Missouri and Kansas, respectively, when the policy was issued on vehicles garaged in those states, the named insureds moved to Oklahoma after the policy was issued, thereafter one of the named insureds was injured while riding as a passenger in a vehicle owned and driven by her daughter, a resident of Oklahoma, caused by the fault of an underinsured motorist, and the Oklahoma Court of Civil Appeals held that the UM laws of Missouri and Kansas, not Oklahoma, applied.

Q. BEESON_M. WELCH 00113

If Safeco had given consideration to the very likely outcome of a choice of law analysis for Mrs. Beeson's claim, application of the Colorado contract choice of law rule should have led Safeco to conclude that Colorado law applies to the interpretation of the Beeson policy, including whether damages an insured is legally entitled to recover from the driver of an underinsured vehicle, is subject to the collateral source rule.  In other words, Safeco never got to the point of evaluating whether the Colorado common law Collateral Source Rule should have been applied in evaluating Mrs. Beeson's damages, rather than the Oklahoma statute Safeco purported to have applied in the evaluation, 12 O.S. § 3009.1.

Had Safeco known and applied Colorado law it would have realized that the Colorado common law Collateral Source Rule would apply because, under Colorado contract choice of law rules, the law of Colorado would apply because the Beeson policy was issued in Colorado to the Beesons when they were residents of Colorado insuring vehicles garaged in Colorado when the policy was issued, even though the Beesons subsequently moved to Oklahoma (without knowledge of Safeco) and Mrs. Beeson was involved in an accident in Oklahoma.

Safeco's failure to know of and apply relevant Colorado law violated the Knowledge of Law, Training and Evaluation Standards, and led to an offer to settle Mrs. Beeson's claim which was significantly less than the value the claim has where Colorado's Collateral Source Rule been applied.  This is because the $63,000 plus in medical provider bills should have been considered as the amount recoverable as Special Damages rather than the amount paid by Mrs. Beeson's health insurer.  Thus, a violation of the Negotiation Standard also occurred.

114

### b.  Section 3009.1 By Its Express Terms Does Not Apply To The Judgment Of A UM/UIM Claim.

Even if the Beesons' policy had been issued in Oklahoma to insure vehicles garaged in Oklahoma, the application of section 3009.1 by Safeco in the evaluation of Mrs. Beeson's UIM claim violated the Knowledge of Law, Training and Evaluation Standards because the plain language of the statute as interpreted by the Oklahoma Supreme Court simply does not apply to the adjustment of UM or UIM claims.

Section 3009.1 in its entirety states:

A. Upon the trial of any civil action arising from personal injury, the actual amounts paid for any services in the treatment of the injured party, including doctor bills, hospital bills, ambulance service bills, drug and other prescription bills, and similar bills shall be the amounts admissible at trial, not the amounts billed for such expenses incurred in the treatment of the party. If, in addition to evidence of payment, a party submits a signed statement acknowledged by the medical provider or an authorized representative or sworn testimony that the provider will accept the amount paid as full payment of the obligations, the statement or testimony shall be admitted into evidence. The statement or testimony shall be part of the record as an exhibit but need not be shown to the jury. If a medical provider has filed a lien in the case for an amount in excess of the amount paid, then the bills in excess of the amount paid, but not more than the amount of the lien, shall be admissible.

B. If no payment has been made, the Medicare reimbursement rates in effect when the personal injury occurred, not the amounts billed, shall be admissible if, in addition to evidence of nonpayment, a party submits a signed statement acknowledged by the medical provider or an authorized representative or sworn testimony that the provider will accept payment at the Medicare reimbursement rate less cost of recovery as provided in Medicare regulations as full payment of the obligation. The statement or testimony shall be admitted into evidence and shall be part of the record as an exhibit but need not be shown to the jury. If a medical provider has filed a lien in the case for an amount in excess of the Medicare rate, then the bills in excess of the amount of the Medicare rate, but not more than the amount of the lien, shall be admissible.

Q. BEESON_M. WELCH 00115

C. If no bills have been paid, or no statement acknowledged by the medical provider or sworn testimony as provided in subsections A and B of this section is provided to the opposing party and listed as an exhibit by the final pretrial hearing, then the amount billed shall be admissible at trial subject to the limitations regarding any lien filed in the case.

D. This section shall apply to civil actions arising from personal injury filed on or after November 1, 2015.

Section 3009.1 is a part of the Evidence Code in Article X entitled "Contents of Writings, Records and Photographs."  Its scope is stated in paragraph A as "the trial of any civil action arising from personal injury."  In such a trial the statute describes what evidence of the cost of medical care of an injured plaintiff is admissible in a "civil action arising from personal injury," and, therefore, what are recoverable medical expenses as part of the plaintiff's damages caused by the tortious conduct of the defendant.

Paragraph A provides that the amount of medical bills paid, not the amount billed, is admissible if "a party submits a signed statement acknowledged by the medical provider or an authorized representative or sworn testimony that the provider will accept the amount paid as full payment of the obligation."  This language plainly modifies the Collateral Source Rule by limiting admissibility and therefore recovery to an amount less than the full amount of the bill which was paid by a collateral source, provided the requisite signed statement or sworn testimony of the provider is also admitted into evidence.

Q. BEESON_M. WELCH 00116

Paragraph B addresses the situation in which a medical bill has not been paid. It provides that, in the event evidence of nonpayment is admitted, "the Medicare reimbursement rates in effect when the personal injury occurred, not the amounts billed, shall be admissible if... a party submits a signed statement acknowledged by the medical provider or an authorized representative or sworn testimony that the provider will accept payment of the Medicare reimbursement rate... as full payment of the obligation." This language does not directly affect the Collateral Source Rule because the only bills affected are unpaid bills. However, this paragraph modifies the common law rule that the plaintiff in a tort action for damages resulting from bodily injury can recover the reasonable value of necessary services provided to evaluate and treat the injury. Normally, the plaintiff introduces into evidence the billing document received from the medical provider as evidence of what the reasonable value of necessary services is. Indeed, pursuant to 12 O.S. § 3009 (not 3009.1), "[u]pon the trial of any civil case involving injury, disease or disability, the patient, a member of the patient's family or any other person responsible for the care of the patient, shall be a competent witness to identify medical provider bills..." "upon a showing... such expenses were incurred in connection with the treatment of the injury, disease or disability... and **it shall not be necessary for an expert witness to testify that the charges were reasonable and necessary**." (emp. add.) Paragraph B implicitly renders section 3009 ineffective if a medical provider actually agrees to accept payment at Medicare reimbursement rates.

Paragraph C of section 3009.1 states that "[i]f... no statement acknowledged by the medical provider or sworn testimony as provided in subsections A and B of this section is provided to the opposing party and listed as an exhibit by the final pretrial hearing, then **the**

117

**amount billed shall be admitted at trial**…." (emp. add.).   The emphasized language reaffirms that the Collateral Source Rule will apply when the requirements of subsections A or B are not satisfied.[136]

Thus, the plain language of section 3009.1 limits its scope to the admission of evidence to prove the reasonable value of necessary services of the plaintiff's healthcare providers to treat the injury which is the subject of the civil action and at the trial of that civil action.   UM coverage, as discussed in section VII.D., *supra.*, is insurance coverage included in an auto insurance contract.   The adjustment of a claim under UM coverage is, therefore, the determination of whether an insured is entitled to receive the contractual benefit for which she paid premiums.   The adjustment is obviously not a "civil action" in which the rules of evidence, such as section 3009.1, apply.   For this reason, some federal trial courts in Oklahoma have stated that an insured's action for bad faith breach of an insurance contract is not a "civil action… arising from personal injury" within the scope of section 3009.1.[137]

---

[136] Oklahoma also has a statute applicable to "medical liability action" which modifies the Collateral Source Rule in a manner very different from the method incorporated into section 3009.1.  See 63 O.S. § 1-1708.1D which allows evidence of medical bills **and** amounts paid on the bills **unless** payor of bills has a right of subrogation, in which case the amounts paid are not admissible.  See e.g. Andrew v. Depani-Sparkes, 2021 Okla. Civ. App. 41 ¶ 32, ___ P.3d ___ ; Roberts v. St. John Med. Ctr., Inc., 2016 WL 11371927 at *4 (Dist. Ct. Tulsa Co., OK Aug. 23, 2016) and Broyles v. Gray, 2008 WL 3819786 (Dist. Ct. Tulsa Co., May 5, 2008).

[137] Stewart v. Brotherhood Mut. Ins. Co., 2018 WL 4092018 at *5 (N.D. Okla. July 10, 2018) ("Defendant cites no case law supporting the proposition that § 3009.1 applies in bad faith cases, and the court is not persuaded that it does apply."); Dennis v. Progressive Northern Ins. Co., 2018 WL 4871039 at *4 (W.D. Okla. April 9, 2018) ("as an initial matter, Progressive fails to address whether the statute even applies to this action.  The statute limits the admissibility of evidence of medical bills in 'any case involving personal injury'….  The sole claim in this action is bad faith breach of contract.").

Q. BEESON_M. WELCH 00118

Decisions of other federal trial courts are not binding on any other court but the reasoning of the cited cases is sound because, as in the instant case, the alleged bad faith breach of the Beeson auto policy did not arise from any personal injury, but from the alleged wrongful refusal of Safeco to pay the benefits it has contractually agreed to pay Mrs. Beeson in the UM/UIM coverage of her policy. A viable claim of bad faith is based upon "a clear showing 'that the insurer unreasonably, and in bad faith, withholds payment of the claim of the insured.'" Falcone v. Liberty Mut. Ins. Co., 2017 OK 11 ¶ 10, 391 P.3d 105, 107, quoting from the leading first party bad faith insurance case, Christian v. American Home Assur. Co., 1977 OK 141, 577 P.2d 899, 905.

Moreover, the adjustment of a claim under the UM/UIM coverage of an auto policy is not a "civil action" or a "trial". This is knowledge every first party insurer should possess pursuant to the Knowledge of Law Standard. Consequently, an insurer like Safeco cannot, consistent with the Knowledge of Law Standard, obtain testimony of a medical provider or a signed statement of a medical provider acknowledging that he/she will accept the amount paid on his bill (if the amount paid is less than the full amount of the bill) as full payment, in the course of adjusting a UM/UIM claim. The statement of a medical provider agreeing to accept the amount paid for less than the full amount of the bill is a method which section 3009.1(A) and (B) requires as a condition to admissibility of certain evidence in a "trial" of a "civil action".

Q. BEESON_M. WELCH 00119

Neither the claim file nor the Safeco training materials provide any sort of explanation for how to apply the unambiguous language of section 3009.1 to the nonjudicial adjustment of UM/UIM claims.  The lack of any analysis of a plausible basis to extend application of section 3009.1 beyond its express scope is a violation of the Knowledge of Law, Training, Evaluation and Documentation Standards.

**c.  Assuming Section 3009.1 Can Be Applied Outside The Trial Of A Civil Action, Safeco Did Not Comply With The Requirements To Allow Consideration Of The Amounts Paid To Mrs. Beeson's Healthcare Providers.**

Even if an insurer could plausibly argue that it can utilize section 3009.1(A) or (B) to avoid counting the total amount of medical expenses as a part of an insured's "damages" which Safeco is obligated to pay pursuant to the UM/UIM coverage of the Beeson policy. Safeco admittedly did not obtain a statement acknowledged by any of Mrs. Beeson's healthcare providers whose bills were reduced in the evaluation of her UIM claim.  See Meyer depo. 138-140, 166.  Of course Safeco did not obtain any "testimony" from providers that they would accept the amount paid by UnitedHealthcare as complete satisfaction of their bills, *Id.* 166, since the adjustment of Mrs. Beeson's UIM claim did not occur in the context of any civil action.

**Q. BEESON_M. WELCH 00120**

The reason no provider statements were obtained, according to the adjuster who evaluated Mrs. Beeson's claim, was because Safeco can get the statements if the insured sues Safeco to recover UIM benefits. *Id.* 190-91.  But Safeco had no evidence when adjusting Mrs. Beeson's claim that her providers would sign the required statements or give the required sworn testimony.  As Mr. Ventura told BM, section 3009.1 is "not self-executing."  (9-10-19 Ventura-Meyer letter 88-91).  Thus, Safeco made an assumption that section 3009.1 would apply in the future (unless the insured did not sue, as is the case with most insureds who are unhappy with the insurance payment they receive), without any evidence to support it.

The adjuster's testimony indicates that Safeco made a policy decision to reduce the amount of an insured's Special Damages in the nonjudicial adjustment of a UM/UIM claim by including only the amount paid on the insured's medical bills, if that payment is less than the full amount of the bill, without obtaining a signed statement from the healthcare provider that the partial payment is accepted in full satisfaction of the bill, and then hope either that the insured doesn't sue Safeco or, if she does, gamble that Safeco can get the required statement. But really, the reason Safeco does not satisfy the requirements of section 3009.1(A) in the adjustment of UM/UIM claims is because it cannot.  The decision Safeco made to try and apply section 3009.1 outside its express scope violates the Knowledge of Law, Training and Evaluation Standards.

Q. BEESON_M. WELCH 00121

### d.  The Only Oklahoma Supreme Court Decision To Interpret Section 3009.1.

Lee v. Bueno, 381 P.3d 736 (Okla. 2016) considered and rejected an argument by a personal injury plaintiff in a negligence action seeking to recover damages because of bodily injuries allegedly caused by the defendant, that the original version of section 3009.1 was unconstitutional.  The defendant asserted the amount of recoverable medical expenses was the amount paid by plaintiff's health insurer, Blue Cross/Blue Shield, not the amount billed, $10,154.  The Court did not consider the constitutionality of the revised version of section 3009.1.  The original version of the statutes effective November 1, 2011.  See Laws 2011, c. 198, § 1.  The current version of section 3009.1 became effective November 1, 2015.  See S.B. 789, 2015 OKLA. SESS. LAW SERV. Ch. 337, attached hereto as Exhibit A.  The revision broke the original statute paragraph into paragraphs A and B.  It also added "sworn testimony" of a medical provider as a means of demonstrating that the provider would accept the amount of a partial payment in full satisfaction of a medical bill in new paragraph A or the Medicare reimbursement rate amount for an unpaid bill in paragraph B.  Most importantly, the revision included paragraph C, an entirely new provision.

Although the Supreme Court was not addressing the constitutionality of the revised statute, in Lee v. Bueno, it did state that "12 O.S. 2015 § 3009.1(C) is a substantive change to the statute that permits the admission of the amount billed at trial if no bills have been paid **or** a statement or sworn testimony provided for in 12 O.S. Supp. 2015 § 3009.1(A) and (B) are

Q. BEESON_M. WELCH 00122

not provided by the final pretrial hearing."[138]   Paragraph C is, therefore, consistent with the Court's further statement that "we must stress that 12 O.S. § 3009.1 has no effect on the collateral source rule except that required by the operation of the statute…. There is no express legislative intent in 12 O.S. 2011 § 3009.1 to abolish the collateral source rule in its entirety, for insured victims of torts or otherwise.[139]

These are definitive statements by the Supreme Court clearly indicating that the Collateral Source Rule applies where the requirements of section 3009.1 are not met.   Safeco never considered whether these requirements can be met outside the context of the "trial of any civil action".   Therefore, Safeco did not consider whether the Collateral Source Rule continues to apply to the consideration of medical bills in the evaluation of a UM claim, and prohibits reduction of the billed amount based upon partial payments on the bills by an insured's own healthcare plan or insurance.   These failures were violations of the Knowledge of Law and Evaluation Standards which caused a violation of the Negotiation Standard because the Collateral Source Rule required consideration of the amounts billed by Mrs. Beeson's providers.

If Safeco wanted to dispute that Mrs. Beeson's medical bills were reasonable in amount, it could have consulted relevant sources, such as doctors, on what the services provided reasonably should be valued at in Oklahoma City where the services were rendered.   In light of the application of 12 O.S. § 3009 (not 3009.1) to personal injury actions, the burden would

---

[138] 381 P.3d at 742.
[139] 381 P.3d at 752.

Q. BEESON_M. WELCH 00123

be on the party asserting that the charges are excessive to present evidence to that effect.  See

e.g., Fixico v. Harmon, 70 P.2d 114, 117-18 (Okla. 1937) (evidence of amounts billed by

medical providers was admitted on issue of value of medical services provided to the plaintiff,

thus defendant was required to produce evidence that charges were excessive in order to

dispute the amounts charged on the medical bills).

Although adjuster BM's evaluation worksheet refers to "excessive" billing by Mrs.

Beeson's medical providers as a talking point to raise negotiations, Safeco never developed

any actual information to show that the bills were excessive in amount.  Instead, Safeco

reduced the amount of recoverable Special Damages to the amounts paid by UnitedHealthcare

to Mrs. Beeson's providers because section 3009.1(A) purported to authorize the reduction.

Consequently, Safeco had no factual basis to choose any amount in evaluating Mrs. Beeson's

Special Damages other than the amount billed by her medical providers.  The failure to

recognize the effect of having no evidence the bills were excessive is a violation of the

Knowledge of Law and Evaluation Standards.

**2.  Failure To Document Each Element Of General Damages Included In The
Evaluation.**

Safeco assigned a range of values for Mrs. Beeson's General Damages (non-economic

damage) as $40,000-$50,000 associated with her right shoulder injury and $8,000-$10,000 for

124

"**neck/chest seat belt contusion**" (143).  Although the evaluation of General Damages is broken down by kind and location of injury, the worksheet does not identify which elements of General Damages (e.g. past and future physical and mental pain and suffering, permanence of injury, disability from injury) are included in the evaluation of General Damages.  This is a violation of the Documentation Standard which is intended to permit someone reviewing the claim file to understand how and why the insurer arrived at its evaluation.  The only comment which sheds any light on the reason for the General Damages value range is the description of the right shoulder and the neck/chest injuries as aggravations of pre-existing conditions. These statements do not disclose how the aggravation translates into the various elements of General Damages.

### 3.  Failure To Include The Cost Of Possible Future Medical Treatment In The Evaluation.

The evaluation plainly does not include any possible future medical expenses in the Special Damages evaluation because the only amounts shown for Special Damages is the amount paid for prior evaluation and treatment of the injuries Mrs. Beeson sustained in the May 12, 2017 accident.  As discussed in section VII.D.8., *supra*, it is not necessary to establish the actual cost of future treatment and damages for the cost of future treatment may be based on evidence of the cost of previous treatment.  Necessarily, any amount awarded for future medical treatment is to a degree based on speculation because no one has a crystal ball concerning an injured person's precise needs for treatment next year, five years from now or

125

twenty years from now. Nevertheless, some amount of damages for the cost of future treatment is an acknowledged element of recovery in bodily injury tort claims.

Nothing in the claim file shows that Safeco took any action to find out if Mrs. Beeson's injuries may necessitate future evaluation and treatment as well as medication. The policy authorizes Safeco to have an insured examined by a medical expert or to have her medical records reviewed by an expert consultant. Safeco did hire an orthopedic surgeon, Dr. Dennis Foster of Oklahoma City, to review Mrs. Beeson's medical records following the May 2017 accident, but never asked him whether or not her injuries might need future treatment. Safeco also could have requested a report from any of Mrs. Beeson's treating doctors or physical therapists concerning whether in their opinion Mrs. Beeson may need future treatment or medication in the future. The policy authorizes Safeco to obtain a medical authorization from an insured which would have allowed providers to provide such information. The failure to obtain expert advice concerning whether future treatment might be necessary is a violation of the Investigation Standard which led to a violation of the Evaluation Standard.

Safeco did send several form letters requesting that a medical authorization be signed by Mrs. Beeson. The letters were sent to her lawyer. The lawyer never responded that his client would not sign such an authorization. However, Safeco never took any affirmative action to compel an authorization to be executed. As discussed in section VII.A., *supra.*, an insurer has the ability to suspend its investigation when necessary information can only be obtained from an insured and the insured does not provide the information. At no time did Safeco inform

126

Mr. Ventura that it was suspending its investigation of Mrs. Beeson's claim because she had not signed a medical authorization. Instead, as many adjusters do, the various adjusters assigned to Mrs. Beeson's UIM claim simply depend upon her lawyer to provide the relevant medical records which in fact Mr. Ventura did. When the same adjusters requested five years of medical records preceding the May 2017 accident, Mr. Ventura provided those records as well. At no time did Safeco ever exhibit an interest in obtaining those records itself.

A brief review online of sources of post-shoulder surgery indicate that "[s]tiffness in the shoulder can be the cause of pain months after surgical repair, so it is important that stiffness be addressed even months or years after the surgery."[140]  For patients who have what are deemed to be large full thickness tendon tears (3cm by 5cm) a greater chance exists that the tendon will tear again after surgical repair: "The larger the rotator cuff tear before surgery than the higher the failure rate of surgery…. The size of the tear is very important as it determines the chances the tendon will heal with surgery…. For large tears (3x5 centimeters) the re-tear rate is approaching 27%….".[141]

The reason for this high failure rate is because there is a hole in the tendon too large to be filled by stretching the remainder of the tendon, and the edges of the tendon will not hold the stitches used in the repair.[142]  If the tendon re-tears "the odds are that it will be difficult to

---

[140] **Failed Rotator Cuff Repairs** (Johns Hopkins Medicine), www.hopkinsmedicine.org/orthopaedic-surgery/specialty-areas/shoulder/treatments-procedures-failed-rotator-cuff-repairs.html  (last  visited 10/20/21).
[141] *Id.*
[142] *Id.*

Q. BEESON_M. WELCH 00127

repair again and to get it to heal… but the exact risk of failure with further surgery is related to how large the tear is at that time."[143]   If surgery for a re-tear is not an option, then "symptoms can often be controlled by watching one's activities…. Basically one can do whatever activity he/she chooses as long as it doesn't hurt."[144]

The foregoing information is just an example of what is available to Safeco to help it evaluate the possibility of future medical treatment.

A UM/UIM insurer cannot turn a blind eye to a potential recoverable element of damages just because the medical records do not address the issue.  Mrs. Beeson's medical records do not document and discuss the need for future treatment after she was released from care.  In my experience this is commonly the case because the records are not being created for the purpose of answering a question concerning whether future treatment may be warranted.  The Investigation Standard requires the first party insurer to take affirmative action to determine if future treatment is in the cards.  Safeco's failure to explore this question with its own medical consultants or Mrs. Beeson's medical providers violated the Investigation Standard which then led to a violation of the Evaluation Standard because no value was assigned for the cost of future medical treatment in the evaluation of Mrs. Beeson's claim.

---

[143] *Id.*
[144] *Id.*

Q. BEESON_M. WELCH 00128

Had any evaluation of future medical costs actually been conducted, Safeco would not have been able to argue that 12 O.S. § 3009.1 would reduce the amount of estimated future medical costs to some other number for the obvious reason that some service which may be provided in the future has not been paid for in the present.[145]


### 4.  Failure To Evaluate Future Pain And Suffering As An Element Of General Damages.


The evaluation worksheet does not include any value assigned to the possibility Mrs. Beeson will continue to have pain and suffering in the future, either on a daily or intermittent basis, as part of Safeco's evaluation of her General Damages.  This violated the Evaluation Standard.


Pain and suffering is not quantifiable like economic loss.   Thus, its evaluation is necessarily subjective.   Nevertheless, sources of information exist which provide a basis on which to evaluate future pain and suffering.  The records of prior treatment provide a resource because they contain the patient's complaints.   Mrs. Beeson consistently complained of constant pain in her right shoulder and neck throughout the course of her evaluation and treatment.   She still complained of pain on her last visit to her surgeon, Dr. Johnson, and on the last day of her post-surgery physical therapy.  The Investigation Standard required Safeco

---

[145] The Oklahoma Supreme Court reached this obvious conclusion in <u>Beason v. I.E. Miller Serv. Inc.</u>, 441 P.3d 1107, 1113 (Okla. 2019).

Q. BEESON_M. WELCH 00129

to examine Mrs. Beeson's medical records for evidence of pain and suffering. The Evaluation Standard required Safeco to then draw reasonable inferences from the records of pain complaints to determine if future pain and suffering is likely. The fact that Mrs. Beeson still complained of pain after the surgery and completion of post-surgery physical therapy is a key indicator of the possibility of continuing pain of some degree in the future.

The other potential source of information about pain and suffering is the insured/first party claimant. Pain is a subjective complaint. Therefore, the Investigation Standard requires that a first party insurer interview the insured/first party claimant about her complaints, including any physical or mental pain and suffering associated with her injuries and treatment. Safeco did not take a recorded statement from Mrs. Beeson. Therefore, it did not obtain any information from a primary source for the evaluation of future pain and suffering, a violation of the Investigation Standard which contributed to a violation of the Evaluation Standard by failure to evaluate future pain and suffering.

As with medical authorizations, Safeco sent form letters requesting a recorded statement of Mrs. Beeson to her lawyer, Mr. Ventura. Mr. Ventura never declined to provide Mrs. Beeson for a recorded statement, and Safeco never affirmatively pressed for such a statement. As with medical authorizations, Safeco had the tools provided in the policy with which to exert leverage on an insured to comply with the conditions of the policy so that Safeco could complete its investigation. Safeco could have informed Mr. Ventura that the investigation

Q. BEESON_M. WELCH 00130

would be suspended pending the taking of a recorded statement from Mrs. Beeson.  Safeco did not take this action.

After adjuster BM was assigned to Mrs. Beeson's claim she also did not attempt to obtain a recorded statement from Mrs. Beeson.  Instead, she immediately reviewed the medical records in the claim file both before and after the May 2017 accident, and conducted an evaluation of Mrs. Beeson's claim.  Had adjuster BM, a very experienced bodily injury adjuster, believed Mrs. Beeson's statement was necessary in order to evaluate her claim she could have requested the statement and informed Mr. Ventura that the response to his settlement demand could not be made without the statement.

Consequently, despite several requests for Mrs. Beeson's recorded statement, the reality is that Safeco's adjuster BM evaluated Mrs. Beeson's claim without her statement.  This was a mistake and violation of the Evaluation Standard because any evaluation of damages for pain and suffering, present or future, necessarily requires information about the subjective pain complaints of the injured person.

Safeco also could have obtained corroboration of the possibility of future pain and suffering by obtaining information from consulting medical and physical therapy experts who have experience with post-shoulder surgery symptoms, complaints and treatment. The policy gave Safeco the right to obtain such consultation but Safeco did not exercise this right.

131

Although it hired Dr. Foster to review Mrs. Beeson's post-May 2017 medical records, it never asked him whether Mrs. Beeson was likely to continue to suffer pain and suffering once she had been discharged by her surgeon and physical therapist. The failure to utilize these resources also was a violation of the Investigation Standard. Safeco also could have requested the opinion of Mrs. Beeson's treating doctors and physical therapists on the possibility of future pain and suffering after the shoulder surgery and post-surgery physical therapy. Safeco did not ever obtain a medical authorization from Mrs. Beeson. Accordingly, it never requested this sort of information from any of Mrs. Beeson's providers.

### 5. Failure To Evaluate Permanence Of And Disability From Injury.

Once again the General Damages evaluation fails to identify other key elements of General Damages, permanence of injury and disability from injury. These elements are not mentioned in the evaluation worksheet. Therefore, it is impossible to determine if they were considered in the evaluation. This represents a violation of the Documentation Standard.

Without any factual basis to conclude that Safeco actually evaluated permanence of injury and disability as potential recoverable damages, Safeco violated the Evaluation Standard. It could have requested a medical consultant such as Dr. Foster to advise if the injuries to Mrs. Beeson's right shoulder and cervical spine are permanent in nature and if she has disability as a result. It could have asked the treating physicians the same thing. It could have had Mrs.

132

Beeson examined by a doctor of its choice.  It did not take any of these actions and this failure was a violation of the Investigation Standard.


A review of Mrs. Beeson's medical records both before and after the May 2017 accident demonstrates she had a long standing shoulder problem aggravated by the trauma of the rear-end accident of May 2017.  While the right shoulder surgery clearly did some good according to the records of Dr. Johnson and the physical therapist, the fact remains that Safeco did not bother to find out if all of the pre-surgical symptoms had been eliminated by surgery or therapy and, if not, whether the remaining symptoms are permanent and whether the remaining symptoms impair any of Mrs. Beeson's physical functions.  This was a violation of the Evaluation Standard.


### a.  Failure To Consider That The UM/UIM Coverage Provisions Of The Beeson Policy Do Not Authorize The Application Of Section 3009.1

**COVERAGE C** of the Beeson policy, the UM/UIM coverage, does not contain any provision which authorizes Safeco to utilize section 3009.1 to determine the amount of "damages" Mrs. Beeson is legally entitled to recover from the driver of the vehicle which rear ended her vehicle.  Whether the policy is to be interpreted under Colorado law or Oklahoma law, the fact is that no provision is made in the policy language to reduce what would otherwise be the measure of Mrs. Beeson's Special Damages down to the amount paid by her

133

health insurer. No evidence exists Safeco considered that its contract with the Beesons does not authorize it to reduce an element of recoverable damages by reference to a law not referred to in the contract or if this omission may prevent application of section 3009.1 to adjustment of UM/UIM claims. This failure was a violation of the Knowledge of Law, Training and Evaluation Standards.


**b.  Failure To Consider That Colorado UM/UIM Statute Prohibits Reduction In Special Damages.**


The UM/UIM statute of Colorado does not permit reduction of an insured's recoverable damage. The Colorado statute which should have been considered when evaluating Mrs. Beeson's UIM claim, CSR 10-4-609(c), expressly prohibits the use of payments made under any other type of coverage to reduce the amount of recovery on a UM/UIM claim: "The amount of the coverage available pursuant to this section shall not be reduced by a set off from other coverage, including, **but not limited to**,... health insurance...." (emp. add.). As discussed in section VII.D.4, *supra.*, the Colorado Supreme Court interpreted this language in the Calderon case to prohibit a UIM insurer from reducing the amount of damages it must pay by the amount of any payment under other coverages. If section 3009.1(A) could be applied to the adjustment of UM/UIM claims, it would do exactly the same thing as a set off barred by the Colorado UM/UIM statute: it would reduce the amount an insured can recover as Special Damages by the difference between the amount the insured's medical providers billed and the amount paid to the providers by health insurance or other coverage (the "write off").

134

Q. BEESON_M. WELCH 00134

The failure to consider that Mrs. Beeson's claim under her Colorado auto policy is controlled by the Colorado UM/UIM statute violates the Knowledge of Law, Training and Evaluation Standards.

### c. Failure To Consider Oklahoma Insurance Department Regulation Prohibiting Reduction of UM Coverage Because Insured Has Health Insurance.

If Oklahoma law applied to the interpretation of the Beeson policy, Safeco should have considered whether OAC § 365-151-17, quoted in section VII.D.5, *supra.* prevented Safeco from using section 3009.1 to reduce the amount of Mrs. Beeson's Special Damages. The Insurance Commissioner's regulation prohibiting reduction of UM coverage "because the injured party has insurance through a… health insurance provider". Thus, OAC § 365-151-17, has the same effect as the set off prohibition in the Colorado UM/UIM statute which was discussed in the Calderon decision. The failure to consider whether the regulation prohibited reduction of Mrs. Beeson's Special Damages under section 3009.1 because Mrs. Beeson had health insurance violated the Knowledge of Law, Training and Evaluation Standards.

135

Q. BEESON_M. WELCH 00135

**d. Failure To Consider Oklahoma And Colorado Case Law Prohibit Reduction Of The Amount Of Recoverable UM/UIM Benefits By The Amount Paid By Collateral Sources.**

Both Colorado and Oklahoma case law have condemned attempts to reduce the amount an insured is entitled to recover under UM/UIM coverage by amounts paid by other sources, as discussed in section VII.D.6, *supra.* Application of section 3009.1 to the adjustment of Mrs. Beeson's UIM claim, regardless of which state's law applies, conflicts with this case law. It conflicts because the effect of reducing the amount of recoverable Special Damages (the value of medical services provided to Mrs. Beeson) to the amounts paid by a collateral source, United Healthcare, reduces the amount Mrs. Beeson as an insured is otherwise entitled to recover pursuant to a contract for which she paid premiums.

Neither the claim file nor the Safeco claims handling standards I received contain any discussion of the foregoing case law or the basic principle the cases apply – once a person qualifies as an insured, the UM/UIM statutes do not permit the amount the insured is entitled to recover to be reduced because of payments received from other sources. The absence of this discussion and whether it prevents trying to apply section 3009.1 to the adjustment of UM/UIM claims violates the Knowledge of Law, Training and Evaluation Standards.

136

**Q. BEESON_M. WELCH 00136**

**D. Failure To Investigate Whether United Healthcare/OPTUM Had A Viable Subrogation Or Reimbursement Claim Under Colorado Or Oklahoma Law.**

Safeco violated the Knowledge of Law, Investigation, Training, Documentation and Negotiation Standards by failing to determine if UnitedHealthcare or its collection agent, OPTUM, had a viable claim of subrogation to Mrs. Beeson's UIM claim or a right to be reimbursed from any UIM recovery for the amounts paid to Mrs. Beeson's healthcare providers. As discussed in section VII.D.6, *supra.*, absent a contractual right to subrogation or reimbursement, a health insurer or plan does not have such rights at common law. Therefore, it was Safeco's duty to obtain the applicable policy or plan documents to see if they confer subrogation or reimbursement rights in UIM coverage benefits. Safeco did not request, much less obtain, this documentation.

Had Safeco obtained the required documents and found they did authorize subrogation or reimbursement to UIM benefits, Safeco would then be obligated to evaluate whether the language of the policy or plan made UnitedHealthcare's right to recover prior to Mrs. Beeson's right to full recovery pursuant to the make whole rule of Colorado and Oklahoma law. Safeco would also have to evaluate whether, if UnitedHealthcare made payment under an ERISA "employee benefit plan", the plan was self-funded or funded by insurance. If funded by insurance the Colorado and Oklahoma anti-subrogation/reimbursement statutes and case law would not be pre-empted and so would apply. The complete failure to examine these issues violated the Investigation, Knowledge of Law, Training and Documentation Standards.

137

Q. BEESON_M. WELCH 00137

By failing to take any of the foregoing action, Safeco assumed without any basis in fact or law that UnitedHealthcare/OPTUM had a legal right to be paid part of the amount which Safeco evaluated Mrs. Beeson's UIM claim to be worth.  Thus, Safeco deducted $7500 from the $25,000 it unconditionally tendered to Mrs. Beeson.   This was a violation of the Negotiation Standard.

Very truly yours,

Mort G. Welch

MGW:vm

138

**PUBLISHED DECISIONS**

Cases resulting in officially and unofficially published trial or appellate court opinions in which I was either trial or appellate counsel or both include the following: <u>Lindsey v. Dayton-Hudson Corp.</u>, 592 F.2d 1118 (10th Cir. 1979), *cert. den'd.* 444 U.S. 856 (1979); <u>Wilson and Co. v. Reed</u>, 603 P.2d 1172 (Okla. Civ. App. 1979); <u>Wilson Foods Corp. v. Noble</u>, 613 P.2d 485 (Okla. Civ. App. 1980); <u>Wilson Foods Corp. v. Porter</u>, 612 P.2d 261 (Okla. 1980); <u>Short v. Oklahoma Farmers Union</u>, 619 P.2d 588 (Okla. 1980) (homeowners property coverage); <u>Fleming v. Hall</u>, 638 P.2d 1115 (Okla. 1981); <u>Tax Investments Concepts Inc. v. McLaughlin</u>, 670 P.2d 981 (Okla. 1982); <u>Snethen v. Oklahoma State Union of the Farmers' Edu. and Coop. Union of Am.</u>, 664 P.2d 377 (Okla. 1983) (auto property coverage); <u>Takagi v. Wilson Foods Corp.</u>, 662 P.2d 308 (Okla. 1983); <u>Thiry v. Armstrong World Industries, Inc.</u>, 661 P.2d 515 (Okla. 1983); <u>Beeman v. Manville Corp. Asbestos Disease Compensation Fund</u>, 496 N.W.2d 247 (Iowa 1983); <u>Bristol v. Fibreboard Corp.</u>, 789 F.2d 846 (10th Cir. 1986); <u>Case v. Fibreboard Corp.</u>, 743 P.2d 1062; <u>Coleman v. Turpen</u>, 697 F.2d 1341 (10th Cir. 1982), *app. after remand*, 827 F.2d 667 (10th Cir. 1987); <u>Huff v. Fibreboard Corp.</u>, 836 F.2d 473 (10th Cir. 1987); <u>Livengood v. Thetford</u>, 681 F.Supp. 695 (W.D. Okla. 1988); <u>Cofer v. Morton</u>, 784 P.2d 67 (Okla. 1989) (auto uninsured motorist coverage); <u>Fisher v. Owens Corning Fiberglass Corp.</u>, 868 F.2d 1175 (10th Cir. 1989); <u>Wever v. State ex rel. Dept. of Human Serv.</u>, 839 P.2d 672 (Okla. Civ. App. 1990); <u>Horace Mann Ins. Co. v. Johnson</u>, 953 F.2d 575 (10th Cir. 1991) (homeowners liability coverage); <u>State Farm Mut. Ins. Co. v. Schwartz</u>, 933 F.2d 848 (10th Cir. 1991) (amicus curiae – auto liability coverage); <u>Sargent v. Central Nat'l Bank & Trust Co. of Enid, Oklahoma</u>, 809 P.2d 1298 (Okla. 1991); <u>Shebester v Triple Crown Insurers</u>, 826 P.2d 603 (Okla. 1992) answer to cert. question

Q. BEESON_M. WELCH 00139

conformed to, 974 F2d 135 (10th Cir. 1992) (equine life insurance); Vilseck v. Fibreboard Corp., 861 S.W.2d 659 (Mo. App. 1993); Angelo v. Armstrong World Industries, 11 F.3d 957 (10th Cir. 1993); Timberlake Const. Co. v. U.S. Fid. & Guar. Co., 71 F.3d 335 (10th Cir. 1995) (builders risk policy; First Financial Ins. Co. v. Roach, 80 F.3d 426 (10th Cir. 1996) (commercial general liability "CGL" coverage); Trinity Univ. Ins. Co. v. Broussard, 932 F.Supp. 1307 (N.D. Okla. 1996) (CGL coverage); Akin v. Ashland Chem. Co., 156 F.3d 1030 (10th Cir. 1998) *cert. den'd* 526 U.S. 1112 (1994); Kerr-McGee Corp. v. Admiral Ins. Co., 905 P.2d 760 (Okla. 1995) (CGL coverage); Allstate Ins. Co. v. Fox, 139 F.3d 911 (Tab.), 1998 WL 77745 (10th Cir. 1998) (auto and homeowners liability coverage); Oklahoma Farmers Union Mut. Ins. Co. v. John Deere Ins. Co., 967 P.2d 479 (Okla. Civ. App. 1998) (auto dealer liability coverage); Grain Dealers Mut. Ins. Co. v. Farmers Alliance Mut. Ins. Co., 298 F.3d 1178 (10th Cir. 2002) (CGL and farmowners liability coverage) Gonzalez v. Dub Ross Co., Inc., 224 P.3d 1283, (Okla. Civ. App. 2009); Alea London Ltd. v. Canal Club, Inc., 231 P.3d 157 (Okla. Civ. App. 2009) (CGL coverage); Condray v. Unum Life Ins. Co. of Am., 2009 WL 1312515 (W.D. Okla. May 7, 2009) (accidental death policy); Poteau Ford Mercury, Inc. v. Zurich American Ins. Co., 2009 WL 9508739 (Okla. Civ. App. May 8, 2009) (employment practices liability and CGL coverages); American Interstate Ins. Co. v. Wilson Paving & Excavating, Inc., 2009 WL 3427992 (N.D. Okla. Oct. 20, 2009) and 2010 WL 2624133 (N.D. Okla. June 25, 2010) (workers compensation and employers liability coverages); O'Rear v. American Gen. Assur. Co., 2010 WL 2594748 (W.D. Okla. June 23, 2010) (accidental death policy); American Farmers & Ranchers Mut. Ins. Co. v. Shelter Mut. Ins. Co., 267 P.3d 147 (Okla. Civ. App. 2011) (auto liability coverage); GuideOne Mutual Ins. Co. v. The Shore Ins. Agy., 259 P.3d 864 (Okla. Civ. App. 2011); Employers Ins. Co. of Wausau v. Midwest Towers, Inc., 2011 WL 5117610 (W.D. Okla. Oct. 25, 2011) (CGL coverage); Mulford

2

v. Neal, 264 P.3d 1173 (Okla. 2011) (auto liability coverage); Republic Underwriters Ins. Co. v. Moore, 493 Fed. Appx. 907 (10th Cir. 2012) (CGL and commercial umbrella liability coverages); Barnard v. Sutton, 321 P.3d 999 (Okla. Civ. App. 2013); Arnold v. Continental Cas. Co., 2012 WL 12863977 (W.D. Okla. Nov. 26, 2012) (long term case policy); Liberty Corporate Capital, Inc. v. Hinton Eats, Inc., 2011 WL 13229628 (W.D. Okla. Jan. 13, 2011) (commercial property coverage); Century Surety Co. v. S&H Tank Serv., Inc., 2009 WL 10702060 (W.D. Okla. June 4, 2009); Ray v. Oklahoma Heritage Home Care, Inc., 2013 WL 2368808 (W.D. Okla. May 29, 2013); Hanover American Ins. Co. v. Saul, 594 Fed.Appx. 526 (10th Cir. 2015) (businessowners' liability coverage); Zurich American Ins. Co. v. Good To Go, LLC, 2018 WL 8333413 (W.D. Okla. Jan. 2, 2018) (CGL coverage); and MTI, Inc. v. Employers Ins. Co. of Wausau, 913 F.3d 1245 (10th Cir. 2019) (CGL coverage).

Q. BEESON_M. WELCH 00141

## PRIOR TESTIMONY

Allen v. Lynn Hickey Dodge, No. CJ-96-6076, District Court of Oklahoma County, Oklahoma, February 7, 2003 for plaintiffs and their attorney, Ed Abel; Anders v. GEICO, No. CJ-2002-6387, District Court of Tulsa County, Oklahoma, September 18 and September 19, 2003 for defendant GEICO and its attorney, Gerard Pignato; Arrow Exterminators Inc. v. Mid-Continent Cas. Co., No. CJ-2000-1558, District Court of Tulsa County, Oklahoma, June 3, 2004 for defendant, Mid-Continent Casualty Co. and its attorney, Roger N. Butler, Jr.; GuideOne Mut. Ins. Co. v. Smith, No. CIV-03-1087-F, United States District Court for the Western District of Oklahoma, October 28, 2004 for defendants and their attorney, Joe E. White, Jr.; Gutkowski v. Oklahoma Farmers Union Mut. Ins. Co., No. CJ-04-7542-62, District Court of Oklahoma County, Oklahoma November 16, 2005 for defendant and its attorney, David Donchin; Horn v. GEICO, No. CIV-02-0058, United States District Court for the Western District of Oklahoma, October 10, 2002 for defendant GEICO and its attorney, Robert Allen; Hutchinson v. United Services Auto. Assoc., No. C-98-596, District Court of Pittsburgh County, Oklahoma for defendant, Oklahoma Farmers Union Mutual Insurance Company and its attorney, W. G. "Gil" Steidley; Melton Truck Lines Inc. v. Indemnity Ins. Co. of North America, No. CV-263-JHP-SHA, Northern District of Oklahoma, August 2, 2007 for defendant and its attorney, Robert Rivera, Jr.; Ward v. Oklahoma Farmers Union Mut. Ins. Co., No. C-04-603, District Court of Pontotoc County, September 8, 2005 for defendant and its attorney, David Donchin; Cordova v. Oklahoma Farm Bureau Ins. Co., No. CJ-2008-1557, District Court of Oklahoma County, November 16, 2009 for plaintiff and her attorney Gregg W. Luther; Cearley v. Great American Ins. Co. of New York, No. CJ-2008-1202, District Court of Creek County January 21, 2010 for plaintiff and his attorneys, W.G. "Gil" Steidley and Whitney Eschenheimer; Tate v. Allstate Ins.

1

Q. BEESON_M. WELCH 00142

Co., Case No. 10-CV-104-R, United States District Court, Western District of Oklahoma February 16, 2011, for plaintiff and his attorney, Gregg W. Luther; Sherwood Construction Company, Inc. v. American Home Assurance Company, et al., Case No. 5:09-cv-1395-HE, United States District Court for the Western District of Oklahoma April 13, 2011, for defendants and their attorneys, Elizabeth E. Muckala and Linda M. Szuhy; David Gregory Miller v. Farmers Ins. Grp., et al., Case No. CIV-10-466-F, United States District Court for the Western District of Oklahoma, July 8, 2011, for plaintiff and his attorneys Logan Johnson and Brad Miller; Steven Hayes v. State Farm Fire & Casualty Co., Case No. 10-CV-680-HE, United States District Court for the Western District of Oklahoma, September 13, 2011, for plaintiff Steven Hayes and his attorney Rachel Bussett; Brookwood Storage Partnership LLC v. Employers Mut. Cas. Co., Wedel Group X LLC v. Employers Mut. Cas. Co. , Case No. 11-CV-1110-F, United States District Court for the Western District of Oklahoma, for plaintiffs and their attorney, Mike McGrew; Billings v. Conseco health Ins. Co., Case No. 10-CV-372-M, United States District Court for the Western District of Oklahoma, January 31, 2012, for plaintiff and his attorney, Simone Fulmer; Janet McDonald v. American General Life Ins. Co., Case No. 12-CV-0012-D, United States District Court for the Western District of Oklahoma, September 28, 2012, for plaintiff Janet McDonald and her attorney Patrick Ryan; L.P.D. Energy Co., L.L.C. v. Mid-Continent Cas. Co., Case No. CJ-2011-2577, District Court of Tulsa County October 22, 2013 for defendant and its attorney, Roger N. Butler, Jr.; SRM, Inc. v. Great American Ins. Co., Case No. 11-CV-1090-F, United States District Court for the Western District of Oklahoma, January 23, 2014, for defendant Great American Insurance Company and its attorney, Roger N. Butler, Jr.; Elizabeth A. Roberts v. Safeco Ins. Co. of America, Case No. CJ-2012-1051, District Court of Oklahoma County, Oklahoma, February 24, 2015, for plaintiff Elizabeth Roberts and her

2

attorneys, Simone Gosnell Fulmer and Jacob Rowe; <u>Rebecca Zeavin v. Evronia Ray and USAA Casualty Ins. Co.</u>, Case No. CJ-2011-7887, District Court of Oklahoma County, Oklahoma, February 26, 2016, for plaintiff Rebecca Zeavin and her attorneys, Simone Gosnell Fulmer and Jacob Rowe; <u>Wade Lavoy v. USAA and USAA General Indemnity Co.</u>, Case No. CJ-2014-131, District Court of Jackson County, Oklahoma, April 9, 2016, for plaintiff Wade Lavoy and his attorneys, Simone Gosnell Fulmer and Jacob Rowe; <u>Eric LaFollette et al. v. Liberty Mut. Fire Ins. Co.</u>, Case No. 14-CV-04147-NKL, United States District Court for the Eastern District of Missouri, Central Division, April 11, 2016, for plaintiffs and their attorney Derrick Morton; <u>Seeley v. Ozark Elec. Coop. Corp., et al.</u>, Case No. CJ-2011-100, District Court of Adair County, Oklahoma, June 17, 2016 for third party defendant Federated Rural Electric Insurance Exchange and its attorney Richard E. Hornbeek; <u>Rose Marie Carrier v. United Services Auto. Assoc. and USAA Casualty Ins. Co.</u>, Case No. CJ-2013-2547, District Court of Tulsa County, Oklahoma, February 23, 2017, for plaintiff and her attorneys, Simone Gosnell Fulmer and Jacob Rowe; <u>Dee Ann Harper v. United Services Auto. Assoc. and United Services Auto. Assoc. Casualty Insurance Co.</u>, Case No. CJ-2012-5890, District Court of Oklahoma County, Oklahoma, February 23, 2017 for plaintiff and her attorneys, Simone Gosnell Fulmer and Jacob Rowe; <u>Luke Stewart v. Brotherhood Mutual Insurance Company</u>, Case No. 16-CV-00488, United States District Court for the Northern District of Oklahoma, November 27, 2017, for plaintiff and his attorney Simone Fulmer; <u>Reinaldo Lozano v. Golden Rule Insurance Company</u>, Case No. CIV-15-1230-F, United States District Court for the Western District of Oklahoma, November 30, 2017, for plaintiff and his attorneys Simone Fulmer and Jacob Rowe; <u>Powell v. American Farmers & Ranchers Mutual Insurance Company</u>, Case No. CJ-2016-64, District Court of Custer County, Oklahoma, August 22, 2018, for American Farmers & Ranchers Mutual Insurance

3

Q. BEESON_M. WELCH 00144

Company and its attorney Kayce Gisinger; <u>Greenway Park v. Nautilus Ins. Co.</u>, Case No. CJ-2016-754, District Court of Cleveland County, Oklahoma, November 2, 2018 for plaintiff and its attorneys Logan Johnson and Brad Miller; <u>Taylor v. AIG Property Cas. Co., et al.</u>, Case No. 17-CV-525-GKF, United States District Court for the Northern District of Oklahoma, June 10, 2019 on behalf of plaintiff and her attorneys, Reggie Whitten and Revell Parrish; and <u>Shackelford v. American Income Life Ins. Co.</u>, Case No. CIV-18-0456-HE, United States District Court for the Western District of Oklahoma, June 27, 2019 for plaintiff and her attorney Jacob Rowe.

I have testified at trial as an expert witness in the following insurance cases:

<u>Anders v. GEICO</u>; <u>Gutkowski v. Oklahoma Farmers Union Mut. Ins. Co.</u>; <u>Tate v. Allstate Ins. Co.</u>; <u>David Gregory Miller v. Farmers Ins. Grp., et al.</u> (hearing on class certification)**;** <u>Wade Lavoy v. USAA</u>; <u>Carrier v. USAA</u>; and <u>Nelson v. Granite State Ins. Co.</u>, Case No. CIV-08-1165-M, United States District Court for the Western District of Oklahoma, for defendant and its attorney, Steve Holden.

I testified as an expert witness in legal malpractice cases by deposition for the defendants and their attorney, James K. Secrest II, in <u>Wheat v. Richardson</u>, No. CJ-2007-7248, District Court of Tulsa County, Oklahoma on October 13, 2009, and for the plaintiff and its attorney, Robert Killeen, in <u>Gray Ins. Co. v. Heggy</u>, No. 11-CV-733-C, United States District Court for the Western District of Oklahoma, on October 10, 2012.

4

# An Act

ENROLLED SENATE
BILL NO. 789

By: Sykes of the Senate

and

Grau of the House

An Act relating to civil procedure; amending 12 O.S.
2011, Section 3009.1, which relates to admissibility
of medical expenses; clarifying admissibility of
amounts paid for services in treatment of the injured
party; providing for sworn testimony; requiring
admissibility of amount billed in specified
instances; providing limitation for liens filed;
modifying applicability of provisions; and providing
an effective date.

SUBJECT:  Admissibility of medical bills

BE IT ENACTED BY THE PEOPLE OF THE STATE OF OKLAHOMA:

    SECTION 1.    AMENDATORY    12 O.S. 2011, Section 3009.1, is
amended to read as follows:

    Section 3009.1  A.  Upon the trial of any civil ~~case involving~~
action arising from personal injury, the actual amounts paid for any
services in the treatment of the injured party, including doctor
bills, hospital bills, ambulance service bills, drug and other
prescription bills, and similar bills ~~for expenses incurred in the~~
~~treatment of the party~~ shall be the amounts admissible at trial, not
the amounts billed for such expenses incurred in the treatment of
the party.  If, in addition to evidence of payment, a party submits
a signed statement acknowledged by the medical provider or an
authorized representative or sworn testimony that the provider ~~in~~

~~consideration of the patient's efforts to collect the funds to pay the provider,~~ will accept the amount paid as full payment of the obligations ~~is also admitted~~, the statement or testimony shall be admitted into evidence.  The statement or testimony shall be part of the record as an exhibit but need not be shown to the jury. ~~Provided, if~~ If a medical provider has filed a lien in the case for an amount in excess of the amount paid, then the bills in excess of the amount paid, but not more than the amount of the lien, shall be admissible.

B. If no payment has been made, the Medicare reimbursement rates in effect when the personal injury occurred, not the amounts billed, shall be admissible if, in addition to evidence of nonpayment, a party submits a signed statement acknowledged by the medical provider or an authorized representative or sworn testimony that the provider~~, in consideration of the patient's efforts to collect the funds to pay the provider,~~ will accept payment at the Medicare reimbursement rate less cost of recovery as provided in Medicare regulations as full payment of the obligation ~~is also admitted~~.  The statement or testimony shall be admitted into evidence and shall be part of the record as an exhibit but need not be shown to the jury. ~~Provided, if~~ If a medical provider has filed a lien in the case for an amount in excess of the Medicare rate, then the bills in excess of the amount of the Medicare rate, but not more than the amount of the lien, shall be admissible.

~~B.~~ C. If no bills have been paid, or no statement acknowledged by the medical provider or sworn testimony as provided in subsections A and B of this section is provided to the opposing party and listed as an exhibit by the final pretrial hearing, then the amount billed shall be admissible at trial subject to the limitations regarding any lien filed in the case.

D. This section shall apply to civil ~~cases involving~~ actions arising from personal injury filed on or after November 1, ~~2011~~ 2015.

SECTION 2.  This act shall become effective November 1, 2015.

Passed the Senate the 18th day of May, 2015.

_____
Presiding Officer of the Senate

Passed the House of Representatives the 23rd day of April, 2015.

_____
Presiding Officer of the House
of Representatives

OFFICE OF THE GOVERNOR

Received by the Office of the Governor this _____19th_____

day of _____May_____, 20 15, at 10:30 o'clock A M.

By: _____Audrey Rockwell_____

Approved by the Governor of the State of Oklahoma this 20th

day of _____May_____, 20 15, at 1:31 o'clock P M.

_____
Governor of the State of Oklahoma

OFFICE OF THE SECRETARY OF STATE

Received by the Office of the Secretary of State this 20th

day of _____May_____, 20 15, at 2:46 o'clock P. M.

By: _____Chris Benge_____