```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE WESTERN DISTRICT OF OKLAHOMA

 3

 4   QUINDA BEESON,

 5        Plaintiff,

 6   vs.                            No. CIV-20-327-SLP

 7   SAFECO INSURANCE COMPANY OF
     AMERICA,
 8
          Defendant.
 9

10

11        VIDEOCONFERENCE DEPOSITION OF BARBARA MEYER
               Taken on Behalf of the Plaintiff
12        On February 11, 2021, beginning at 9:36 a.m.
               All Parties Appearing Via Zoom
13

14                      APPEARANCES:

15   Appearing on behalf of the PLAINTIFF

16             Jacob J. Rowe
               FULMER SILL
17             1101 North Broadway, Suite 102
               Oklahoma City, Oklahoma 73103
18             (405) 510-0077
               Jrowe@fulmersill.com
19
     Appearing on behalf of the DEFENDANT
20
               William W. O'Connor
21             HALL ESTILL
               320 South Boston Avenue, Suite 200
22             Tulsa, Oklahoma 74103-3706
               (918) 594-0588
23             Boconnor@hallestill.com

24

25   Reported By:  Becky C. Dame, CSR, RPR
```

Professional Reporters        EXHIBIT 2
800.376.1006
www.proreporters.com

1    the event of a covered loss?

2              MR. O'CONNOR:  Objection to form.

3              THE WITNESS:  True.

4    BY MR. ROWE:

5       Q    And the purpose of that financial security

6    is at some level to put them in the best place --

7    well, strike that.  That is not correct.

8              The purpose of that policy is to put the

9    insured in a position as close as it can be to where

10   they were before the loss happened; right?

11      A    True.

12      Q    And an insurance company must comply with

13   the law that applies to the insurance contract it

14   has with its insured?

15      A    True.

16             MR. O'CONNOR:  Objection to form.

17   BY MR. ROWE:

18      Q    And in order to do that, the insurance

19   company must know and understand the law that

20   applies; correct?

21      A    True.

22      Q    And the adjusters handling the claim have

23   to know and understand the law that applies;

24   correct?

25      A    True.

1    Q    And an insurance company is obligated to

2    provide training and resources to its adjusters to

3    ensure that they know and understand the law that

4    applies; correct?

5          MR. O'CONNOR:  Objection to form.

6          THE WITNESS:  As I said, there's not

7    necessarily a formal training, so I don't know

8    what -- how you're defining "training."

9    BY MR. ROWE:

10   Q    And, Ms. Meyer, my question was not about

11   Safeco here.  It was generally:  An insurance

12   company is obligated to properly train and educate

13   the claims adjusters it employs on the laws that

14   apply to the policies that they are adjusting?

15   A    I don't know what the requirements are for

16   the insurance company because I've only been an

17   adjuster within that company.

18   Q    Okay.  But is it your testimony today that

19   you don't know whether an insurance company should

20   properly train its adjusters on the law and the

21   jurisdictions in which it does business?

22         MR. O'CONNOR:  Objection.  Asked and

23   answered.

24   BY MR. ROWE:

25   Q    And you can answer, Ms. Meyer.

1    Q    An insurance company must perform a

2    reasonably thorough investigation of claims made by

3    its insured?

4    A    Yes.

5    Q    An insurance company must fairly evaluate

6    the facts gathered during its investigation?

7    A    Yes.

8    Q    An insurance company must promptly pay

9    benefits owed to its insureds?

10   A    Yes.

11   Q    When Safeco is handling an insurance

12   claim, the adjusters working on it ought to keep

13   contemporaneous notes of what they're doing?

14   A    Yes.

15   Q    And we talked about that earlier.  Those

16   notes are stored in a claim file; correct?

17   A    Correct.

18   Q    And all of the adjusters on Ms. Beeson's

19   claim would have had access to the claim notes like

20   you do?

21   A    Correct.

22   Q    And all of those adjusters would also have

23   been able to examine documents that were submitted

24   by Ms. Beeson or by an attorney that was

25   representing her; correct?

```
 1        A     Correct.

 2        Q     I'm going to share my screen with you,

 3   Ms. Meyer.

 4              MR. ROWE:   And, Bill, if you have a hard

 5   time seeing it, let me know.

 6              MR. O'CONNOR:   Okay.

 7   BY MR. ROWE:

 8        Q     Now, Ms. Meyer, it looks like you got

 9   involved in the Beeson underinsured motorist claim

10   on or about August 21st, 2018.  Does that sound

11   right to you?

12        A     Yes.

13        Q     And I'm showing you a document here.  This

14   is a claim note from -- it looks like -- it looks

15   like this might be Jung Wong.

16        A     Yes.

17        Q     And at the top of this claim note, which

18   bears Bates stamp Safeco 342, it says, "Created by

19   JUNWON."  That's a -- that's kind of a user ID that

20   Safeco has for people in its electronic claim

21   handling environment; true?

22        A     Yes.

23        Q     And that's the first three letters of

24   Mr. Wong's first name and the first three letters of

25   his last name?
```

1        A    Yes.

2        Q    And it also has a date stamp of August

3    21st, 2018, and a time stamp; right?

4        A    Yes.

5        Q    So when we're looking at these claim

6    notes, we will be able to determine who made the

7    note, when they made the note?

8        A    Yes.

9        Q    Excellent.

10            Now, this note on 342 indicates that there

11    was a complex triage and it says, "Complex triage to

12    BARMEY."  That's you; right?

13        A    That's me.

14        Q    The first three of your first and last

15    name.  And the text of the note reads, "Although CO

16    policy, insured now lives in Oklahoma.  OK loss and

17    OK attorney involved."

18            Is all that right?

19        A    Yes.

20        Q    And it looks like Mr. Wong brought this

21    claim to you because it had a pretty significant

22    connection in the state of Oklahoma; true?

23        A    True.

24        Q    And it looked like Oklahoma law was going

25    to apply to the underinsured motorist claim that was

1   presented; true?

2       A   Yes.

3       Q   And you have a framework and a frame of

4   reference that allows you to appropriately handle

5   Oklahoma underinsured motorist claims?

6       A   Yes.

7       Q   And you handled this claim with what you

8   believe compliance to be with Oklahoma law?

9       A   Yes.

10      Q   When you receive a new assignment for a

11  claim, one of the first things that Safeco expects

12  you to do is to review the insurance policy;

13  correct?

14      A   We're expected to review the claim file.

15      Q   Is the insurance policy usually included

16  in the claims file?

17      A   Not necessarily.

18      Q   Now, we discussed earlier that when

19  handling a claim, that Safeco has to be in

20  compliance with the insurance policy; correct?

21      A   Right.

22      Q   So when you are delivering the terms of

23  that policy, you've got to know what the policy

24  says?

25      A   Correct.  We are familiar with the

1  policies.

2      Q    Sure.  And I'm not trying to trick you,

3  Ms. Beeson -- I'm going to call you Ms. Beeson

4  several times, and I don't intend to.  And I'm not

5  trying to trick you, Ms. Meyer, but one of the

6  things that you need to do when you're handling a

7  claim is to take a look at the insurance policy;

8  right?

9      A    We do not necessarily look at the

10  insurance policy on every single claim.

11      Q    If you are handling a claim that involved

12  a coverage from a state outside of your zone, it

13  would be a wise idea to review the policy, though,

14  wouldn't it?

15      A    Yes.

16      Q    And this was a coverage issued outside of

17  your zone from the state of Colorado; right?

18      A    I don't recall this being a coverage

19  issue.  I'm not sure what you're, again, defining as

20  a "coverage issue."

21      Q    Well, I guess what I'm really wondering,

22  Ms. Meyer, is:  When you started handling

23  Ms. Beeson's claim, did you read the policy at

24  issue?

25      A    When I started handling the claim, her

1      Q    Because an underinsured motorist carrier

2   in Oklahoma from the time that they receive notice

3   of a claim has an obligation to begin investigating

4   the loss; correct?

5      A    Correct.

6      Q    They've got to investigate that loss

7   promptly?

8      A    Correct.

9      Q    And they have to pay it promptly when they

10  determine that benefits might be owed to an insured;

11  correct?

12     A    Correct.

13     Q    And the law in Oklahoma is that they have

14  to carry out those obligations regardless of the

15  actions of any applicable liability insurance

16  carrier; correct?

17          MR. O'CONNOR:  Objection to form.

18          THE WITNESS:  I'm not understanding

19  exactly what you're saying, but I interpret that to

20  be that we do our independent investigation.

21          Is that what you're asking me?

22  BY MR. ROWE:

23     Q    If that's language that you're more

24  comfortable with, Ms. Meyer, I can ask that question

25  using that language.

1    great memory -- that the accident underlying this

2    claim happened on May 12th, 2017; correct?

3        A    Yes.

4        Q    So this Loss Notice Report comes the day

5    after and includes some information that you need to

6    know when you're handling the claim.  The first is

7    the date of loss, which is May 12, 2017; true?

8        A    Yes.

9        Q    And it indicates that the claim was -- or

10   the loss was reported by Quinda Beeson, which is

11   Safeco's insured; correct?

12       A    Yes.

13       Q    That's going to be considered prompt

14   notice of the claim by Safeco's insured; correct?

15       A    Yes.

16       Q    Now, I'm going to go to -- for the

17   purposes of the record, this document consists of

18   two pages, 1648 and it carries over into 1649.  And

19   just to be clear, you've seen this and reviewed this

20   when you were handling the claim; correct?

21       A    Yes.

22       Q    The next document that I'm going to bring

23   us to consists of Bates stamps Safeco 1633 and 1634.

24   This is a document titled BI Initial Analysis, and

25   it bears a date of May 15, 2017.

1      Q    If we move down to page 144, we've got the

2  spreadsheet of damages.  Now, before we get to that,

3  and I just go down to give us some framework here,

4  there are no other general damages that are

5  attributed to the injuries caused by Mr. Salgado

6  outside of what's enumerated here in your Bodily

7  Injury Evaluation; correct?

8      A    Correct.

9      Q    The sum of these two provides a range of

10  48 to $60,000 that you believe are appropriate

11  recompense for the pain and suffering Ms. Beeson

12  received as a result of the crash; true?

13      A    Correct.

14      Q    Now, I want to look at the spreed sheet

15  with you just a little bit, and there are several

16  different sections.  The first section are Special

17  Damages, and as we discussed earlier, special

18  damages are medical bills, any future medical bills,

19  lost wages, future wage loss, and any other

20  documented hard expenses related to the injury;

21  true?

22      A    Right.

23      Q    Okay.  And you indicate here that

24  $63,393.13 were submitted, and only $28,754.13 were

25  accepted; correct?

1       A    Correct.

2       Q    And Safeco's position is that those

3    represent the amounts of medical liens that were

4    provided by Optum to Safeco?

5       A    That is correct.

6       Q    When we go to the General Damages portion,

7    this contains the range that we discussed earlier.

8    48,000 to $60,000?

9       A    Yes.

10      Q    And it's acceptable for you as an adjuster

11   handling an underinsured motorist claim in Oklahoma

12   to create a range of values that you think might be

13   appropriate to compensate an insured; right?

14      A    Right.  It's not an exact science, so we

15   try to, as best as we can, have a range.

16      Q    And it's never acceptable for Safeco to

17   pay its insured less than its own evaluation of a

18   claim; correct?

19      A    True.

20      Q    So the amounts of your evaluation here

21   indicate that the total value of Ms. Beeson's

22   damages associated with this crash range from

23   $76,754.13 to $88,754.13; correct?

24      A    Correct.

25      Q    And then, if we follow the spreadsheet

1          A     Yes.

2          Q     And this was an email sent by you on

3     October 3rd to Mr. Ventura.  I'm going to expand it

4     so maybe you can see it a little better.

5          A     Uh-huh.

6          Q     If you would, please read through that.

7     Let me know when you're finished.

8          A     Yes.

9          Q     This is an email that memorializes a

10    conversation that you had with Mr. Ventura after you

11    completed Safeco's evaluation; correct?

12         A     Correct.

13         Q     And during that conversation, you offered

14    to settle Ms. Beeson's underinsured motorist claim

15    in the amount of $25,000; correct?

16         A     Correct.

17         Q     And that is approximately $1,700 less than

18    the lowest amount of your evaluation; correct?

19         A     As noted on there, yes.

20         Q     When you say "as noted on there," where is

21    that noted?

22         A     On the evaluation form.

23         Q     Okay.  So we can agree that the offer that

24    you extended to Ms. Beeson was less than your

25    evaluated range?

1       A    No.  What I'm saying is that the $25,000

2  was offered to him; however, the amount of the

3  specials that are noted as accepted on the

4  evaluation form, if you go back to that, show 28,000

5  and some odd amount; however, what the offer

6  reflects is a reduction in the Optum lien that we

7  acquired from Optum.  There is -- Optum -- we had,

8  you know, wanted to confirm that their amount of the

9  lien that they submitted showing the $28,754.13 was

10  accurate and included all of the treatment related

11  to this accident.  What we learned was that the

12  Optum lien was actually less than the $28,754, but,

13  actually, was $25,461.64.

14           And on top of that, they were still

15  willing to yet reduce their amount to $22,500, so if

16  you look at the amount that is on that form and the

17  amount that actually would represent the total

18  amount paid for her treatment, which is the amount

19  as we established before that we use in our

20  evaluation is about $4,000 less than what is

21  reflected on that evaluation form.

22       **Q    I appreciate you telling me that,**

23  **Ms. Meyer, but I don't see that included in your**

24  **evaluation here.  It's not, is it?**

25       A    On that particular day that the evaluation

1    was written --

2        **Q    Yes, ma'am.**

3        A    -- it's based on the amount of the lien

4    submitted at $28,000, but that is not the final lien

5    amount.

6            So as I noted before, the evaluation form

7    is a living document, as we established before,

8    whereas, it is added to and subtracted from based on

9    new information acquired, and we acquired new

10   information that altered the amount of the accepted

11   specials in a lesser amount.

12       **Q    And I understand that, that is what you**

13   **would tell us today.**

14       A    No.  That's -- that's documented by the

15   letter from Optum lien outlining the amount that

16   they are accepting as payment in full of their lien,

17   so they reduced their lien amount.

18       **Q    And, Ms. Meyer --**

19       A    And we did not --

20       **Q    Ms. Meyer, Mr. O'Connor can ask you about**

21   **the communications that you or somebody else may**

22   **have had --**

23           MR. O'CONNOR:  Let her finish the answer

24   because you asked the question, so you can't ask the

25   question and then not let her finish because you

1   don't like it.

2          MR. ROWE:  Well, it's not that I don't

3   like it.

4          MR. O'CONNOR:  Let her finish.

5          MR. ROWE:  It's not that I don't like

6   it --

7          MR. O'CONNOR:  Well, let her finish.  Let

8   her finish.  Stop interrupting your questions.

9          MR. ROWE:  What's the question that I

10   asked that Ms. Meyer answered?

11          THE REPORTER:  I'm looking.  Hold on.

12          MR. ROWE:  Thank you.

13          (Reporter read back previous question)

14          MR. O'CONNOR:  Can she finish her response

15   now?

16          MR. ROWE:  I think that it's completely

17   nonresponsive, Bill, but Ms. Meyer --

18          MR. O'CONNOR:  Well, I understand you do,

19   but I don't, and I think it answers your question.

20          MR. ROWE:  I'll rephrase.

21          MR. O'CONNOR:  Well, I want her to finish

22   your question -- I mean, I'm sorry -- finish your

23   response -- because you interrupted her.

24   BY MR. ROWE:

25      **Q    Ms. Meyer, is $26,754.13 more than or less**

1    than $25,000?

2        A    It's arithmetic.  Okay?  26,000 is more

3    than 25,000.

4        Q    Okay.  Thank you.

5             I'd like to go through a few pages of the

6    claim file with you, if we could, and I'll share the

7    screen with you.  And I'm having a hard time getting

8    -- there we go.  The page number is up.

9             So the claim file that was produced,

10   Ms. Meyer, appears to go in sequential range from

11   most recent to oldest.  The evaluation that we have

12   been looking at is on page 139 and moves through

13   144.  If we move up, there is a claim note by RICCAM

14   on September 28th.  Do you know who RICCAM is?

15       A    No, I do not.

16       Q    There is a claim note created by LYNLUN.

17   Do you know who that is?

18       A    No, I do not.

19       Q    Next, we come to a letter by the name

20   McCall that appears to be on a medical payments

21   coverage.  You didn't have anything to do with that,

22   did you?

23       A    No.

24       Q    Next, we have the email that we looked at

25   just a moment ago on page 135 reflecting a

1    right?

2         A    Yes.  Yes.  Yes.

3         Q    It indicates that you discussed the Optum

4    lien and the billed versus paid amount?

5         A    Right.

6         Q    Correct?

7         A    Right.

8         Q    And noted that your evaluation would be

9    based on paid specials?

10        A    Right.

11        Q    And when you write that here, you mean the

12   amounts paid by Ms. Beeson's health insurance

13   company; correct?

14        A    As reflected in the Optum lien, yes.

15        Q    You also go on to write that you

16   understand that should the matter not be resolved

17   and go forward in litigation, that you would be

18   required to obtain affidavits from each provider;

19   correct?

20        A    Correct.

21        Q    Is it an option for you to not acquire

22   affidavits and just use the billed amounts?

23        A    As outlined on the statute that we read

24   before, the amount -- once a matter goes to trial,

25   in order for it to be admissible evidence, my

1  understanding or interpretation of that is that you

2  can either obtain affidavits or testimony from each

3  of the providers outlining what they accepted as

4  paid in full, or you also can use the amount of the

5  lien which also reflects the same information.  It

6  would also reflect what was accepted as paid in full

7  because it was all submitted to her health

8  insurance, so Optum lien is also, you know, the

9  amount that is being paid, as reflected in that

10 lien.

11         And as you go on and read the remainder

12 portion of the memorialization of our conversation,

13 Mr. Ventura states to us that he is going to be

14 reducing or negotiating that Optum lien, so we know

15 that the $28,754.13 is going to be less, reflecting,

16 then, the amount accepted as paid.  We know it's

17 going to be less than 28,754.

18         In fact, in the outline that he provided

19 to us back in September before this date, it was

20 $25,461, and it ended up being even less than that.

21    Q    My question, Ms. Meyer, was that, if you

22 wanted to, you could have just evaluated the special

23 damages at the amounts billed; correct?

24    A    No.  That's not the standard practice.

25    Q    That's not the standard practice at

1    **Safeco?**

2         A    That's not the standard practice for

3    Oklahoma as outlined in the statute that we just

4    read.

5         **Q    You go on in your note to indicate that**

6    **your evaluation shows a breakdown of the specials on**

7    **Quinda at $28,754.13; correct?**

8         A    Right.

9         **Q    Which is the same amount included in your**

10   **evaluation; correct?**

11        A    Correct.  Which was then the basis for the

12   final settlement range.

13        **Q    And on the day that you made this note and**

14   **had this call, your evaluation of Ms. Beeson's**

15   **damages -- or special damages -- was $28,754.13?**

16        A    No.  Actually, it was being based on the

17   outline being provided by Mr. Ventura, which was

18   $25,461.64.

19        **Q    But that's not the amount you included in**

20   **your evaluation, is it?**

21        A    That is ultimately the amount -- no.

22   Actually, the amount of the evaluation would be less

23   began Optum did agree to reduce their lien to

24   $22,500, so, in actuality, the $28,754.13 number

25   should be reduced to $22,500.