# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **QUINDA BEESON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-20-327-SLP** |
| | ) | |
| **SAFECO INSURANCE COMPANY** | ) | |
| **OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## RULE 26 EXPERT REPORT OF ANDREW C. JAYNE

### I.    Qualifications and Background

1.      I am a member of the Oklahoma Bar, and I am a member and manager of Baum Glass Jayne Carwile & Peters, PLLC, a law firm located in Tulsa, Oklahoma.  A copy of my CV is attached hereto as Exhibit "1".

2.      I have practiced in the area of insurance bad faith, coverage litigation, litigation involving allegations of breach of contract, and general claim-related litigation for my entire nineteen (19) years of practice. I have litigated insurance breach of contract and bad faith lawsuits in all Oklahoma Federal Courts and numerous State District Courts.

3.      The vast majority of my practice has always involved insurance.  I have represented numerous insurance carriers in coverage litigation, bad faith litigation, and breach of contract litigation. I have also represented numerous policyholders and insureds in coverage litigation, bad faith litigation, and breach of insurance contract litigation.

4.      I have also had the opportunity to handle numerous first and third party insurance claims, including UIM claims, on behalf of insurance carriers pre-suit. This involves investigating claims, taking examinations under oath, taking recorded statements, assisting with SIU investigations, preparing documentation that is part of the claim file, communicating with supervisors and managers within the insurance company regarding the claim, evaluating claims, and settling claims. I have been given authority by insurance carriers to settle and resolve claims during the claims process before a lawsuit has been filed or before there are even disputes between the insured and the insurance company.

5.      I am routinely involved in adjusting claims, including UIM claims, pre-suit for insurance carriers in the State of Oklahoma. I am in the course of adjusting several insurance claims during my review of the Beeson claim file and my preparation of this Rule 26 report.

6.      I have assisted insurance carriers in responding to complaints made by insureds to the Oklahoma Department of Insurance.

7.      I am a licensed insurance adjuster in the State of Oklahoma.

8.      I am General Counsel for Metro Insurance Agencies, LLC and Russell Companies, LLC, which own and operate numerous insurance agency branches in Oklahoma City and Tulsa, Oklahoma.  I assist the agencies in dealing with claim related matters, all of which have been pre-suit.

9.      I have been retained by numerous insureds or policy holders to represent them in claims, including UIM claims, pre-suit during the claims process. This involves communicating with the insurance adjuster, submitting documentation to the insurance carrier, and handling all aspects of the claim.  This process is identical to what a public adjuster does for an insured during the claims process.

10.      My practice and experience have focused on numerous different types of insurance, including, without limitation, uninsured/underinsured motorist insurance coverage, homeowners insurance, commercial general liability insurance, business risk insurance, professional negligence insurance, and other property, casualty, and commercial insurance matters.

11.      I have put on numerous training seminars for claims adjusters who handle uninsured/underinsured ("UIM") claims in the State of Oklahoma. These seminars include training on how to handle UIM claims consistent with the duty of good faith and fair dealing in the State of Oklahoma.

12.      Through my involvement with representing insurance carriers and insureds, I have had the opportunity to review the insurance policies and claim files of more than sixty (60) different insurance carriers.  In terms of total claim files, I have certainly reviewed hundreds during the course of my career.

13.      I have also had the opportunity to review policies and procedures, training manuals, and other similar materials for more than twenty-five (25) insurance carriers during the course of my career.

14.    I have had the opportunity on numerous occasions to counsel insurance carriers on proper training materials, policies, and procedures that need to be in place to handle claims consistent with the duty of good faith and fair dealing in the State of Oklahoma.

15.    Separate and apart from continuing legal education, I have attended more than a hundred hours of insurance adjuster seminars and training both as part of the continuing education required of an insurance adjuster and for other purposes.

16.    I have provided insurance adjusters with continuing education, including continuing education regarding how to handle UM/UIM claims and how to comply with the duty of good faith and fair dealing in the State of Oklahoma.  I was approved by the Oklahoma Insurance Department to provide this continuing education.

17.    I have provided testimony as an expert witness nine times regarding insurance industry practices and claims handling consistent with the duty of good faith and fair dealing. My testimonial history is contained at the conclusion of my CV, attached hereto as Exhibit "1".

18.    I have submitted Rule 26 Expert Reports as an expert in the area of insurance industry practices and procedures and claims handling consistent with the duty of good faith and fair dealing in the United States District Courts for the Western, Northern, and Eastern Districts.

19.    I have been qualified as an expert in the area of insurance industry practices and procedures and claims handling consistent with the duty of good faith and fair dealing after a *Daubert/Gray* challenge twice in the District Court in and for Oklahoma County and once in the District Court in and for Marshall County.

## II.    Case Specific Documents Reviewed and Relied Upon

1.    Claim File.

2.    The policy of insurance.

3.    Discovery Responses of both parties.

4.    Documents produced by Plaintiff.

5.    Depositions of Quinda Beeson and Barbara Meyer.

6.    Expert Report of Mort Welch.

7.      Expert Report of Diane Luther.

8.      Safeco's Motion of Summary Judgment.

9.      Safeco's Daubert Motion with respect to Mort Welch.

10.     Plaintiff's Daubert Motion with respect to Diane Luther.

11.     Plaintiff's Motion for Partial Summary Judgment.

12.     Safeco Claims Handling Guidelines.

13.     Documents produced by Farmers.

14.     The Complaint, Answer, and various other pleadings in the case.

## III.   <u>Summary of Facts Relied Upon</u>

On May 12, 2017, Quinda Beeson was rear-ended by Marcos Salgado.  The accident was caused by the negligence of Mr. Salgado.  The accident took place in Oklahoma City. Ms. Beeson was 59 years of age at the time accident.  Mr. Salgado was insured by Allstate.

When the accident occurred, Ms. Beeson was insured under a Safeco policy of automobile insurance.  The policy included $100,000.00 in UIM coverage.  The policy was originally issued to Ms. Beeson when she lived in Colorado.  However, she had moved to Oklahoma before the accident.  With respect to UIM coverage, Ms. Beeson's policy provides:

> We will pay damages which an insured is legally entitled to recover from the owner or operator of an:
>
> 1.      Uninsured motor vehicle; or
> 2.      Underinsured motor vehicle;
>
> Because of bodily injury:
>
> 1.      Sustained by that insured; and
> 2.       Caused by an accident.

The "legally entitled to recover" language in the Safeco policy is the same language found in 36 O.S. § 3636, Oklahoma's UIM statute.

Ms. Beeson provide Safeco notice of the accident on May 13, 2017.  She advised that her stomach, right arm, left arm, neck, and head were in pain and the right bumper of her car was damaged.

On May 15, 2017, a Safeco adjuster called Ms. Beeson to obtain a recorded statement.  Ms. Beeson did not answer, and the claim representative left a voicemail.  On the same day, the adjuster called Allstate and confirmed that Allstate accepted 100% liability for the accident.

On May 16, 2017, the Safeco adjuster spoke with Ms. Beeson to obtain facts relating to the accident.  During the call, the Safeco adjuster explained the claim process to Ms. Beeson, and Ms. Beeson indicated she was going to seek compensation for the damage to her car and her injuries from Allstate.  Ms. Beeson advised that she had gone to the emergency room after the accident, but did not have a follow-up appointment with her primary care physician scheduled.

On May 17, 2017, "Tammy" from Carr & Carr called Safeco about Ms. Beeson on behalf of attorney Thomas Ventura.  Mr. Ventura was with the law firm of Carr & Carr.  Later that day, Mr. Ventura sent Safeco a letter of representation.  The letter noted that there "may be inadequate liability coverage" for the at-fault driver and that Ms. Beeson "may seek payment" under her UIM coverage.

The next day, May 18, 2017, Safeco sent Carr & Carr a letter requesting, among other things, a recorded statement of Ms. Beeson, paid vs. incurred bills, medical records, wage loss documentation, a medical and wage loss authorization, and the police report.  On the same date, Safeco's property adjuster contacted Ms. Beeson and advised he had inspected the vehicle, which was at the tow yard.  The property adjuster advised Ms. Beeson that the repair estimate was $3,802.51.  Ms. Beeson told Safeco to hold off on payment for the property damage, as she had not yet decided whether to go through Allstate or Safeco for the property damage.

The pictures of Ms. Beeson's vehicle show mild damage to the rear of her vehicle.  The pictures are attached hereto as Exhibit "2".

During this period of time, Safeco began communicating with Allstate to try to find out Mr. Salgado's liability limits.  On May 25, 2017, Safeco again contacted Carr & Carr about obtaining the recorded statement of Ms. Beeson.  The claim file reflects that Safeco spoke with a "Tiffany" at Carr & Carr who advised that the "only reason they opened [a] UIM claim is because they always do for every accident."

Safeco continued to contact Allstate in an attempt to get Mr. Salgado's liability limits.  On June 28, 2017, the Allstate adjuster assigned to Ms. Beeson's liability claim told Safeco that Allstate could not disclose Mr. Salgado's liability limits.

On August 10, 2017, Carr & Carr sent a letter to Safeco enclosing Ms. Beeson's medical bills and records to date relating to the accident. The medical bills totaled $8,507.57, and Carr & Carr requested payment under Ms. Beeson's med pay coverage. Safeco issued payment for med pay limits of $5,000.00 on September 18, 2017. Ten days later, on September 28, 2017, Safeco contacted Allstate again to see if Ms. Beeson had made a demand.

On December 19, 2017, Safeco called Carr & Carr to inquire about the status of Ms. Beeson's treatment and claim. There was no one available to speak to the Safeco adjuster, so the call was transferred to voicemail. On February 15, 2018, Safeco left another voicemail about the status of Ms. Beeson's UIM demand.

Thereafter, on February 23, 2018, Carr & Carr sent a letter to Safeco enclosing Mr. Beeson's medical bills totaling $63,393.13. The letter asked Safeco to evaluate and pay UIM limits of $100,000.00 pursuant to *Burch v. Allstate*. Approximately two weeks later, Carr & Carr sent another letter enclosing a few additional bills which were not included in the original demand.

Upon receipt of the UIM demand, on March 19, 2018, Safeco again contacted Allstate about either obtaining liability limits or the status of liability claim. Safeco again was not able to reach an adjuster at Allstate and had to leave a voicemail. Safeco also contacted Carr & Carr and confirmed that they had not been able to get Allstate to disclose liability limits. Carr & Carr confirmed that they had submitted a demand to Allstate, and anticipated having a response in 2-4 weeks. Safeco asked Carr & Carr to please advise Safeco if they became aware of Allstate's limits. Finally, on the same day Safeco decided to conduct an Independent Medical Review ("IMR") to confirm, among other things, that Ms. Beeson's surgery for a right rotator cuff tear was related to the accident. Safeco put a "rush" on the IMR.

Several days later, on March 23, 2018, Safeco made contact with the Allstate adjuster assigned to Ms. Beeson's claim. Again, Allstate would not disclose its liability limits. However, the Allstate adjuster did note that Allstate had some causation concerns about whether the right shoulder surgery was related to the accident.

Safeco utilized Dr. Dennis Foster for the IMR. On March 29, 2018, Safeco contacted Dr. Foster regarding his findings. Dr. Foster noted that the MRI of Ms. Beeson's neck showed multiple degenerative issues. With regard to the right shoulder, Dr. Foster advised that there is a questionable injury mechanism, but he could not definitively say that the accident did not aid in the tearing of the rotator cuff without seeing Ms. Beeson's prior

records.  Dr. Foster advised that he would be willing to supplement his report if he received Ms. Beeson's prior records.

On March 29, 2018, the assigned Safeco adjuster triaged the claim with his managers.  They agreed that they could not complete an evaluation without the underlying liability limits.  They also determined they should obtain Ms. Beeson's prior medical records to further investigate a causation issue with respect to the right shoulder surgery.

On the same day, Safeco contacted Carr & Carr to discuss the status of the UIM claim.  Safeco spoke with Carrie Harris.  Safeco advised Ms. Harris that they needed Allstate's limits and prior medical records to complete the evaluation.  Ms. Harris indicated she understood.  On the same day, Safeco sent a letter to Carr & Carr confirming that they needed Allstate's limits and prior medical records to complete the UIM evaluation.

On June 22, 2018, Carr & Carr sent Safeco a letter which purported to contain all of Ms. Beeson's prior medical records.  On July 2, 2018, Safeco sent a letter to Carr & Carr advising that it still needed Allstate's liability limits to complete the UIM evaluation.

On July 31, 2018, Carr & Carr sent Safeco an email advising that Allstate had offered Mr. Salgado's policy limits of $50,000.00 to resolve the liability claim.  Safeco waived subrogation so Ms. Beeson could accept liability limits.

On August 20, 2018, a Safeco adjuster spoke with Ms. Beeson's counsel at Carr & Carr.  Counsel advised that the main injury in the claim was the right shoulder.  He acknowledged that Ms. Beeson had been in a prior car accident with "noted shoulder complaints", but she did not have surgery at that time.  Counsel confirmed that Ms. Beeson was not pursuing a lost income claim.

Thereafter, on August 22, 2018, the claim was transferred to Safeco adjuster Barbara Meyer.  Ms. Meyer began by contacting Optum, the third-party United Healthcare used to recover subrogation for health insurance payments made on behalf of Ms. Beeson.  Ms. Meyer was trying to determine the amount of United Healthcare's subrogation interest which would be the amount that was actually paid by United Healthcare.

Two days later, on August 24, 2018, Ms. Meyer contacted Carr & Carr to discuss her evaluation.  Ms. Meyer spoke with Carrie.  During the call, the two walked through the medical bills and reviewed the "billed vs. paid specials" to make sure everything was included in the evaluation.  The two discovered that there were some unpaid balances that needed to be addressed.  Carrie stated she would provide additional information regarding those unpaid balances so they could revisit the evaluation.

On September 4, 2018, Carr and Carr emailed Ms. Meyer, stating as follows:

> We have attached a copy of an itemization of Ms. Beeson's and
> Ms. Briley's medical expenses and subrogation interests.  It is
> our position that it is not appropriate for a first party carrier to
> hold the "paid vs. incurred" statute against their insured unless
> you have complied with 12 O.S. § 3009.1.  The statute requires
> you obtain signed statements from the medical provider that
> the provider will accept the amount paid as full payment of the
> obligations.  I look forward to receiving your offer for the
> underinsured motorist claim shortly.

Between September 7, 2018 and September 26, 2019 Ms. Meyer and Carr & Carr exchanged numerous voicemails.  However, they never connected on a call.  On September 28, 2019, Ms. Meyer completed her full evaluation of the claim.  At this time, Ms. Beeson's incurred medical bills totaled $63,393.13.  However, Ms. Meyer's total for medical bills paid by United Healthcare was $28,754.13.  Ms. Meyer calculated general damages in the range of $48,000.00 to $60,000.00.  The evaluation notes the shoulder surgery and contusion appear to be an aggravation of a prior condition.  After accounting for Allstate's payment of $50,000.00, Ms. Meyer's evaluation range was $26,754.13 - $38,754.13.

On the same day, Ms. Meyer contacted Ms. Beeson's counsel at Carr & Carr to discuss the evaluation.  The claim file reflects that Ms. Meyer explained there were paid medical specials of $28,754.13 and Allstate had paid $50,000.00.  Thus, Ms. Meyer made an opening offer of $25,000.00.  Counsel indicated he would speak to his client about the office.  On October 3, 2018, Ms. Meyer sent an email to counsel confirming the opening offer.  Thereafter, counsel sent an email to Ms. Meyer indicating she should hold off issuing the check while he was negotiating the lien with Optum.

On October 30, 2018, Ms. Beeson's counsel sent Ms. Meyer an email transmitting a letter from Optum stating they were willing to accept $22,500.00 in full satisfaction of the lien.  He also provided confirmation that Optum had already been paid $15,000.00 from the Allstate settlement.  Counsel asked Ms. Meyer to issue a check for $7,500.00 to Optum and another check for $17,500.00 to Ms. Beeson and Carr & Carr.   Ms. Meyer issued the check requests the same day.

On November 6, 2018, in a phone call, counsel for Ms. Beeson advised that Ms. Beeson was not accepting the $25,000.00 UIM payment as a full and final settlement of her UIM claim; rather it was accepted as an unconditional undisputed payment.  Counsel

advised that Ms. Beeson was continuing to experience calcification in her right breast and was seeking medical treatment every six months. Counsel stated he would provide additional medical records to document this issue. Counsel also raised the issue of Safeco considering the amount paid by United Healthcare, rather than the amount originally billed by the healthcare providers, and that Oklahoma law required Safeco to consider the amount billed as part of its evaluation. Counsel stated that the Oklahoma court's ruling in 2017 did not allow Safeco to only consider amounts paid by the health insurance company. The claim file does not reflect any mention of Colorado law by counsel for Ms. Beeson.

On the same day, Ms. Meyer sent an email to counsel for Ms. Beeson confirming he would provide additional medical records regarding the breast calcification and asking for the referenced 2017 Oklahoma court decision.

After receiving nothing from counsel for Ms. Beeson, on June 14, 2019, Ms. Meyer called counsel to follow up. While counsel for Ms. Beeson was not in the office, Ms. Meyer advised that she was calling to follow up on the supplemental medical records.

On September 10, 2019, counsel for Ms. Beeson sent Ms. Meyer a letter arguing why Oklahoma law did not permit Safeco to consider only medical bills actually paid by the health insurance company in an UIM evaluation. The arguments in the letter are based on the interpretation of 12 O.S. § 3009.1 and the Oklahoma Supreme Court's opinion in *Lee v. Bueno*. Again, the letter does not reference application of Colorado law or that there were any out-of-pocket medical expenses that were not considered by Safeco.

On September 18, 2019, Ms. Meyer called counsel for Ms. Beeson to discuss the September 10th letter. She had to leave a voicemail. On September 27, 2019, Ms. Meyer called again and spoke to counsel. She reiterated her belief that it was appropriate to only consider what the health insurance company actually paid for the medical treatment. Counsel did not indicate there was any out of pocket medical that was not considered or that there was any medical providers that was seeking additional payments. There is nothing in the claim file indicating counsel raised the issue of Colorado law, or that counsel raised the issue of United Healthcare not having a valid subrogation claim. The claim file does not reflect that counsel ever made an offer less than policy limits of $100,000.00. The call concluded with counsel for Ms. Beeson stating he would speak with his client about whether she wanted to file a lawsuit or accept a nominal additional sum in full.

Two days after Christmas in 2019, Ms. Meyer sent a follow-up email to counsel for Ms. Beeson. She received no response. On February 24, 2020, Ms. Beeson filed the instant lawsuit.

**IV.**   <u>**Scope of Opinions**</u>

At the outset, it is important to address the scope of the opinions set forth herein. The opinions addressed below all relate to the insurance industry standards for proper UIM claims handling in Oklahoma consistent with the duty of good faith and fair dealing. Because insurance is a highly regulated field, and UIM coverage in particular is a complicated creature of statue with Oklahoma appellate court cases which further define its parameters, it is necessary to understand Oklahoma law in order to understand the industry standards for proper UIM claims handling consistent with the duty of good faith and fair dealing.  While the opinions expressed herein which all go toward the industry standards for proper UIM claims handling may on occasion necessarily touch on Oklahoma insurance law, the undersigned does not intend on giving legal opinions which are exclusively within the province of the court.

**V.**   <u>**Opinions**</u>

**1.**   **Safeco Timely Investigated and Evaluated Ms. Beeson's UIM Claim**

The industry standard for proper UIM claims handling does require timely investigation and evaluation of a UIM claim.  This industry standard is established by Oklahoma case law, insurance industry treatises such as Couch on Insurance, Appleman's on Insurance, and some of the industry materials referenced by Mort Welch in his report. However, timely investigation and evaluation is fact-specific based on the particulars of a specific claim.  Based on the facts of this case, Safeco timely investigated and evaluated Ms. Beeson's UIM claim.

Ms. Beeson first gave Safeco notice of the accident and a potential claim on May 13, 2017, the day after the accident.  The claim file reflects proper communication with Ms. Beeson to advise her of her options to pursue a claim with the insurance carrier for the at-fault driver and the availability of UIM coverage.  It is common in the industry for individuals like Ms. Beeson who have been injured in a car accident to initially be working with both her own UIM carrier and the carrier for the at-fault driver.  At the early stages of a claim, it is not uncommon for neither the UIM carrier nor the insured to know whether there is going to be a UIM claim because they do not fully understand the extent of the injuries and they do not know the liability limits of the at-fault driver.  In this case, because the accident was a low impact rear end accident and Allstate's liability limits were not known, there was no way to know shortly after the accident whether there would be a UIM claim.

The industry standard for settling or resolving a UIM claim is to wait until the UIM insured is finished treating, reached medical improvement, or reached a point where resolution of the UIM claim makes sense. Sometimes, it is difficult to determine when this point is reached. It was not in this case. Early on in the claim, Ms. Beeson obtained legal counsel with Carr & Carr to help her with the various insurance claims that would arise out of the car wreck. Safeco properly communicated with Carr & Carr, and in May of 2017 there are a comments made in the claim file indicating that Carr & Carr acknowledges that it is unclear whether there will ultimately be a UIM claim presented. Safeco sent correspondence to Carr & Carr asking for an authorization, a recorded statement, medical records and bills, and other information in support of the UIM claim in May of 2017. Carr & Carr never provided a medical authorization or presented Ms. Beeson for a recorded statement. However, on February 23, 2018, Carr & Carr provided Safeco with Ms. Beeson's medical records and bills associated with the accident and made a UIM demand for policy limits.

Without an authorization, there was not much Safeco could do to investigate the claim before receiving medical records and bills from Carr & Carr. There was no liability investigation needed because it was clear that Mr. Salgado was at fault. Safeco did go to great efforts to obtain Allstate's liability limits both before and after receiving the bills and records on February 23, 2018. The claim file reflects numerous calls to Allstate requesting disclosure of liability limits. Unfortunately, it is very common in the insurance industry for third party carries such as Allstate to refuse to disclose policy limits. I have frequently counselled third-party adjusters not to refuse to disclose liability limits to the UIM carrier, and I have fielded numerous phone calls from frustrated UIM adjusters who cannot get the third-party liability adjuster to disclose limits. It is an unfortunate situation that happens a lot, and it makes a UIM claim virtually impossible to evaluate. I have encountered several cases where a plaintiff's lawyer has sued the at-fault driver just to get the liability limits so the UIM claim could be evaluated. In this case, Safeco appropriately continued to try to get the liability limits from Allstate and also kept counsel for Ms. Beeson informed of Safeco's efforts.

After the bills and records were provided, Safeco properly continued its attempts to get Allstate to disclose its limits and also obtained a records review from Dr. Foster. A records review in this case was appropriate given Ms. Beeson's age, the medical records relating to the accident, and the fact the accident was a low speed minor impact accident. As reflected in numerous insurance industry treatises and claims manuals for numerous carriers, a records review is a commonly utilized claims investigative tool.

Ultimately, the issue of Allstate's liability limits was resolved by Allstate offering its limits of $50,000.00 and Safeco receiving notice of the same on July 31, 2018.

Thereafter, Ms. Meyer worked to determine the amount of paid vs. billed medical bills and spoke with Carr & Carr on August 24, 2018 about her evaluation.  During this discussion, it appears there was some questions about the total amount of medical paid by United Healthcare, but on September 28, 2018, Ms. Meyer completed her evaluation.  On October 30, 2018, Safeco made an undisputed payment of $25,000.00 on the UIM claim.

While ideally UIM claims are resolved quicker, there were numerous factors outside of Safeco's control which impacted the timeframe upon which Safeco made the undisputed payment in this case.   All of these factors are not uncommon in the insurance industry. First, Allstate would not disclose its limits.  Second, Carr & Carr elected not to give Safeco a medical authorization which forced Safeco to wait for a demand packet to get the medical records and bills and determine whether it was necessary to obtain prior records.  Finally, on multiple occasions Safeco contacted Carr & Carr seeking information and either did not get a return call or the return call was delayed.  Given the facts and circumstances of this particular claim, the timeliness of Safeco's investigation of Ms. Beeson's claim was well within industry standards for good faith UIM claims handling.

### 2.      The Value Range Safeco Placed on Ms. Beeson's General Damages was Within Industry Standards for a Proper UIM Claim Evaluation

The industry standard for a proper UIM claim evaluation requires that the evaluation be fair and reasonable under the circumstances.   Again, this standard comes from Oklahoma case law, insurance treatises, claims handling manuals and guidelines from numerous insurance carriers, and general practices of insurance carriers in Oklahoma.  In this case, Safeco considered $28,754.13 in medical expenses which were paid by United Healthcare.  The appropriateness of considering this amount will be discussed below. However, based on this amount of medical, Safeco came up with a range of $48,000 to $60,000 in general damages.  General damages is the amount allocated to compensate Ms. Beeson for those damages other than special damages such as medical bills or lost wages. I have been called upon to value a claim, which includes placing a value on general damages, hundreds of times in my career.  I have done it pre-suit in the adjustment of a claim as well as post-suit as the attorney reviewing a claim.  Based on my education, training, and experience, the general damage range Safeco placed on Ms. Beeson's claim was reasonable and within industry standards for numerous reasons.

First of all, it was appropriate for Safeco to place a range on both the general damages and the overall value of a claim.  Evaluating a claim is an art, not a science.  It is unrealistic to think that someone can pinpoint the exact value of a claim.   The range of $48,000 to $60,000 for general damages in this case is a fair reflection of the injuries presented by Ms. Beeson.  When valuing a UIM claim, it is not uncommon for there to be

12

disagreements about the range of value of general damages. For instance, one person might look at the pictures from Ms. Beeson's accident and the minor damage to her vehicle impacts their thoughts on the value of the claim, while it might not have much impact on someone else. Likewise, the fact that Ms. Beeson is not making a lost wages claim might increase the value of the general damages for one adjuster, but decrease it for another. Finally, as Ms. Meyer pointed out in her deposition, some adjusters may place a slightly lower evaluation range on a claim that involves an exacerbation of a pre-existing condition, while others may actually give the claim a higher value. The point is, it is not a perfect science. In this case, the range Safeco put on the claim is not out of line with what I have seen adjusters and colleagues do in other similar claims over the last two decades.

Further, the fact that Ms. Meyer did not specifically note a value for future pain and suffering, future medical treatment, or permanent disability does not make the claim handling in this case fall below industry standards. It is not uncommon for carriers to not specifically break out the separate components of general damages. It should be noted that Ms. Beeson was represented during the course of this claim, and Safeco did request Ms. Beeson's recorded statement on multiple occasions. It has been my experience that if an attorney for the insured believes that his client has something unique about his or her medical condition that needs to be considered by a claims adjuster, the attorney will welcome or offer a recorded statement or interview. It did not happen in this case. Further, the medical records gave a fair description of Ms. Beeson's condition and the amount of the general damages range appears to encompass those items of future pain and suffering and permanent disability. While Carr & Carr mentioned the possibility of future medical treatment, they failed to ever produce any documents to support this claim. The range for general damages indicates consideration was given for the elements of future pain and suffering and consideration of any permanent disability.

Finally, it should be noted that Ms. Beeson's claim presented significant causation issues. Safeco investigated this issue with the use of an IMR, but ultimately determined not to discount the value of the claim based on pre-existing issues. This was based on the pre-existing medical records provided by Carr & Carr. As it turns out, there was significant additional information about Ms. Beeson's pre-existing condition that was not provided. Safeco's consideration of the full value of Ms. Beeson's claim without any reduction for issues of questionable causation is additional indicia of a reasonable and fair evaluation of Ms. Beeson's claim within the industry standards.

### 3. Safeco's Initial Offer of $25,000 was Reasonable In this Case

It is commonplace in the insurance industry for a carrier to initially offer the low end of the range of the value of the claim. Especially when an attorney is involved for an

insured, the claim process is a negotiation.  There is nothing wrong with starting the negotiating process by offering the low end of the evaluation.  In this case, Ms. Meyer began the negotiation by offering $25,000.00, which was near the low end of her evaluation.  In her deposition, Ms. Meyer tried to explain that there was some issue as to the exact amount of the medical bills paid by United Healthcare so she offered $25,000.00, rather than $26,754.13. Again, because the claims process is not an exact science, Ms. Meyer's initial offer was appropriate because of her willingness to continue negotiations with Carr & Carr.  However, Carr & Carr never came off of their policy limits demand in this matter so there was no real opportunity for a meaningful negotiation.  Further, as discussed below, Ms. Meyer kept the negotiation process open after paying the undisputed amount, and she was willing to consider additional medical provided by Carr & Carr. However, the additional medical was never provided.  Given the circumstances in this case, Ms. Meyer's initial offer of $25,000 and subsequent tender of the same was consistent with industry standards for proper UIM claims handling.

### 4.     Safeco's Handling of the Claim After Tender of the Undisputed Payment was Within Industry Standards

Safeco promptly tendered their initial offer of $25,000.00 at the request of Carr & Carr in the form of two checks, one made out to Optum and the other the Carr & Carr and Ms. Beeson.  Thereafter, Carr & Carr indicated there was additional medical Safeco needed to consider regarding calcification in Ms. Beeson's breast and the potential need for future medical care or treatment.  However, Carr & Carr never provided the information, and instead filed suit.  Safeco properly followed up to determine if there was additional information so the negotiation could continue.  Safeco's adjuster properly left the matter open for consideration of additional information which could have continued the negotiation process.  However, Ms. Beeson elected to file suit.

### 5.     Safeco Properly Considered the Amount of Medical Paid Rather than the Amount Billed

Ms. Beeson's counsel and Mort Welch are highly critical of Safeco's consideration of the amount that United Healthcare paid for Ms. Beeson's medical treatment, rather than the amount that was billed.  Safeco considered the amount that was paid by United Healthcare based on 12 O.S. § 3009.1 ("3009.1").  The consideration of the amount of medical bills paid by a health insurer rather than the amount billed in the UIM setting is an issue that has not been directly answered by the Oklahoma Supreme Court.  To my knowledge, it has only been addressed by one court in Oklahoma.  In the case of *Perry v. Safeco Ins. Co. of America*, Case No. 18-CV-539-TCK-FHM, 2020 WL 1180726 (N.D. Okla. Mar. 11, 2020), the Northern District of Oklahoma approved the use of 3009.1 in the

UIM setting. Further, given what a UIM claims adjuster is trying to accomplish in the claims process, it only makes sense to apply 3009.1 in the UIM setting.

When valuing a claim in the pre-litigation setting a UIM adjuster is striving to determine what the insured is legally entitled to recover if the car wreck case is tried. In so doing, there always has to be assumptions or reasoned guesses. Since the initial passage of 3009.1 and its approval by the Oklahoma Supreme Court, a UIM adjuster must consider it in light of the obligation to try to determine what the insured would be legally entitled to recover. In so doing, if health insurance pays medical bills associated with an accident, the most likely outcome if the case is tried is that the amount of medical bills considered by the jury will be the amount paid by the health insurer, not the amount billed by the health care provider.

Counsel for Ms. Beeson and Mr. Welch raise the fact that Safeco did not get affidavits or testimony from the healthcare providers as required by the 3009.1 when the matter is in litigation. As Mr. Welch knows, there is no mechanism to get those affidavits during the claims process. Those affidavits are obtained through the use of subpoenas in the litigation process. The purpose of the affidavits is to make sure that the injured party has no financial obligation to the health care provider over and above what the health insurer paid. Because the UIM insurer does not have subpoena power during the claims process, they must do the best they can to make sure that the insured does not have any financial responsibility for medical expenses over and above what health insurance paid. This issue is in large part handled by the fact that in-network contracts between health insurance companies and medical providers typically provide that other than co-pays and deductibles the patient will not be responsible for any additional sums. In this case, Ms. Meyer went to additional efforts to make sure that Ms. Beeson was not going to be responsible for any medical bills over and above her considered amount during her discussions with Carr & Carr. Further, Ms. Beeson testified she has no outstanding obligations for any medical bills associated with the accident.

The likely result if a car wreck case is tried is that the attorney for the defendant will get the affidavits or testimony required under 3009.1 through the subpoena process, and the amount of medical presented to the jury will be the amount the health insurer paid, not the amount billed by the provider. In fact, it takes an odd situation or a mistake by the defense attorney for that not to be the case. Thus, when an UIM adjuster is trying to determine what the likely outcome would be if the case were tried, it has to be that only the amount paid by the health insurer would be considered by the jury.

Additionally, it does not make sense that a UIM claim is worth more in the claims setting than it is in litigation. That is, it would not make sense for a claim to be worth more

pre-suit because of an insurer's inability to obtain testimony or an affidavit from the medical provider than it is post-suit when a defense attorney has the subpoena power needed to obtain the testimony or affidavits referenced in 3009.1. If it were the case that a claim lost value when it went into litigation because of the affidavit requirement, that would seem to incentivize an insurance carrier to push claims into litigation so the value of the claim would go down after affidavits were obtainable.

Finally, Mr. Welch makes an argument that *Lee v. Bueno* only addresses the prior version of 3009.1. That is a legal issue for courts to decide. While I personally believe that the reasoning in *Lee v. Bueno* is equally applicable to the current version of 3009.1, that is nuanced legal opinion that is frankly irrelevant to the issue of whether Safeco properly adjusted Ms. Beeson's claim. Whether this court finds the application of 3009.1 in the UIM setting right or wrong, given the current state of the law and what UIM adjusters should try to do when properly adjusting claims, Safeco's consideration of only amounts paid by the health insurer rather than amounts billed by the providers in this case was within the industry standard for proper UIM claims handling.

### 6.     The Issue of Whether Colorado Law Applies is a Matter for the Court and Safeco's Application of Oklahoma Law During the Claims Process is Consistent with Good Faith UIM Claims Handling

The issue of whether Colorado or Oklahoma law applies in this case is again a complicated legal issue for the court. While the policy was delivered in Colorado, Ms. Beeson was a resident of Oklahoma at the time of the accident, the accident occurred in Oklahoma, the medical treatment took place in Oklahoma, and Ms. Beeson's counsel repeatedly referred to Oklahoma law in regard to the claim, including asking Safeco to evaluate the claim pursuant to *Burch v. Allstate*. *See, e.g.*, SAFECO 90-19, 120, 151, 948. There is frankly nothing about the claim that has anything to do with Colorado other than the fact the policy was written when Ms. Beeson lived in Colorado. Once again, that is a legal issue for the court. Whether the court finds that Oklahoma or Colorado law applies regarding interpretation of the insurance contract of application of 3009.1, it is still my opinion that Safeco's consideration of the claim under Oklahoma law was within industry standards for proper UIM claims handling in Oklahoma.

The claim file reflects that there was consideration of the issue and Safeco decided to apply Oklahoma claims handling principles because the accident happened in Oklahoma, Ms. Beeson lived in Oklahoma at the time of the accident, and Ms. Beeson's counsel was invoking Oklahoma law. That is certainly not an unreasonable decision. Ms. Beeson's counsel repeatedly referred to Oklahoma law in his communication with Safeco.

Carr & Carr referenced *Lee v. Bueno* and made an argument under Oklahoma law as to why 3009.1 should not apply.  Carr & Carr never once raised the issue of Colorado law. Again, whether the Court ultimately determines that Oklahoma or Colorado law applies, Safeco's application of Oklahoma law in this case was within industry standards for proper UIM claims handling.

### 7.      Safeco Properly Considered the Health Insurance Subrogation Interest

Mr. Welch also raises an issue as to whether United Healthcare has a subrogation interest that needed to be addressed.  While I agree that United Healthcare must have a contractual right to subrogation, there is absolutely no doubt that the industry standard is for UIM insurance carriers to honor subrogation claims such as the one made by Optum on behalf of United Healthcare absent the insured or the insured's counsel showing the UIM carrier that the health insurer does not have a valid subrogation interest.

First, in my almost twenty years of practice I have handled more than a hundred car accident and UIM claims both pre- and post-suit on behalf of insurance carriers and insureds or claimants.  I have never seen a case where the health insurance carrier did not have a valid subrogation claim.  Further, I have looked a numerous health insurance policies for carriers and for plaintiffs or potential plaintiffs.  I have never seen one that did not have a valid subrogation provision.  Our law firm has United Healthcare health insurance and our policy has a valid subrogation provision.  There is no evidence in this case that Ms. Beeson's United Healthcare insurance policy did not have a valid subrogation provision.  Further, Carr & Carr negotiated with Optum and paid United Healthcare's subrogation claim out of proceeds from both Allstate and Safeco.

I have attended subrogation training during continuing legal education and continuing education for adjusters that specifically advises attorneys and claims adjusters to honor subrogation claims of health insurance companies unless the insured/claimant or their attorneys can show it does not apply.  I have advised carriers in the same fashion.  I have occasionally seen attorneys for an insured/claimant somewhat question the validity of a health insurance subrogation interest, but I have never seen it successfully challenged. Without question, it is the industry standard that UIM insurance carriers will honor a health insurance subrogation claim such as the one in this case absent the insured or his/her attorney raising the issue and establishing that it should not be honored.  Carr & Carr never did that in this case.  They did the opposite, and Safeco's claims handing in this respect was squarely within industry standards.

**VI.**   **Prior Testimony**

See CV attached hereto as Exhibit "1".

**VII.**   **Publications**

See CV attached hereto as Exhibit "1".

**VIII.**   **Compensation**

My compensation is $300.00 per hour to review materials, prepare this report, or to testify at a deposition or at trial.

Signed this 7th day of January, 2022.

/s/ Andrew C. Jayne
Andrew C. Jayne

-

5129172.1:003439.00097

# EXHIBIT 1

**ANDREW C. JAYNE**
*Baum Glass Jayne Carwile & Peters, PLLC*
401 S. Boston, Suite 2000 – Tulsa, OK 74103

---

## PROFESSIONAL EXPERIENCE

**Atkinson, Haskins, Nellis, Brittingham, Gladd & Fiasco, P.C.,** Tulsa, OK (2002-2015)
    *Shareholder*

**Southwestern Payroll Service, Inc.,** Tulsa, OK (2007-2008)
    *Vice President of Human Resources*

**Savage Baum & Glass, PLLC,** Tulsa, OK (2015)
    *Of Counsel*

**Baum Glass & Jayne, PLLC,** Tulsa, OK (2016)
    *Member/Manager*

**Licensed Oklahoma Adjuster,** (2016)
    License No. 100277503

**Baum Glass Jayne & Carwile, PLLC** Tulsa, OK (2018)
    *Member/Manager*

**Metro Insurance Agencies, LLC and Russell Companies, LLC** (2019)
    *General Counsel*

**Baum Glass Jayne Carwile & Peters, PLLC**, Tulsa, OK (2019)
    *Member/Manager*

## EDUCATION

**UNIVERSITY OF OKLAHOMA COLLEGE OF LAW,** Norman, OK
    *Juris Doctor*, May 2002
-   Graduated Order of the Coif
-   Oklahoma Law Review, Chief Articles Editor
-   Published Oklahoma Law Review Article, Comment: "*Affirmative Action in the Public Sector: The Admissibility of Post-Enactment Evidence of Discrimination to Provide a Compelling Governmental Interest*" (2002)

**WESTMINSTER COLLEGE**, Fulton, MO
    *B.A. in History and Political Science*, May 1999

## ADMISSIONS

- All Oklahoma State Courts
- U.S. Court of Appeals, Tenth Circuit
- U.S. District Court for the Northern District of Oklahoma
- U.S. District Court for the Eastern District of Oklahoma
- U.S. District Court for the Western District of Oklahoma

## PUBLICATIONS

- Oklahoma Law Review: *"The Impact of Recent U.S. Supreme Court Punitive Damages Jurisprudence on Oklahoma's Punitive Damages Statute and Jury Instruction"* (2004)

- *'Fines or Penalties' Exclusions in Professional Liability Policies*, Oklahoma Bar Journal, Vol. 88, No. 27, October 21, 2017.

## PROFESSIONAL HONORS & AWARDS

- AV Preeminent Rating from Martindale Hubble
- Super Lawyers

## PROFESSIONAL ASSOCIATIONS & MEMBERSHIPS

- Oklahoma Bar Association
- Tulsa County Bar Association
- American Bar Association
- American Inns of Court, Council Oak/Johnson-Sontag Chapter

**TESTIMONIAL HISTORY**

*Ramsey v. Farmers Ins. Co.*, Oklahoma County State of Oklahoma, CJ-2013-962 (2016) (Retained by the Plaintiff)

*Thomas v. SAFECO*, Marshall County State of Oklahoma, CJ-2014-23 (2016)* (Retained by the Plaintiff)

*Odell v. Oklahoma Farm Bureau*, Oklahoma County State of Oklahoma, CJ-2014-635 (2017) (Retained by the Plaintiff)

*Dockum v. Metropolitan Property and Casualty Ins. Co.*, Oklahoma County State of Oklahoma, CJ-2015-3249 (2018)* (Retained by the Plaintiff)

*Strong v. CSAA Fire & Casualty, Inc. Co.*, Rogers County State of Oklahoma, CJ-2018-51 (2018) (Retained by the Defendant)

*Blakely v. State Farm*, Oklahoma County State of Oklahoma, CJ-2017-5373 (2019)* (Retained by the Plaintiff)

Ellis v. State Farm, United States District Court for the Eastern District of Oklahoma, 19-cv-273-RAW (Retained by the Plaintiff)

Huggins v. Casualty Corporation of America, Inc., Grady County State of Oklahoma, CJ-2018-89 (2021) (Retained by the Plaintiff)

Guyton v. Safeco, Tulsa County State of Oklahoma, CJ-2019-02763 (2021) (Retained by the Plaintiff)

*  Qualified to testify as an expert after a *Daubert* hearing

# EXHIBIT 2



**Left Front**

**Claim Reference Id:** 105873756039-201

**File Name:** PHOTO1

**File Date:** 05/18/2017

**Label:** Left Front

**Note:** Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|ClaimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceCompan

**Photo Location:**

**Photo Taken By:** JUSTIN MORTON

**Estimate Indicator:** E01

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001564



**rebar**

**Claim Reference Id:** 105873756039-201

**File Name:** PHOTO2

**File Date:** 05/18/2017

**Label:** rebar

**Note:** Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|ClaimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceCompan

**Photo Location:**

**Photo Taken By:** JUSTIN MORTON

**Estimate Indicator:** E01

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001565



**Left Rear**

**Claim Reference Id:** 105873756039-201

**File Name:** PHOTO3

**File Date:** 05/18/2017

**Label:** Left Rear

**Note:** Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|ClaimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceCompan

**Photo Location:**

**Photo Taken By:** JUSTIN MORTON

**Estimate Indicator:** E01

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER        SAFECO_001566



**inner tailgate**

**Claim Reference Id:** **105873756039-201**

**File Name:** **PHOTO4**

**File Date:** **05/18/2017**

**Label:** **inner tailgate**

**Note:** **Style:2011,BMW,X5 50i
AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|Cl
aimRepresentative:JOIE
JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceComp
an**

**Photo Location:**

**Photo Taken By:** **JUSTIN MORTON**

**Estimate Indicator:** **E01**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001567



lower centerscraped an

Claim Reference Id: **105873756039-201**

File Name: **PHOTO5**

File Date: **05/18/2017**

Label: **lower centerscraped and distorted**

Note: **Style:2011,BMW,X5 50i
AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|Cl
aimRepresentative:JOIE
JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceComp
an**

Photo Location:

Photo Taken By: **JUSTIN MORTON**

Estimate Indicator: **E01**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER       SAFECO_001568



**License Plate**

**Claim Reference Id:** 105873756039-201

**File Name:** PHOTO6

**File Date:** 05/18/2017

**Label:** License Plate

**Note:** Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|ClaimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceCompan

**Photo Location:**

**Photo Taken By:** JUSTIN MORTON

**Estimate Indicator:** E01

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001569



**IMG_4650**

**Claim Reference Id:** 105873756039-201

**File Name:** PHOTO7

**File Date:** 05/18/2017

**Label:** IMG_4650

**Note:** Style:2011,BMW,X5 50i
AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|Cl
aimRepresentative:JOIE
JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceComp
an

**Photo Location:**

**Photo Taken By:** JUSTIN MORTON

**Estimate Indicator:** E01

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER     SAFECO_001570



**rear body seam sealer**

Claim Reference Id: **105873756039-201**

File Name: **PHOTO8**

File Date: **05/18/2017**

Label: **rear body seam sealer**

Note: **Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|Cl aimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceComp an**

Photo Location:

Photo Taken By: **JUSTIN MORTON**

Estimate Indicator: **E01**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001571



**Interior**

Claim Reference Id: **105873756039-201**

File Name: **PHOTO9**

File Date: **05/18/2017**

Label: **Interior**

Note: **Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|ClaimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceCompan**

Photo Location:

Photo Taken By: **JUSTIN MORTON**

Estimate Indicator: **E01**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001572



IMG_4635

**Claim Reference Id:** 105873756039-201

**File Name:** PHOTO10

**File Date:** 05/18/2017

**Label:** IMG_4635

**Note:** Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|ClaimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceCompan

**Photo Location:**

**Photo Taken By:** JUSTIN MORTON

**Estimate Indicator:** E01

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER        SAFECO_001573



IMG_4655

Claim Reference Id: 105873756039-201

File Name: PHOTO11

File Date: 05/18/2017

Label: IMG_4655

Note: Style:2011,BMW,X5 50i
AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|Cl
aimRepresentative:JOIE
JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceComp
an

Photo Location:

Photo Taken By: JUSTIN MORTON

Estimate Indicator: E01

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001574



IMG_4657

**Claim Reference Id:** 105873756039-201

**File Name:** PHOTO12

**File Date:** 05/18/2017

**Label:** IMG_4657

**Note:** Style:2011,BMW,X5 50i
AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|Cl
aimRepresentative:JOIE
JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceComp
an

**Photo Location:**

**Photo Taken By:** JUSTIN MORTON

**Estimate Indicator:** E01

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001575



VIN

**Claim Reference Id:** 105873756039-201

**File Name:** PHOTO13

**File Date:** 05/18/2017

**Label:** VIN

**Note:** Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|ClaimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceCompan

**Photo Location:**

**Photo Taken By:** JUSTIN MORTON

**Estimate Indicator:** E01

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER            SAFECO_001576



**left lower cover**

**Claim Reference Id:** 105873756039-201

**File Name:** PHOTO14

**File Date:** 05/18/2017

**Label:** left lower cover

**Note:** Style:2011,BMW,X5 50i
AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|Cl
aimRepresentative:JOIE
JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceComp
an

**Photo Location:**

**Photo Taken By:** JUSTIN MORTON

**Estimate Indicator:** E01

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001577



IMG_4633

**Claim Reference Id:** 105873756039-201
**File Name:** PHOTO15
**File Date:** 05/18/2017
**Label:** IMG_4633
**Note:** Style:2011,BMW,X5 50i
AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|Cl
aimRepresentative:JOIE
JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceComp
an

**Photo Location:**
**Photo Taken By:** JUSTIN MORTON
**Estimate Indicator:** E01

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001578



**Right Front**

**Claim Reference Id:** 105873756039-201

**File Name:** PHOTO16

**File Date:** 05/18/2017

**Label:** Right Front

**Note:** Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|ClaimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceCompan

**Photo Location:**

**Photo Taken By:** JUSTIN MORTON

**Estimate Indicator:** E01

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER        SAFECO_001579



**inner tailgate**

Claim Reference Id: **105873756039-201**

File Name: **PHOTO17**

File Date: **05/18/2017**

Label: **inner tailgate**

Note: **Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|ClaimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceCompan**

Photo Location:

Photo Taken By: **JUSTIN MORTON**

Estimate Indicator: **E01**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER       SAFECO_001580



**rear body**

Claim Reference Id: **105873756039-201**

File Name: **PHOTO18**

File Date: **05/18/2017**

Label: **rear body**

Note: **Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|ClaimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceCompan**

Photo Location:

Photo Taken By: **JUSTIN MORTON**

Estimate Indicator: **E01**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001581



**exhaust has transfer**

Claim Reference Id: **105873756039-201**

File Name: **PHOTO19**

File Date: **05/18/2017**

Label: **exhaust has transfer**

Note: **Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|ClaimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceCompan**

Photo Location:

Photo Taken By: **JUSTIN MORTON**

Estimate Indicator: **E01**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001582



**Rear**

Claim Reference Id: **105873756039-201**

File Name: **PHOTO20**

File Date: **05/18/2017**

Label: **Rear**

Note: **Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|ClaimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceCompan**

Photo Location:

Photo Taken By: **JUSTIN MORTON**

Estimate Indicator: **E01**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER        SAFECO_001583



lower centerscraped an

Claim Reference Id: **105873756039-201**

File Name: **PHOTO21**

File Date: **05/18/2017**

Label: **lower centerscraped and distorted/t**

Note: **Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|ClaimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceCompan**

Photo Location:

Photo Taken By: **JUSTIN MORTON**

Estimate Indicator: **E01**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001584



IMG_4656

Claim Reference Id: 105873756039-201

File Name: PHOTO22

File Date: 05/18/2017

Label: IMG_4656

Note: Style:2011,BMW,X5 50i
AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|Cl
aimRepresentative:JOIE
JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceComp
an

Photo Location:

Photo Taken By: JUSTIN MORTON

Estimate Indicator: E01

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001585



IMG_4645

Claim Reference Id: 105873756039-201

File Name: PHOTO23

File Date: 05/18/2017

Label: IMG_4645

Note: Style:2011,BMW,X5 50i
AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|Cl
aimRepresentative:JOIE
JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceComp
an

Photo Location:

Photo Taken By: JUSTIN MORTON

Estimate Indicator: E01

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001586



IMG_4658

Claim Reference Id: 105873756039-201

File Name: PHOTO24

File Date: 05/18/2017

Label: IMG_4658

Note: Style:2011,BMW,X5 50i
AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|Cl
aimRepresentative:JOIE
JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceComp
an

Photo Location:

Photo Taken By: JUSTIN MORTON

Estimate Indicator: E01

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER        SAFECO_001587



IMG_4632

Claim Reference Id: **105873756039-201**

File Name: **PHOTO25**

File Date: **05/18/2017**

Label: **IMG_4632**

Note: **Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|ClaimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceCompan**

Photo Location:

Photo Taken By: **JUSTIN MORTON**

Estimate Indicator: **E01**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001588



**inner tailgate**

**Claim Reference Id:** 105873756039-201
**File Name:** PHOTO26
**File Date:** 05/18/2017
**Label:** inner tailgate
**Note:** Style:2011,BMW,X5 50i
AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|Cl
aimRepresentative:JOIE
JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceComp
an
**Photo Location:**
**Photo Taken By:** JUSTIN MORTON
**Estimate Indicator:** E01

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001589



**lower center**

**Claim Reference Id:** 105873756039-201

**File Name:** PHOTO27

**File Date:** 05/18/2017

**Label:** lower center

**Note:** Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|ClaimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceCompan

**Photo Location:**

**Photo Taken By:** JUSTIN MORTON

**Estimate Indicator:** E01

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER        SAFECO_001590



**IMG_4660**

Claim Reference Id: **105873756039-201**

File Name: **PHOTO28**

File Date: **05/18/2017**

Label: **IMG_4660**

Note: **Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|ClaimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceCompan**

Photo Location:

Photo Taken By: **JUSTIN MORTON**

Estimate Indicator: **E01**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001591



IMG_4638

Claim Reference Id: 105873756039-201

File Name: PHOTO29

File Date: 05/18/2017

Label: IMG_4638

Note: Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|ClaimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceCompan

Photo Location:

Photo Taken By: JUSTIN MORTON

Estimate Indicator: E01

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001592



**Odometer**

Claim Reference Id: **105873756039-201**

File Name: **PHOTO30**

File Date: **05/18/2017**

Label: **Odometer**

Note: **Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|ClaimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceCompan**

Photo Location:

Photo Taken By: **JUSTIN MORTON**

Estimate Indicator: **E01**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001593



**rear cover needs replaced**

| | |
|---|---|
| Claim Reference Id: | **105873756039-201** |
| File Name: | **PHOTO31** |
| File Date: | **05/18/2017** |
| Label: | **rear cover needs replaced** |
| Note: | **Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|ClaimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceCompan** |
| Photo Location: | |
| Photo Taken By: | **JUSTIN MORTON** |
| Estimate Indicator: | **E01** |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001594



**heat shield torn**

**Claim Reference Id:** 105873756039-201

**File Name:** PHOTO32

**File Date:** 05/18/2017

**Label:** heat shield torn

**Note:** Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|ClaimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceCompan

**Photo Location:**

**Photo Taken By:** JUSTIN MORTON

**Estimate Indicator:** E01

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001595



**bumper center support**

Claim Reference Id: **105873756039-201**

File Name: **PHOTO33**

File Date: **05/18/2017**

Label: **bumper center support**

Note: **Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|ClaimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceCompan**

Photo Location:

Photo Taken By: **JUSTIN MORTON**

Estimate Indicator: **E01**

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER       SAFECO_001596**



**IMG_4659**

Claim Reference Id: **105873756039-201**

File Name: **PHOTO34**

File Date: **05/18/2017**

Label: **IMG_4659**

Note: **Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|ClaimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceCompan**

Photo Location:

Photo Taken By: **JUSTIN MORTON**

Estimate Indicator: **E01**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER        SAFECO_001597



**Right Rear**

**Claim Reference Id:** 105873756039-201

**File Name:** PHOTO35

**File Date:** 05/18/2017

**Label:** Right Rear

**Note:** Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|ClaimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceCompan

**Photo Location:**

**Photo Taken By:** JUSTIN MORTON

**Estimate Indicator:** E01

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER        SAFECO_001598



**rear cover distorted s**

Claim Reference Id: **105873756039-201**

File Name: **PHOTO36**

File Date: **05/18/2017**

Label: **rear cover distorted scraped and go**

Note: **Style:2011,BMW,X5 50i AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|ClaimRepresentative:JOIE JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceCompan**

Photo Location:

Photo Taken By: **JUSTIN MORTON**

Estimate Indicator: **E01**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001599



**IMG_4634**

Claim Reference Id: **105873756039-201**

File Name: **PHOTO37**

File Date: **05/18/2017**

Label: **IMG_4634**

Note: **Style:2011,BMW,X5 50i
AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|Cl
aimRepresentative:JOIE
JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceComp
an**

Photo Location:

Photo Taken By: **JUSTIN MORTON**

Estimate Indicator: **E01**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001600



IMG_4637

Claim Reference Id: **105873756039-201**

File Name: **PHOTO38**

File Date: **05/18/2017**

Label: **IMG_4637**

Note: **Style:2011,BMW,X5 50i
AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|Cl
aimRepresentative:JOIE
JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceComp
an**

Photo Location:

Photo Taken By: **JUSTIN MORTON**

Estimate Indicator: **E01**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          SAFECO_001601



IMG_4661

**Claim Reference Id:** 105873756039-201

**File Name:** PHOTO39

**File Date:** 05/18/2017

**Label:** IMG_4661

**Note:** Style:2011,BMW,X5 50i
AWD|LossDate:05/12/2017|PolicyNumber:Z4806041|Cl
aimRepresentative:JOIE
JOLIVETTE|VIN:5UXZV8C54BL420651|InsuranceComp
an

**Photo Location:**

**Photo Taken By:** JUSTIN MORTON

**Estimate Indicator:** E01

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER        SAFECO_001602